Jason R.N. Monteleone, ISB#: 5441
JOHNSON & MONTELEONE, L.L.P.
350 N. 9th St., ste. 500
Boise, Idaho 83702
Telephone: (208) 331-2100
Facsimile: (208) 947-2424
*jason@treasurevalleylawyers.com*

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID M GRANT,<br><br>Plaintiff<br><br>v.<br><br>BENJAMIN KEY, in his official and individual capacities, CITY OF FRUITLAND, a political subdivision of the State of Idaho, FRUITLAND CITY POLICE DEPARTMENT, a department of the City of Fruitland, J.D. HUFF, in his individual and official capacity, CITY OF PAYETTE, a political subdivision of the State of Idaho, PAYETTE POLICE DEPARTMENT, a department of the City of Payette, BEN BRANHAM, in his individual and official capacity, DUANE HIGLEY, in his individual and official capacity, MARK CLARK, in his individual and official capacity, JOHN or JANE DOES #1-10, whose true identifies are presently unknown, and other Employees of the City of Fruitland, the City of Payette, or Payette County,<br><br>Defendants | Case No.<br><br>**COMPLAINT AND DEMAND FOR JURTY TRIAL** |

**COMPLAINT AND DEMAND FOR JURY TRIAL -- 1**

COMES NOW Plaintiff, David M. Grant, by and through his attorney of record, Jason R.N. Monteleone of Johnson & Monteleone, L.L.P., and herewith alleges, avers, claims, and states as follows as to causes of actions against Defendants:

## INTRODUCTORY STATEMENT

1. This is a civil rights action pursuant to 42 U.S.C. § 1983, filed by Plaintiff for violations of his right to be free from the use, by law enforcement officers, of the excessive use of lethal force, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and to be free from harm attributed to an unlawful conspiracy to conceal the use of excessive force.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over Plaintiff's claims of violations of his federal, constitutional rights pursuant to 28 U.S.C. §§1331 and 1343. This action is authorized and instituted pursuant to 42 U.S.C. §1983 and 42 U.S.C. §12132, *et seq.*

3. The actions complained of herein took place in Payette County, Idaho, which is within the jurisdiction of the United States District Court for the District of Idaho, in that one or more of Defendants reside(s) in Idaho and have sufficient minimum contacts with this District to warrant personal jurisdiction here, and Plaintiff's claims for relief arose in this District. Accordingly, personal jurisdiction and venue in this District are proper under 28 U.S.C. §1391.

## PARTIES

4. Plaintiff, DAVID GRANT (hereinafter "Grant"), is a person over the age of 18 who, at the time of the incidents described herein was a citizen of the state of Idaho and of the United States.

5. Defendant, BENJAMIN KEY (hereinafter "Key"), was at all times relevant hereto, acting under the color of state law as an employee and police officer of the Fruitland City Police Department. Defendant Key is sued in his individual and official capacities.

6. Defendant, CITY OF FRUITLAND (hereinafter "Fruitland"), is a political subdivision of the state of Idaho. As a local, governmental entity, Fruitland is a suable person under 42 U.S.C. §1983. At all times relevant to this Complaint, Fruitland employed Key through the Fruitland City Police Department and also several of the Doe Defendants. At all times relevant to this Complaint, Key and the Doe Defendants were acting pursuant to Fruitland's laws, customs, and/or policies. As the employer of Key and the Doe Defendants, Fruitland is vicariously liable for all of the tortious and unconstitutional acts and omissions of Key and the Doe Defendants, committed within the course and scope of their employment.

7. Defendant, FRUITLAND CITY POLICE DEPARTMENT (hereinafter "FPD"), is a department within Fruitland.

8. Defendant, J.D. HUFF (hereinafter "Chief Huff"), was, at the time of the relevant events, and now is the chief of the FPD. Defendant Huff is sued in his individual and official capacities.

9.      Defendant, BEN BRANHAM (hereinafter "Branham"), was at all times relevant hereto, acting under the color of state law as an employee and police officer of the Payette Police Department. Defendant Branham is sued in his individual and official capacities.

10.     Defendant DUANE HIGLEY, (hereinafter "Higley"), was at all times relevant hereto, acting under the color of state law as a reserve police officer of the Payette Police Department. Defendant Branham is sued in his individual and official capacities.

11.     Defendant, CITY OF PAYETTE (hereinafter "Payette"), is a political subdivision of the state of Idaho. As a local governmental entity, Payette is a suable person under 42 U.S.C. §1983. At all times relevant to this Complaint, Payette employed Branham and several of the Doe Defendants and employed, supported, and/or sponsored Higley through the Payette Police Department. At all times relevant to this Complaint, Branham, Higley, and the Doe Defendants were acting pursuant to Fruitland's laws, customs, and/or policies. As the employer of Branham, Higley and the Doe Defendants, Payette is vicariously liable for all of the tortious and unconstitutional acts and omissions of Branham, Higley, and the Doe Defendants, committed within the course and scope of their employment.

12.     Defendant, PAYETTE POLICE DEPARTMENT (hereinafter "PPD"), is a department within Payette.

13.     Defendant, MARK CLARK (hereinafter "Chief Clark"), was, at the time of the relevant events, and now is the chief of the PPD. Defendant Clark is sued in his individual and official capacities.

14.     Defendants, JOHN AND/OR JANE DOES #1-10 ("the Doe Defendants"), whose true identities are presently unknown, were at all times herein members of the law enforcement departments named herein and employed by Fruitland, Payette, or Payette

County.  At all material times, the Doe Defendants and Payette County were acting under the color of state law.  The Doe Defendants are each sued in their individual and official capacities.  Payette County is sued as an entity responsible as the employer of one or more of the Doe Defendants and/or for failing to properly train and supervise the conduct of the Defendants herein.   All Doe Defendants are sued as a result of their involvement in the circumstances set forth herein and will be identified and named as party-defendants herein, if necessary, as discovery is obtained.  Conversely, the Doe Defendants are individuals or entities, political, corporate, or otherwise, whose true identities are unknown at the present time, but who engaged in activities and conduct set forth herein.  Alternatively, John/Jane Does I through X are individuals or entities who are now, or at the material and operative times were, the agents, employees, independent contractors, subdivisions, franchisees, wholly-owned subsidiaries, or divisions of Defendants herein, or are individuals or entities acting on behalf of, or in concert with, the other Defendants named herein.

## FACTUAL BACKGROUND

15.   On October 24, 2016, while Grant, who has bipolar disorder, was in the throes of a manic episode, , when he initiated a trip from near Lewiston, Idaho, where he was living to Nampa, Idaho, where his friend, Pamela Johnson, lived.

16.   At approximately 11:30 p.m. on October 24, 2016, Grant was driving through the City of Payette and southbound on Highway-95, when his driving pattern brought him to the attention of Defendant Branham and caused Defendant Branham, accompanied by Defendant Higley, to attempt to execute a traffic stop on Grant.

17. Grant did not stop in response to Defendant Branham's actions and, as a result, Key became involved and deployed a "spike strip" in the vicinity of Centennial Mall in the City of Fruitland.

18. Grant struck the spike strip and, as a result, the two tires on the passenger side of his car were damaged and deflated, but, despite this damage, Grant did not stop and Branham and Higley continued to pursue Grant with lights flashing and siren blaring. This was not a high-speed chase or pursuit.

19. After Grant struck the spike strip, Key removed the strip from the street and got into his patrol car and joined the pursuit. Approximately 1.5 miles further south on Highway-95, Key overtook the vehicle driven by Branham and became "primary" in the pursuit of Grant, while Branham followed closely behind; Branham did not comply with his commanding officer's direction that he stay in the "primary" position instead of yielding it to Key.

20. The video image recorded by the dash camera in Key's vehicle failed to record the speed of the pursuit, but it demonstrated that Grant was maintaining his lane of travel, slowing down when in the vicinity of traffic, and using his turn signals appropriately. Based upon the timer visible in the video images, Key pursued Grant as the "primary" for approximately 170 seconds and they traveled about 2.6 miles in that time for an average speed of about 55 miles per hour.

21. As Grant approached the intersection of Interstate-84 with Highway-95, he became confused, as he was following the directions from the global positioning unit ("GPS") unit in his vehicle and, after signaling his intention to do so, he turned left onto the westbound exit ramp at Interchange 3 of Interstate-84 on the north side of that interstate road.

22. As Grant was signaling to turn left onto the exit ramp, both Grant's and Key's vehicles slowed down substantially, and then Key pulled to the left of Grant's vehicle in an apparent attempt to pull alongside of Grant's vehicle, but Grant slightly accelerated and was able to turn across Key's path. Their respective speeds were low enough that this maneuver did not pose any significant risk of injury or property damage for either of them.

23. Immediately upon starting to enter the exit ramp, Grant saw the one-way sign and realized his error. He applied his brakes and attempted a U-turn by moving to the south side of the ramp and turned back toward the north side of the ramp. He was only able to complete about 1/2 of the U-turn before his front left tire crossed the north-side fog line and he stopped momentarily.

24. As Grant came to a stop, Key pulled his vehicle forward until it his right, front bumper was nearly touching Grant's left, rear quarter panel and began to get out of his vehicle. Seconds before Key exited his vehicle, Grant begin to drive his vehicle back and forth and to steer his vehicle so that, over the course of three, back-and-forth maneuvers, Grant was faced back up the exit ramp in the correct direction.

25. A few seconds after Grant started to maneuver his vehicle around the front of Key's patrol vehicle, Key was out of his vehicle with his gun drawn and pointed at Grant. As Grant did this, Key begin yelling profanity-laced commands at Grant with obviously intense and threatening mannerisms and emotions? At about this same time, Branham parked his vehicle further to the east and got out with his weapon drawn and moved into a position east of and slightly north of Key, and Branham directed Higley toward the back of Grant's vehicle

26. The last time Grant stopped to shift from reverse to drive, Key stepped forward to the left side of Grant's vehicle in an effort to open the door but at all other times he was clearly not at risk of any contact with Grant's vehicle, because it was turning around the front end of the patrol vehicle which intervened in Key's position.

27. As Key let go of the door handle and reached out to touch the base of the driver's side window, Grant began to roll slowly forward toward the east along the guardrail and past Key. As he begin to roll away, Key fired four to five rounds into the driver-side window and/or rear window of Grant's vehicle from a distance of between 5 to 8 feet.

28. The shots that were fired caused life-threatening and debilitating injuries such that it is doubtful Grant was thereafter in complete control of his vehicle, which accelerated slightly and followed the guard rail around to the north and traveled a short distance, before it went off of the road and came to a stop along the median and/or against the guardrail.

29. The use of a firearm constitutes the use of lethal force and, pursuant to the established policy of Fruitland and/or FPD, is clearly and strictly prohibited, when used to fire at a moving vehicle. Even without this written policy, properly-trained officers would not, except in the most exigent of circumstances, employ a firearm to alter the behavior of the driver of a moving car, especially when other officers or members of the public may be nearby. Shooting a driver does not mean the car will stop and is, in fact, more likely to lead to out-of-control, unpredictable driving and/or loss of control of the vehicle. In addition, when bullets hit automobile glass, they often change direction and consequently pose a threat of injury for nearby officers or civilians.

30. The circumstances confronting Key were not and could not have been perceived by an adequately trained and reasonable officer as exigent and warranting the use of lethal

force, because, among other things, the crime of eluding is not one which typically justifies the use of lethal force, Grant's driving pattern after his tires had been spiked and for the approximately three minutes he was being followed by Key was relatively normal and certainly not inherently dangerous, the traffic he would be driving in was very light, his tires had been spiked and would soon shred leaving him driving on metal rims which leads to the car being disabled, stopping, or being susceptible to being pushed off the road or trapped by a Pursuit Intervention Technique ("PIT") maneuver, Key was not himself in danger, as he could and did easily avoid getting in position to be injured, Key did not have a clear idea of where Branham was located and could not therefore assess the risk that shooting would have posed to Branham, Branham was not in harm's way or other danger at the time of the shooting, and there were several, other officers en route to the scene at the time Key fired on Grant.

31. As a direct result of the conduct of Defendants, Grant has suffered grave physical injuries requiring extensive and expensive medical care for the treatment of those injuries and to provide him with daily care and assistance with performing the activities of daily living for the rest of his life necessitated by the quadriplegia resulting from damage to his spinal cord caused by one or more of the bullets fired by Key. The cost of this medical care, both past and future, will be proven at the time of trial but substantially exceeds $250,000.00 and will continue to accrue on a daily basis for the rest of Grant's life, as his quradriplegia caused by the firing is permanent.

32. As a direct result of the conduct of Defendants, Grant has suffered grave, emotional injury, pain, and suffering. His ability to enjoy life has been impaired by these physical and emotional injuries, his physical pain and the overwhelming limitations upon his ability

to function as a result of the quadriplegia resulting from damage to his spinal cord caused by one or more of the bullets fired by Key. The appropriate compensation for these circumstances will be proven at the time of trial.

33. As a direct result of the conduct of Defendants, Grant has suffered a loss of earning capacity both during his initial period of recovery and from the reality that he has no chance of obtaining and maintaining gainful employment due to his quadriplegia from this shooting incident. The appropriate compensation for lost income and lost earning capacity will be proven at the time of trial.

34. Key, Branham, Higley, and one or more of the other Defendants or the Doe Defendants have given statements and testimony which greatly distort and hyperbolize the threat posed by Grant's actions to one or more of them or to the public. They have done so in a concerted attempt to advance the common objective of concealing the wrongfulness of the use of lethal force upon Grant in this case and to thereby insulate Key and other responsible Defendants from liability to Grant for causing him permanent quadriplegia as a result of employing excessive, lethal force to execute a simple traffic stop and by firing upon Grant's vehicle, as it was moving, which violates Defendants' own written policies.

35. By reason of the concerted efforts of Defendants, Grant has been placed at risk of suffering a loss of or serious damage to his claim for injury resulting from the use of excessive force.

36. At all times relevant hereto, Fruitland and Chief Huff and Payette and Chief Clark were legally responsible for the management of their respective Police Departments, including establishing and implementing policies, procedures and protocols governing the conduct of police officers.

37.   At all times relevant hereto, Fruitland and Chief Huff and Payette and Chief Clark were legally responsible for responsible for screening, hiring, training and supervising their employees.

## FIRST CLAIM FOR RELIEF

### (Excessive Use of Lethal Force – 42 U.S.C. §1983: Violations of the Fourth and Fourteenth Amendments to the United States Constitution Asserted Against All Defendants)

38.   Plaintiff incorporates by reference paragraphs 1 through 37 as though fully set forth herein.

39.   The wrongful conduct of Key, Branham, Higley, the FPD, Fruitland, the PPD, and Payette constitute violations under the color of state law and 42 U.S.C. §1983, in that, with deliberate and callous indifference to a known, constitutional right, Defendants deprived Grant of the rights, privileges, and/or immunities secured by the Constitution of the United States.

40.   Grant was entitled to be safe and secure from undue and unreasonable force and to be free from the improper and excessive use of lethal force.

41.   The acts and omissions of Defendants in using excessive, lethal force on Grant, in this police-shooting incident, violated the requirements of the Fourth Amendment and Fourteenth Amendment rights held by Grant to be free from the excessive, unconstitutional use of force, particularly lethal force.

42.   The specific actions of Defendants, acting under color of state law and also individually and/or in concert with each other, alleged to be violations of Grant's protected, constitutional rights are more particularly set forth as follows:

      a.    Defendants used excessive, lethal, physical force against Grant, which caused him to be permanently paralyzed as a quadriplegic;

      b.    Defendants knew or should have known that actions utilizing significantly less force could and should have been used to effectively execute this traffic stop;

      c.    Defendants failed to utilize an objectively reasonable assessment of the facts, when they decided to shoot Grant and use lethal force against him: and

      d.    None of the law enforcement officers attempted to use a degree of force less than lethal force and the choice to use such lesser degree of force would have been objectively reasonable under the circumstances and as they would have been perceived by a reasonable law enforcement officer faced with these same or similar circumstances.

43.    The unreasonableness of Defendants' use of excessive, lethal force under these circumstances is well-defined by existing law and by the established policies of the FPD and the PPD, and each Defendant knew or reasonably should have known that their conduct was not only well below the standard prescribed by law but was illegal and unconstitutional *per se*.

44.    As a result of the violations of the constitutional standards set forth herein, Grant has suffered the injuries described above and has suffered both economic and noneconomic damages and will continue to suffer such damages in the future. The extent of Plaintiffs' damages will be more fully proven at trial.

45.    Grant has been required to hire attorneys to represent him in this matter and is thus entitled to an award of reasonable attorney fees and costs pursuant to 42 U.S.C. §1988.

## SECOND CLAIM FOR RELIEF

### (Conspiracy to Conceal Unlawful, Unconstitutional Conduct -- Violations of 42 U.S.C. §1983: Violations of the Fourth and Fourteenth Amendments to the United States Constitution Asserted Against All Defendants)

46. Plaintiffs incorporate by reference paragraphs 1 through 45 as though fully set forth herein.

47. By engaging in a concerted effort to conceal the wrongfulness of the excessive use of lethal force upon Grant, Key, Branham, Higley, the FPD, Fruitland, the PPD, and Payette have engaged in violations, while acting under the color of state law and in violation of 42 U.S.C. §1983, in that, with deliberate and callous indifference to the truth, they are attempting to deprive Grant of his constitutional claims arising from the use of excessive, lethal force all of which is contrary to Grant's established rights, privileges, and/or immunities secured by the Constitution of the United States.

48. Grant was entitled to be safe and secure from suffering a deprivation of due process and of the right to recover damages for valid, constitutional claims by virtue of distorted, hyperbolic, and disingenuous statements and testimony by law enforcement officers, law enforcement agencies, and/or governmental entities acting in concert with one another.

49. The acts and omissions of Defendants in conspiring to conceal the illegal use of excessive, lethal force on Grant violated the rights and requirements of the Fourth and Fourteenth Amendments held by Grant to due process of law.

50. The specific actions of Defendants, individually and in concert with each other, alleged to be violations of Grant's protected, constitutional rights in conspiring to deny him due process of law include:

      a.      Claims by Branham that he was fearful for Key's safety, because he could have been pulled under Grant's car, which claims are directly controverted by the available video footage from the law enforcement officers on the scene;

      b.      Claims by Key that he was fearful of being hit by Grant, which claims are directly controverted by the available video footage from the law enforcement officers on the scene.

      c.      Claims by Key that he had to shoot Grant to try to protect Branham from a car that was speeding away, when he also claims to not have known, where Branham was at the time of the shooting and when available video footage from law enforcement officers demonstrates that Key shot Grant before Grant's vehicle had begun to slowly move away from Key; and

      d.      Preliminary hearing testimony by Branham that he had to "dive" out of the way of Grant's accelerating vehicle despite the fact that he told officers who interviewed him, within twenty-four (24) hours of the incident, that he had simply stepped back out of the way before the vehicle had begun to slowly move away from Key.

51.     The unreasonableness of these concerted attempts to conceal the use of excessive, lethal force is well defined by existing law, which each Defendant knew or reasonably should have known and which demonstrated that their conduct was not only well below the standard prescribed by law but was illegal and unconstitutional *per se*.

52.     As a result of the violations of the constitutional standards set forth herein, Grant has suffered psychologic and emotional injuries and potentially monetary injury by virtue of having his claims for damages compromised by Defendants' conspiracy to defeat those claims, and he would not have suffered these psychologic and emotional damages or the

damage to his reputation associated with being charged with a serious felony offense against police officers, which he did not commit..

53. Grant has been required to hire attorneys to represent him in this matter and is thus entitled to an award of reasonable attorney fees and costs pursuant to 42 U.S.C. §1988.

### THIRD CLAIM FOR RELIEF

### (*Monell* Liability)

54. Plaintiffs incorporate by reference paragraphs 1 through 53 as though fully set forth herein.

55. Fruitland, the FPD, Payette, and the PPD either adopted an official policy, had a longstanding practice or custom which constituted a policy, or ratified actions, which ratification amounted to a policy, in violation of Grant's constitutional right to be free from the excessive use of lethal force and to be free from damages as a result of the concerted effort to deprive him of due process of law.

56. Fruitland, the FPD, Chief Huff, Payette, the PPD, and Chief Clark failed to appropriately train their law enforcement forces regarding individual's constitutional rights to be free from the excessive use of lethal force and to be free from damages as a result of a concerted action to deprive him of due process of law.

57. Fruitland, the FPD, Chief Huff, Payette, the PPD, and Chief Clark failed to exercise appropriate care in the hiring, training, and supervising of law enforcement officers so as to insure their officers would be capable of making rational decisions in the course of performing their duties relative to the use of lethal force and relative to faithfully and truthfully reporting the unlawful conduct of other law enforcement officers.

58. Said Defendants' failure to properly hire, train, and supervise their law enforcement officers amounts to deliberate indifference to the rights of persons with whom these law enforcement officers came into contact, to wit, Grant.

59. Had Key, Branham, and Higley been properly hired, trained, and supervised regarding the use of lethal force, Grant would not have suffered the injuries inflicted upon him by the bullets fired by Key, and had they been properly hired, trained, and supervised to not conspire with others to conceal the unlawful use of lethal force by making claims that result in criminal prosecution of the victims, Grant would not have been charged or bound over for a crime he did not commit and, as a consequence, he would not have suffered the psychologic and emotional distress and damage to his reputation associated with being charged with a serious felony offense against law enforcement officers.

60. As a result of said Defendants' deficient hiring, training, and supervising practices, policies, and customs, Grant was wrongfully, gravely, and permanently injured, will be a quadriplegic for the remainder of his life, and has suffered substantial, economic and noneconomic damages in an amount which will be proven at trial.

61. Grant has been required to hire attorneys to represent him in this matter and is thus entitled to an award of reasonable attorney fees and costs pursuant to 42 U.S.C. §1988.

## PRAYER FOR RELIEF

A.  On all claims for relief, Plaintiff prays for judgment finding that his protected constitutional rights were violated;

B.  A finding that Defendants used excessive, lethal force on Plaintiff;

C.  A finding that Defendants engaged in an unlawful conspiracy to conceal the use of excessive, lethal force on Plaintiff and to cause him to be wrongfully charged with a serious felony offense against law enforcement officers;

D.  For general and special damages against all Defendants in amounts to be determined at trial;

E.  An award of all other damages which this Court finds just, equitable and proper inn the premises; and

F.  An award of Plaintiff's reasonable attorney fees and costs against all Defendants.

DATED: This 24th day of September, 2018.

JOHNSON & MONTELEONE, L.L.P.

Jason R. N. Monteleone
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Pursuant to F.R.C.P. 38(b), Plaintiff demands a jury trial on all questions of fact or combined questions of law and fact raised by this Complaint and/or properly triable to a jury in this matter.

DATED: This 24th day of September, 2018.

JOHNSON & MONTELEONE, L.L.P.

Jason R. N. Monteleone
Attorneys for Plaintiff

COMPLAINT AND DEMAND FOR JURY TRIAL -- 17