**MICHAEL J. KANE**
**MICHAEL KANE & ASSOCIATES, PLLC**
4355 West Emerald Street, Suite 190
Post Office Box 2865
Boise, Idaho 83701-2865
Telephone:  (208) 342-4545
Facsimile:   (208) 342-2323
Email:  mkane@ktlaw.net
Idaho State Bar No. 2652

ATTORNEYS FOR PAYETTE CITY DEFENDANTS

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID M. GRANT,<br><br>        Plaintiff,<br><br>    vs.<br><br>BENJAMIN KEY, in his official and individual capacities, CITY OF FRUITLAND, a political subdivision of the State of Idaho, FRUITLAND CITY POLICE DEPARTMENT, a department of the City of Fruitland, J.D. HUFF, in his individual and official capacity, CITY OF PAYETTE, a political subdivision of the State of Idaho, PAYETTE POLICE DEPARTMENT, a department of the City of Payette, BEN BRANHAM, in his individual and official capacity, DUANE HIGLEY, in his individual and official capacity, MARK CLARK, in his individual and official capacity, JOHN or JANE DOES #1-10, whose true identifies are presently unknown, and other Employees of the City of Fruitland, the City of Payette, or Payette County,<br>        Defendants. | Case No. 1:18-cv-00411-CWD<br><br>AFFIDAVIT OF MICHAEL J. KANE IN SUPPORT OF PAYETTE CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

STATE OF IDAHO    )
                  : ss.
County of Ada     )

    I, MICHAEL J. KANE, being first duly sworn, depose upon oath and state:

    1.    That I am a member of the firm of Michael Kane & Associates, PLLC, attorneys for the Payette City Defendants in the above-entitled matter.  The following information is true and correct to the best of my knowledge and belief.

    2.    Attached hereto as Exhibit A is a true and correct copy of the transcript from the preliminary hearing held on October 25, 2017, in *State v. David Michael Grant,* Payette County Case No. CR-2017-660.

    3.    Attached hereto as Exhibit B is a true and correct copy of the Plea Agreement entered into by Plaintiff on February 16, 2018.

    Further your Affiant sayeth naught.

    DATED this 18th day of Aril, 2019.

_____
MICHAEL J. KANE

STATE OF IDAHO    )
                  : ss.
County of Ada     )

    On this 18th day of April, in the year 2019, before me, a notary public, personally appeared Michael J. Kane, known to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

_____
Notary Public for State of Idaho
Residing at: _____
My Commission Expires: _____5-16-21_____

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 18th day of April, 2019, I electronically filed the foregoing document with the U.S. District Court.  Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court's CM/ECF System for this action:

- **Jason R. N. Monteleone**
  jason@treasurevalleylawyers.com; lejla@treasurevalleylawyers.com; sam@treasurevalleylawyers.com; cara@treasurevalleylawyers.com; bruce@treasurevalleylawyers.com; kcnovick@treasurevalleylawyers.com

- **Michael J. Elia, Steve R. Kraft**
  mje@melawfirm.net; amber@melawfirm.net; shawna@melawfirm.net; steve@melawfirm.net; krista@melawfirm.net

- **Michael J. Kane**
  mkane@ktlaw.net, tpresler@ktlaw.net

/s/ <em>Michael J. Kane</em>

1  IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT
2  STATE OF IDAHO FOR THE COUNTY OF PAYETTE
3  MAGISTRATE DIVISION
4  - - - - - - - - - - - - - - - - - - - - X
5  STATE OF IDAHO,
6     Plaintiff,
7  VS.                    Case No. CR-2017-660
8  DAVID MICHAEL GRANT,
9     Defendant.
   - - - - - - - - - - - - - - - X
10
11  PRELIMINARY HEARING
12  THE HONORABLE ROBERT JACKSON
13  STATE OF IDAHO MAGISTRATE
14  PAYETTE, IDAHO
15  OCTOBER 25, 2017
16
17
18
19
20     TRANSCRIPTION BY:
21  Leda Waddle, Certified Shorthand Reporter
22
23
24  Proceedings recorded by electronic sound recording.
    Transcript produced by transcription service.
25

1

I N D E X
PROCEEDINGS
OCTOBER 25, 2017

                                              PAGE
Preliminary Hearing............................   5

STATE'S WITNESSES:                            PAGE

   BRANHAM, BEN (OFFICER)
Direct Examination by Mr. Dolton                 11
Cross-Examination by Mr. Bistline                60
Redirect Examination by Mr. Dolton               83
Re-Cross-Examination by Mr. Bistline             88
Re-Redirect Examination by Mr. Dolton            94
Re-Re-Cross-Examination by Mr. Bistline          95

   HIGLEY, DUANE (RESERVE OFFICER)
Direct Examination by Mr. Dolton                 98
Cross-Examination by Mr. Bistline               112
Redirect Examination by Mr. Dolton              120

   KEY, BENJAMIN (OFFICER)
Direct Examination by Mr. Dolton                124
Cross-Examination by Mr. Bistline               154
Redirect Examination by Mr. Dolton              180

3

1  A P P E A R A N C E S :
2
3  For the State:          JOSHUA DOLTON
4                          Deputy Prosecuting Attorney
                           1115 1st Avenue North
5                          Payette, Idaho 83661
6  For the Defendant:      GORDON LAW OFFICES
                           BRUCE S. BISTLINE
7                          Attorney at Law
                           623 W. Hays Street
8                          Boise, Idaho  83702
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2

E X H I B I T S
STATE'S EXHIBIT          PAGE MARKED/ADMITTED
SX 1 - Bodycam Video (Key)        -         152

DEFENSE EXHIBITS
DX A - Photo                     63          82
DX B - Photo                     63          82
DX C - ISP Report                71          82
DX D - ISP Report               117         118
DX E - Video (Thumb Drive)      117          -
DX F - Deposition Transcript      -         186

EXHIBIT
tabbies
A
_____

PAYETTE-12

4

PRELIMINARY HEARING

OCTOBER 25, 2017

(Proceedings begin.)

THE COURT:  This is the time we have set for the preliminary hearing in the case *State of Idaho versus David Michael Grant*.  This is Case CR-2017-660.

First of all, are the parties ready to proceed?

MR. BISTLINE:  The defendant is, Your Honor.

MR. DOLTON:  The State is, Your Honor.

THE COURT:  Okay.  Any preliminary matters that we need to address?

MR. BISTLINE:  Your Honor, we'd move for exclusion of witnesses.  I'd note they are not in the courtroom right now, but just for the sake of the record, we move to exclude witnesses.

THE COURT:  That motion will be granted.

This is essentially a probable cause hearing.  The State must prove a public offense has been committed and there is probable cause to believe the defendant committed such offense.  A finding of probable cause must be based upon substantial evidence as to every material element of the offense charged.

I do want to remind the parties this is not a

5

trial.  I will not permit this to be a trial today.

There are two offenses complained of here.  One of those is felony eluding, in violation of Idaho Code 49-1404 (2)(a), (b), (c), and/or (d).  And the other is aggravated assault, a violation of Idaho Code 18-905 and 18-901 Mr. Bistline, do you wish to have the complaint read?

MR. BISTLINE:  No, Your Honor.  We'll waive the reading of the complaint.

THE COURT:  Okay.

Either party wish to make opening statements before we start?

MR. DOLTON:  I'll be brief, Your Honor.

OPENING STATEMENT

BY MR. DOLTON:

The State's case in chief, for purposes of this preliminary hearing, consists of three witnesses.  All three witnesses are officers who were at the incident.

We will begin our case with Officer Ben Branham, with Payette City Police Department.  We will follow that with reserve Officer Duane Higley.  And then our final witness will be Sergeant Benjamin Key, with Fruitland Police Department.

THE COURT:  Okay.

MR. DOLTON:  That's all we have.

6

THE COURT:  Thank you.

Mr. Bistline.

MR. BISTLINE:  Well, Your Honor, the first thing I'd like to do is advise the Court that I have a slight disagreement with the standard reading of Rule 5.1(b) that I want to call the Court's attention to.

The Rule is very interesting.  First of all, I think we have to start with the presumption that the Idaho Supreme Court knows how to write a rule to say what it wants it to say.  I think that we all have to agree on that.

THE COURT:  I think I remember somebody named Bistline dissenting all the time about these rules.

MR. BISTLINE:  Yeah.

It says, "If from the evidence the magistrate determines that a public offense has been committed and that there is probable or sufficient cause to believe the defendant committed such offense."

I think what that sets up is a distinction between the level of proof necessary to prove that a crime has been committed and the level of proof necessary to prove that the defendant is the person who committed that crime, because it doesn't say probable cause to find a public offense has been committed and probable cause to find that the defendant did it.  It says that public

7

offense has been committed.

And then it goes on to define probable cause as including substantial evidence, but it does not ever define the particular standard of proof that the Court must use in determining whether a public offense has been committed.

And in my experience, there is reasonable suspicion, which is what the officer needs to stop and frisk.  There is probable cause.  There is preponderance.  There is clear and convincing.  And there is beyond a reasonable doubt.  And where the Court did not see fit to tell us what the standard is, it seems to me that it must be more than probable cause.  It certainly couldn't be less than probable cause.  And if it's more than probable cause, the next option is preponderance.

So it's our position that the Court must find that a public offense has been committed by a preponderance of the evidence.  And so to hold others would be to read this rule as written differently than it's written.

So I want to call that to the Court's attention because of the comments made.

We've got many questions for the three officers that he has identified.  Some may go beyond the scope of direct.  And if they do, we can either do them as we have

8

1  the witness on the stand and let him go, or we can make
2  them sit in the hall until it's our turn, but I'm sure
3  we'll have a few questions which are beyond the scope of
4  direct.
5        I do understand this is about the offenses and
6  not about anything else.
7        And then we also have the deposition of a
8  witness, Robert Blank, that we are going to want to have
9  the Court review.
10       So that's just an overview of where we are
11 going.
12       THE COURT:  Okay.  Is there any case that you
13 found where the Supreme Court actually discussed what the
14 threshold is of this preponderance of the evidence
15 standard that you propose has been determined to be the
16 appropriate standard in a prelim?
17       MR. BISTLINE:  No, Your Honor.
18       Actually, I've not found a case where the
19 Supreme Court has said what it meant by the rule.  I can
20 only conclude, though, that we can't start with the
21 presumption that it didn't write the rule right and that
22 it meant probable cause as to both prongs, because it
23 would have said probable cause as to prong (a) and prong
24 (b).  But it didn't say that, so I have to conclude it
25 means something else, and I don't know how you could

9

1  reason otherwise.
2        I know everybody has just blindly gone along
3  assuming that it's probable cause, but I don't see that
4  that's a correct reading of the rule, and I am not aware
5  of a case that anybody has addressed that.
6        THE COURT:  The rule specifically states that a
7  public offense has been committed.  So that's the first
8  phase you are talking about.
9        MR. BISTLINE:  That's prong one.
10       THE COURT:  And that's where the problem is, is
11 what is the standard to whether or not an offense has
12 occurred.
13       MR. BISTLINE:  That's correct, Your Honor.
14       THE COURT:  Okay.
15       And then the probable or sufficient cause as to
16 whether or not a particular defendant actually committed
17 that crime.  Okay.
18       MR. BISTLINE:  That's correct, Your Honor.
19       THE COURT:  You know, I see your distinction.  I
20 think that part is clear in the rule.  And as we go
21 through this, we'll see where that ends up on prong one.
22       MR. BISTLINE:  Thank you, Your Honor.
23       THE COURT:  All right.  If you'd like to call
24 your first witness, Mr. Dolton.
25       MR. DOLTON:  Okay.  State calls Ben Branham.

10

1        THE COURT:  If you'd step forward and raise your
2  right hand, Officer.
3        (Witness sworn.)
4        THE COURT:  You may proceed, Mr. Dolton.
5        MR. DOLTON:  Thank you, Your Honor.
6  DIRECT EXAMINATION OF BEN BRANHAM (OFFICER)
7  BY MR. DOLTON:
8        Q.  Can you please state your name, spell your last
9  name for the record.
10       A.  Ben Anderson Branham, B-r-a-n-h-a-m.
11       Q.  And Mr. Branham, are you employed with the
12 Payette Police Department?
13       A.  I am.
14       Q.  In what capacity?
15       A.  As a patrol officer.
16       Q.  How long have you been with Payette City as a
17 patrol officer?
18       A.  A little over three-and-a-half years.
19       Q.  And during the three years with Payette Police,
20 have you attended any trainings?
21       A.  I have been to the POST Academy.  I've been to
22 some interdiction classes, a ride, safety assessments
23 with NRA School Shield Program, I'm a taser instructor,
24 I'm also in the National Guard, been in the National
25 Guard for over five years, have military training,

11

1  Calvary, Scout, and Infantry.
2        Q.  Now, at POST, what certification did you
3  achieve?
4        A.  Patrol certificate.
5        Q.  And prior to your time with Payette Police, did
6  you have other law enforcement experiences?
7        A.  I had some security training through the
8  Walmart.  I was in asset protection with Walmart for over
9  three years doing security for them and worked with law
10 enforcement extensively.
11       My father was law enforcement growing up, if
12 that matters.
13       Q.  Okay.
14       And what are your duties as a patrol officer
15 with Payette City Police Department?
16       A.  To uphold the laws of the City, State, and
17 Federal Government if they are broken in my presence and
18 to hold those accountable who break them up to bringing
19 them to jail, not sentencing.
20       Q.  Okay.  Now I want to draw your attention to
21 around October 24th, 2016.
22       Do you recall whether you were on duty?
23       A.  I was on duty.  I was on a graveyard shift.
24       Q.  Okay.  And your graveyard shift is essentially
25 what time to what time?

12

1  A. 9:00 o'clock at night to 7:00 a.m. normally.
2  Q. Okay. So your shift would go into October 25th,
3  the following day?
4  A. Yes.
5  Q. All right.
6  And were you on duty and in uniform in your
7  patrol vehicle?
8  A. I was.
9  Q. Okay. Now, going back briefly, you are with
10 Payette Police. Jurisdictionally speaking, where can you
11 enforce the law?
12 A. I'm deputized for -- I can enforce the law
13 anywhere in the country, technically. I am deputized
14 through Payette County and a police officer in Payette
15 City.
16 Q. Okay. Graveyard shift, typically what other
17 officers are on duty?
18 A. One per jurisdiction after midnight.
19 Q. Okay. So one per jurisdiction. So we are
20 talking --
21 A. Three in the entire county.
22 Q. All right.
23 So Fruitland Police Department --
24 A. Before midnight, you might have four or five in
25 the entire county: Fruitland City, Payette City, and

13

1  Payette County.
2  Q. All right. And those are patrol officers on
3  duty; is that correct?
4  A. Yes.
5  Q. All right. So back to the 24th, 2016, did you
6  attempt to conduct a stop on a black 2013 Toyota Scion?
7  A. I did.
8  Q. Where did your investigation regarding this
9  black 2013 Scion start?
10 A. I was driving southbound Highway 95 in the area
11 of Bus Barn and Family Dollar, approximately in that
12 area. A vehicle was approaching me from behind very
13 quickly. I knew this because I was driving near the
14 speed limit, which was approximately 35 miles an hour.
15 The speed limit is 35 miles an hour.
16 I was going approximately 35 miles an hour. The
17 vehicle was approaching very quickly. Its brights
18 appeared to be on, as his lights were very bright. They
19 were blinding me through my rear-view mirror. My reserve
20 officer with me recounted saying, "Well, that's getting
21 on us really fast."
22 Once I got up to the light at the Y, I pulled
23 over into the right-hand lane to see what vehicle was
24 pulling up behind me so quickly, and the vehicle was a
25 black Scion. It ran the red light at the Y, heading

14

1  southbound toward Fruitland. I got behind it -- do you
2  want me to continue?
3  Q. So, yeah. Let me draw back.
4  As to in the City of Payette, what is Highway
5  95?
6  A. South 16th or North 16th.
7  Q. Okay. South and North 16th?
8  A. Yes.
9  Q. I see.
10 And then as you are approaching what would
11 essentially be main, or --
12 A. Business 95.
13 Q. What directions can you go from there?
14 A. When you get to the Y coming south off of
15 Highway 95 or South 16th, you can take a right going
16 north on Business 95 or South Main, or you can take a
17 left going south on Highway 95 towards Fruitland.
18 Q. I see.
19 And so the North or South 16th in the City of
20 Payette, how many lanes are there?
21 A. It's two lanes.
22 Q. Okay. So one lane going --
23 A. North.
24 Q. -- and one lane going south?
25 A. That's correct.

15

1  Q. And as you approached this stoplight, how many
2  lanes are there?
3  A. It widens to a two-lane for the southbound, so
4  that you can take a right in the right-hand lane or a
5  left in the left-hand lane, because it turns facing east
6  and west right before the light.
7  Q. Okay. And so as you approached the stoplight
8  and as the Scion was passing you, what was the color of
9  the south light?
10 A. It was red.
11 Q. And as the black Toyota Scion turned left to go
12 southbound on 95, what was the color of the light?
13 A. It was still red.
14 Q. Okay. When you initiated your pursuit to
15 conduct a traffic stop on this 2013 Scion, what was the
16 color of the stoplight?
17 A. I was after the stoplight on Vetter Flats, but
18 when I went through the light to follow the vehicle, it
19 was still red.
20 Q. Okay. How many -- approximately how many
21 seconds passed before the car went through and turned
22 left southbound on 95 to when you started to pursue it?
23 A. I can give you distance better than time. But
24 if I had to guesstimate, estimate time, I would say 10,
25 15 seconds.

**PAYETTE-15**

16

1    Q.  Okay.

2    A.  It was in the area of the middle of Vetter Flats

3  from the light at the Y in Payette and the bridge towards

4  Fruitland.  Approximately the middle area is where I

5  called out and activated my overhead lights.

6    Q.  And as you were approaching the stoplight, were

7  you slowing down?

8    A.  Yes.  I was almost at a complete stop.

9    Q.  And this Toyota Scion, what was its movement?

10    A.  It sped up prior to reaching my vehicle and then

11  accelerated very quickly as it passed my vehicle and made

12  the turn.

13    Q.  Okay.  So now let's talk about after the

14  stoplight.

15    You mentioned Vetter Flats, is that a part of

16  southbound 95?

17    A.  That's the area -- what we refer to as the area

18  of Highway 95 between the Y, which is when you enter

19  Payette, when it Y's off into Highway 95 and Business 95

20  into Payette and then to the bridge, heading south toward

21  Fruitland.  Those two areas in that area right there

22  between the bridge and the Y is what we reference as

23  Vetter Flats.

24    Q.  Okay.

25    And when on that Vetter Flats area of Highway 95

17

1  did you activate your lights?

2    A.  Approximately halfway across Vetter Flats.

3    I had to call out to dispatch, notify them of

4  the vehicle, of its license plate once I caught up to the

5  vehicle, and then activate my overhead lights.

6    Q.  What was your speed as you are attempting to

7  identify the vehicle through its license plate?

8    A.  We had reached on Vetter Flats speeds of

9  approximately 80 miles an hour.  But it was still going

10  up in speed when I called out to dispatch my traffic stop

11  and then activated my overhead lights.  So I would

12  assume, and this would be an assumption, because we

13  reached speeds of 80.  We were not quite at speeds of 80

14  when I was calling it out over the radio initially, so

15  probably 70.

16    Q.  Okay.

17    A.  Initially.

18    Q.  What's the speed limit on the Vetter Flats part

19  of southbound Highway 95?

20    A.  55 for a short period.

21    Q.  Okay.

22    And 55 through Vetter Flats essentially to the

23  bridge?

24    A.  Yes.  For the most part; yes.

25    Q.  Okay.

18

1    And after you called out to dispatch that you

2  were -- what did you say to dispatch you were going to

3  do?

4    A.  I can give you the exact wording, or I can just

5  tell you what we are doing.

6    Do you want the exact wording?

7    Q.  Let's just get both for the record.

8    A.  Okay.  The exact wording is I usually say my

9  number, Payette 114, Code 6.

10    That's telling them I'm doing a traffic stop.

11  Code 6 is the words we generally use.

12    They ask.  They say, "Go ahead," or some

13  variation thereof.  I then tell them the license plate,

14  description of the vehicle, direction of travel.  And if

15  it's a pursuit, which I didn't know it was initially, I

16  have 10-9 to continue after I had activated my lights.

17    And then after you give them that base

18  information, where you are at, how fast they are going,

19  description of the vehicle and people, if they

20  continue for a pursuit, you are to announce over the

21  radio pursuit, or vehicle pursuit, so that everyone is

22  aware that you have a priority call and you need to clear

23  the air and give you priority, which dispatch then

24  notifies the entire listening law enforcement

25  population --

19

1    Q.  Okay.

2    A.  -- we have a pursuit.

3    Q.  And after your first call to dispatch that you

4  are conducting a traffic stop and activating your lights,

5  how much time passed before you called the dispatch that

6  you were seeking a pursuit?

7    A.  It was before the bridge.  So not very much

8  time.

9    I activated my lights halfway across Vetter.  So

10  the other half.  And I notified everyone of the pursuit

11  to probably maybe 10 seconds, estimating.

12    Q.  Okay.  And at that time you were exceeding

13  speeds of 55 miles an hour?

14    A.  Yes.

15    Q.  Okay.  And was the 2013 black Toyota Scion, was

16  it gaining distance, or were you catching up to it?

17    A.  It was gaining distance about the time I

18  notified of pursuit, simply because I didn't want to be

19  that close at those speeds and wasn't willing to drive

20  ridiculously fast.

21    Q.  Okay.  So now let's go to the bridge.

22    Once you crossed the bridge, does the speed

23  limit change there?

24    A.  It had slowed down a little bit because there

25  is curves.

**PAYETTE-16**

20

17

1    Q.   When you say it, what do you mean it?
2    A.   The black Toyota Scion slowed down.
3         I also activated my -- sorry.  Worked last
4    night.  Give me a second -- my sirens upon crossing the
5    bridge.
6         So initially did not activate my siren.  I
7    activated it around the same time that I notified of
8    pursuit.
9    Q.   Okay.  Now, I just directed your attention to
10   the date of October 24th.  You said you worked the
11   graveyard shift.  At what time did this incident occur?
12   A.   Approximately 2300, which is 11:00 o'clock.
13   Q.   Sure.
14        And so you activate your lights at the bridge.
15   Did the speed limit that was posted change from 55 upon
16   reaching the bridge?
17   A.   Yes.  It changes to 45, which is slowing down
18   going into the City of Fruitland.  And further into
19   Fruitland, it will slow down to 35.
20   Q.   Okay.  And as you were pursuing this Toyota
21   Scion past the bridge into Fruitland, what speeds were
22   you going?
23   A.   60.  In the 60s.  So a little faster than 60.
24   Up to 65, almost 70, and then down to about 50 at points.
25   Q.   Okay.  And this Toyota Scion, where was it in

21

1    So a decent distance from Gayway intersection.
2    Q.   Okay.  Now, Gayway intersection, that's kind of
3    an old term that's used in our area.  What is it
4    officially known as?
5    A.   South 16th and Highway 95.
6    Q.   Okay.
7    A.   I believe.  And/or in Fruitland it's called -- I
8    always call it Highway 95 in Fruitland.  It's got a W in
9    the name.  I'm trying to remember it.  Highway 95 is
10   called by a different name.
11   Q.   Whitley?
12   A.   Yes.
13   Q.   Whitley Drive?
14   A.   Whitley Drive.  Thank you.
15   Q.   And were you informed what measures this
16   Fruitland officer used to attempt to slow down or stop
17   this 2000 --
18   A.   Yes, the Fruitland officer notified me that he
19   was setting up spike strips and to back off.
20   Q.   Okay.  And in what location were the strips to
21   be set?
22   A.   They were being set on the southbound lane,
23   which the black Scion was traveling in at that time.
24   Q.   Okay.
25        And the Fruitland officer who assisted or was

23

1    relation to you from when you were on Vetter Flats to
2    when you entered the city limit?
3    A.   It was getting further away.
4         Because a Fruitland officer notified me he was
5    setting up his spikes, so I was backing off to give
6    distance so I didn't run over the same spikes, so.
7         So my speeds were at the 60s and then into the
8    low 50s as I slowed down.
9    Q.   And so you were slowing down, and the vehicle
10   was either going same speed or possibly a greater
11   speed?
12   A.   It looked to be gaining distance between myself
13   and it.
14   Q.   Yeah.  But you were slowing down; is that
15   correct?
16   A.   I was.
17   Q.   All right.
18        And at what part or what area in Fruitland did
19   you receive assistance from Fruitland Police?
20   A.   It was before Gayway intersection, which is the
21   intersection that goes toward Ontario.  So that would be
22   to the north of Gayway intersection.
23        If I had to guess distance from Gayway, I would
24   say 300 meters approximately.
25        This is an approximation.  I did not measure it.

22

1    participating with you in this investigation, what was
2    his name?
3    A.   Officer Key.
4    Q.   And as you were -- when does the speed limit
5    change in the City of Fruitland from 45 to 35?
6    A.   Approximately around the area of Miller's Auto,
7    which is right after you take the final curve to that
8    long straightaway in Fruitland.  So 400 meters before, or
9    500 meters before approximately the spike strips.
10        The spikes are set almost halfway between Gayway
11   intersection and the curve.
12   Q.   Dickinson's Fine Food, it's to the east of
13   Highway 95 in Fruitland; is that correct?
14   A.   Yes.  Yes.
15   Q.   Where was the spikes in relation to
16   Dickinson's?
17   A.   Just north of the turn-off for Dickinson's.
18   Q.   Okay.
19   A.   I'm not sure exactly how far north.  But just
20   north.
21   Q.   All right.
22        And so you slowed down.  Spike strips were down.
23   And did your pursuit continue after strips were passed,
24   spike strips were passed?
25   A.   Yes, it did.

**PAYETTE-17**

24

21

1       The Toyota Scion looked to run over the -- from
2  what I saw, looked to run over the spike strips with its
3  passenger side tires.  Looked like both sets of tires hit
4  the spike strip, and appeared the front tire at least was
5  losing air.
6       Initially, after the spike strip set was hit by
7  the Scion, it continued.  It slowed down initially.  The
8  pursuit did slow down after the spike strips were hit,
9  but then we sped up again as we went southbound through
10 Fruitland and got up to speeds of 60, approximately 60, a
11 little higher than 60.
12      Q.  Okay.  So spike strips were deployed.  You saw
13 the vehicle go over those strips.  And then you continue
14 on to this Gayway junction or Whitley and --
15      A.  South 16th.
16      Q.  South 16th.
17      The stoplight, what color was the stoplight
18 southbound?
19      A.  I do not recall exactly.  I thought it was red,
20 but that's not an exact.  I do not remember clearly what
21 color it was.
22      Q.  And you continued your pursuit --
23      A.  I did.
24      Q.  -- through Fruitland?
25      What speeds were you going as you were pursuing

25

1  this Scion through the City of Fruitland after the spike
2  strips were deployed?
3      A.  As I said, we were speeding up.  We reached
4  speeds of 50, maybe 55 in Fruitland.
5      Q.  Okay.
6      A.  It was when we left Fruitland, still southbound,
7  that we picked up to the 60s and a little higher than
8  60s.
9      I don't know what they call that big plain
10 between the interstate and Fruitland, but in that area we
11 picked up again.
12     Q.  All right.
13     Now, as you are going to the City of Fruitland
14 and as you approach City Hall, the speed limit changes,
15 does it not?
16     A.  It does.  Changes to 45 miles an hour.
17     Q.  Okay.
18     And what was your speed as you were continuing
19 to pursue this Toyota Scion when the speed limit changed
20 from 45 to 35?
21     A.  55 miles an hour, maybe a little faster.
22     Q.  Okay.
23     Were your lights and sirens on, or did you
24 deactivate them at all once you activated them?
25     A.  From the time I activated my lights and sirens,

26

1  I did not deactivate them until the very end, which I can
2  explain further on.
3      I may have deactivated the siren at the very end
4  when everything was completely stopped.
5      Q.  Okay.  And any officers besides your patrol unit
6  join in this pursuit of the Toyota Scion?
7      A.  Yes.  Officer Key caught up to me in Fruitland
8  before the City Hall.  I would say it was approximately
9  in that area.  And it's our policy to offer the primary
10 jurisdiction that we are going through, primary position
11 in a pursuit, which means give them the first car in the
12 pursuit and to back off to second car ourselves.
13     I offered that over the radio to Officer Key.
14 He requested to take primary, so I slowed down to allow
15 him to take primary.
16     While that was happening, my corporal did come
17 across the air and say some things.
18     Did you want me to talk about that?  Do you want
19 me to back up?
20     Q.  Unless it's something in disagreement with
21 having Officer Key take priority --
22     A.  Yeah.  He said, "Negative.  Maintain primary."
23     It was already done.  We had already switched at
24 that point.
25     I notified him that we had already switched and

27

1  it is our policy to switch if they want the primary
2  position, which Officer Key did say he wanted.
3      I don't remember his exact wording in taking it,
4  but he did say he wanted primary.
5      And once you are the secondary vehicle, once
6  there's two, the secondary vehicle calls out over the
7  radio generally while the first vehicle maintains the
8  pursuit as safely as possible.
9      Q.  Okay.  Now, did you still have sight on the
10 Toyota Scion as you were switching roles with Officer
11 Key?
12     A.  Yes.
13     Q.  And could you approximate the distance that the
14 Toyota Scion was ahead of you when you made the switch?
15     A.  So I had to slow down quite a bit to allow him
16 to get in front of me to make sure it was a safe
17 transition.
18     It got quite a bit in front of me.  I -- again,
19 this would be an estimation of distance:  500, 600
20 meters.  Perhaps that far.
21     Q.  Okay.  And so now Key's patrol unit is in the
22 lead as you are passing Fruitland and still heading
23 southbound on 95; is that correct?
24     A.  That is correct.
25     Q.  And when does the speed limit change on

**PAYETTE-18**

28

25

1 southbound 95 south of Fruitland?  From 45 to what?
2     A.  There is what I like to call an S curve at the
3 south end of Fruitland.  At the end of that S curve, it
4 notifies you the speed is changing to 55, and it then
5 changes after you pass the last Fruitland City road, I
6 think is what it is.  I don't remember the name of it off
7 the top of my head, but it's after Pennsylvania.  That
8 comes through next to the middle school there of
9 Fruitland.  After that it turns to 55, and it's
10 approximately a one to one-and-a-half-mile stretch of 55
11 miles an hour.
12     Q.  So that S curve, you have a great line of
13 sight?
14     A.  Oh, yeah.  There's no trees blocking your
15 vision.  The worst you might get is some weeds in that
16 area generally.
17     Q.  All right.
18         And so now Officer Key is in the lead; you are
19 behind.  What speeds were you traveling when you are
20 second unit?
21     A.  Once the second unit had taken primary, we got
22 up to speeds of 60-plus miles an hour.
23     Q.  And were there any observations you made as to
24 the condition of the Toyota Scion as it was continuing?
25     A.  It was going back and forth between the two

29

southbound lanes throughout the pursuit, without turn
2 signals.
3         It did pass other vehicles during the pursuit
4 from the beginning to the end.  There was not a lot out,
5 but there was other vehicles out.  It generally moved
6 over a little bit.  It moved over to the opposite side of
7 the vehicles generally towards the center of the roadway
8 when passing those vehicles, but it was speeding.
9     Q.  Okay.  If you could, or could you give an
10 estimate of the number of vehicles that were passed by
11 the Scion and your unit as you were pursuing?
12     A.  From the beginning of pursuit to end?
13     Q.  Yes.
14     A.  It would be only an estimate, but at least five
15 if I had to guess.
16     Q.  And of those five, do you recall where they were
17 in relation to the cities and the roads?
18     A.  On Vetter Flats I believe there was two vehicles
19 between the start of the pursuit and the curve, first
20 curve of Fruitland.  So it would be after the bridge.
21 And there was at least two vehicles that got over in
22 front of the Toyota Scion and yielded to my lights, in
23 what appeared to me to be yielding to my lights and
24 sirens as they pulled over and this vehicle, this Toyota
25 Scion, then moved over left into the left-most northbound

30

1 lane or southbound lane.
2         Okay.  And then there was further, once through
3 Fruitland, I believe when we were spiking the Toyota
4 Scion, when it was being spiked by Officer Key, there was
5 at least one vehicle in the northbound lane.
6         And then there was another one further south on
7 the northbound lane as well that we eventually then
8 passed.
9         And they yielded prior to us reaching them as
10 they were heading in the opposite direction and could see
11 us, I assume, as I wasn't in those vehicles.
12     Q.  And so of those five vehicles which were heading
13 in the same direction as your pursuit with the Scion --
14     A.  Three maybe four.
15     Q.  Okay.
16     A.  And five is a low estimate.  I was more focused
17 on the southbound lane than the northbound lane, but I
18 remember more than.
19     Q.  Okay.
20     A.  At least two in the northbound lane.
21     Q.  So --
22     A.  And at least three in the southbound lane.
23     Q.  Okay.  All right.
24         Now, besides your own speed, what other means?
25 Did you have either training and experience or machinery

31

1 to evaluate the speed of this Toyota Scion?
2     A.  I've been through estimation of speed training
3 through my FTO field training officer period, as well as
4 my POST training, which is the academy we attend to
5 become a police officer.  I'm radar certified.  And to do
6 radar, you have to be able to estimate the speed of
7 vehicles within five miles an hour of their speed 10
8 times consecutively without error, as well as my years of
9 training as a police officer conducting traffic stops,
10 because part of a traffic stop is to estimate the speed
11 of a vehicle within five miles an hour of the actual
12 speed, at which point you then activate your radar to
13 verify its speed.  And that is when I conduct my traffic
14 stops.  And it's my common practice as a police officer
15 if my estimate is too far off, I will not activate that
16 traffic stop on speed alone, simply because technically
17 -- it's just a guideline.  I don't believe it's law
18 anywhere, but in the training for it, is you need to be
19 within five miles an hour of its speed.  Generally I'm
20 very accurate.
21     Q.  Now, as far as your radar in your vehicle, there
22 was a radar unit in the patrol vehicle?
23     A.  Yes.
24     Q.  And was it used during the course of this
25 incident?

PAYETTE-19

32

1   A.  No.  It was not.  Because when you are traveling
2   the same direction as another vehicle, you cannot
3   estimate speed unless you stop your vehicle to activate
4   your radar.
5        You can do that for vehicles heading toward you
6   while you are moving, but if moving in the same direction
7   as a vehicle, you cannot.  It does not operate in that
8   way.
9   Q.  So the only basis of speed is the speed your
10  vehicle was traveling, as well as then your estimates
11  based on your training and experience?
12  A.  Yes.  And the policy of our department is to
13  notify dispatch of our speed in our patrol vehicle.
14  Q.  Okay.
15  A.  Through the pursuit.
16  Q.  Okay.
17        And once Officer Key took the lead in the
18  pursuit, did you continue to report your speeds to
19  dispatch?
20  A.  I did.
21        There was some garbling between officers,
22  because officers trying to come to the scene were on the
23  radio intermittently, which causes a little bit of
24  cross-talks, which causes squelching on the radio.  As
25  well as Officer Key, once, a few times, I'm not sure

33

1   exactly how many times, he got on the radio to make
2   observations, I believe.  I'm not sure how many times he
3   did that, but I was primary on the radio for the
4   pursuit.
5   Q.  And once Officer Key took the lead in the
6   pursuit, were you still exceeding the speed limit that
7   was posted?
8   A.  Yes.
9   Q.  By how much were you exceeding the speed
10  limit?
11  A.  It gets up to 55 on that straight-away, and we
12  reached 60 miles plus on that.
13        If I had to say an exact speed, as an estimate I
14  would say 63, 64 miles an hour were reached, again on
15  that southbound stretch between the interstate and
16  Fruitland.
17  Q.  And based on your training and experience in the
18  estimates, when was the maximum speed being reached by
19  this Toyota Scion when you were pursuing it?
20  A.  Mid point of before the interstate and
21  Fruitland.  It started slowing down as we reached the
22  interstate because there's a hill up, and then it turned
23  at that point on to the off-ramp for the westbound
24  understate.  So the wrong way on the off-ramp.
25  Q.  Oh, I'm sorry.  A little bit ahead of me.  It's

34

1   my questions that are confusing.
2   A.  Sorry.
3   Q.  So my question was, is the speed of the vehicle
4   when you were leading, what was the estimated maximum
5   speed --
6   A.  Oh.
7   Q.  -- of the vehicle?
8   A.  When I was leading?  80 plus miles an hour.
9   Q.  And where did that occur?
10  A.  Between the beginning of the pursuit and the
11  first curve of Fruitland.  And then it sped up again.
12  I'm not sure exactly how high, but I know it was at
13  80-plus miles an hour between the Vetter Flats activation
14  point of my traffic stop and the last or mid point of the
15  first curve, I guess you would say.  It's one big curve.
16  Q.  So is it safe to say that after the deployment
17  of the spike strips and the vehicle going over it, it
18  never reached those speeds again?
19  A.  It did not reach 80 miles an hour again; no.
20  Q.  Okay.  All right.
21        Now, I didn't ask you this question prior, but
22  this area that we've talked about on southbound Highway
23  95, what county and state is that located in?
24  A.  Payette County, State of Idaho.
25  Q.  All right.

35

1        So now going to whip you back.
2   A.  Okay.
3   Q.  To you are just exiting the city limits of
4   Fruitland on southbound 95, you've reached the
5   55-mile-an-hour posted speed limit after Pennsylvania,
6   south of Fruitland, Officer Key has taken the lead.  What
7   happens from that point on?
8   A.  Officer Key continued following the vehicle as
9   the primary vehicle.  I notified of speeds and direction
10  of travel for the pursuit all the way up until the
11  stopping of the pursuit.
12  Q.  Okay.  And the pursuit, where did it stop?
13  A.  The first stopping point of the pursuit?
14  Because there's two, if you look at it.  At the end was
15  on the off-ramp of I-84 westbound.  So he went into the
16  off-ramp the wrong direction.
17  Q.  Okay.
18  A.  And then he stopped his vehicle.
19        And that is when Officer -- do you want me to
20  continue?
21  Q.  Sure.
22        So just to clarify for purposes of the record,
23  you passed the highway, or the Highway 30 junction where
24  the Hammer Stores are?

**PAYETTE-20**

25  A.  Yes.

36

1  Q.  Is that correct?
2  A.  Yes.  So there's Highway 30.  There's a little
3  convenience store there right after it to the south of
4  Highway 30.  We passed that, still on, southbound on
5  Highway 95, went up the -- yeah, started going up the
6  hill, and then there is the off-ramp, the first off-ramp
7  to the east of Highway 95 that comes off of I-84
8  westbound.  So the people traveling towards Oregon get
9  off there if they want to go towards Payette or Fruitland
10 or New Plymouth or Highway 30.
11     He went down the off-ramp in the opposite
12 direction of travel.
13 Q.  So he was heading eastbound on a westbound --
14 A.  Off-ramp.
15 Q.  -- exit?
16 A.  Yes.
17 Q.  Okay.
18 A.  That is correct.
19 Q.  All right.
20     And so it would be the, if you were
21 directionally south, it would be --
22 A.  The left.
23 Q.  -- the first exit on the left?
24 A.  That is correct.
25 Q.  After Hammer Store and --

37

1  A.  Highway 30.
2  Q.  After the left on Highway 30?
3  A.  That is correct.
4  Q.  Okay.
5     And this hill is actually a bridge that goes
6  over the interstate?
7  A.  It is.
8  Q.  Is that correct?
9  A.  It is.  It's the overpass over the interstate.
10 Q.  All right.  So after this Toyota Scion makes a
11 left on a westbound off-ramp, what happens?
12 A.  It turned into and did not -- I don't believe it
13 struck it, but it turned into the barrier guiding the
14 off-ramp and stopped.
15     So Officer Key's vehicle stopped, pointed at the
16 suspect vehicle.  Officer Key got out of his vehicle and
17 approached the suspect vehicle, which was still moving.
18 After it initially stopped, it started backing up and
19 turning like it was going to head back towards either
20 Highway 95 or back towards Payette area, is what it
21 appeared.
22     I pulled up next to or behind kind of both, a
23 little behind and next to Officer Key's vehicle, stopped,
24 advised Officer Higley to assist Officer Key but not get
25 ran over, as the vehicle was still moving and we were now

38

1  going to be out on foot, as Officer Key was already at
2  the vehicle and we were trying to catch up to assist
3  Officer Key.
4  Q.  Okay.
5     Now, Officer Key is, in relation to the exit to
6  the off-ramp onto Highway 95, so if you are going
7  westbound, was he between 95 and the exit or behind the
8  car, this Toyota Scion and the exit?
9  A.  So if this is Officer Key's vehicle pointed
10 pretty much down the exit, the suspect vehicle is
11 parallel, kind of blocking the entire exit at this point.
12     It looked like it was turning around.  Officer
13 Key was next to the suspect vehicle driver's door when I
14 was running up to assist.
15 Q.  I see.
16     All right.  So in relation, we --
17 A.  So Highway 95 would have been behind Officer Key
18 as he was facing down the off-ramp.
19 Q.  Okay.
20 A.  And the vehicle was pointed north and south,
21 trying to turn around to go back.
22 Q.  Is it safe to say that Officer Key's vehicle was
23 perpendicular to the Toyota Scion?
24 A.  It was in the --
25 Q.  So he was east/west --

39

1  A.  He was pointed east and west, and the suspect
2  vehicle was pointed north and south, more or less.
3  Q.  Okay.  More or less.  But not exact?
4  A.  Yes.
5  Q.  But not exactly.  We are not talking --
6  A.  I mean, I didn't have a compass, and I didn't
7  measure it.  But, yes.  More or less they were pointed in
8  those directions.
9  Q.  All right.  And you mentioned Officer Key's
10 conduct.  Where were you in relation to observing Officer
11 Key's conduct of him exiting the vehicle and approaching
12 the driver's side of the Toyota Scion?
13 A.  During the pursuit, when someone takes primary,
14 we try to maintain a safe following distance to the
15 primary officer's vehicle so that we are always there to
16 back them up.
17     I was within, I would say within 200 meters of
18 Officer Key's vehicle throughout the pursuit from that
19 point.  Give or take.
20     I mean, there's also some movement in a pursuit.
21 And so when he got out of his vehicle and was moving
22 toward the suspect vehicle, I was parking to get out of
23 my vehicle.  So I was within easy eyesight of Officer Key
24 and the suspect vehicle.
25 Q.  Okay.  And your vehicle, when had you placed it

**PAYETTE-21**

40

1   in park?  Did you place it in park on this westbound
2   off-ramp?
3        A.  I was -- so Officer Key's vehicle was here.
4   Mine was more or less pointed northwest and southeast.
5   So kind of at an angle.  But there was still room between
6   my vehicle and the off-ramp for a vehicle to fit through.
7   So I was to the north of Officer Key's vehicle when I put
8   it in park, stopped, put it in park and got out of my
9   vehicle to approach and assist Officer Key.
10       Q.  Would it be fair to say, and it might be
11  simplifying it, but did you essentially make a V --
12       A.  Yes.
13       Q.  -- with Officer Key's vehicle and your own?
14       A.  That is correct.
15       Q.  To limit the access back to 95?
16       A.  Yes.
17       Q.  Okay.
18           And you exited your vehicle; correct?
19       A.  I did, as well as Reserve Officer Higley.
20       Q.  And where were you in relation to Officer Key
21  when he was approaching the driver's side door --
22       A.  He was at the driver's side door between the
23  back of the driver's side door and the front fender, in
24  that area.  He was right up against that vehicle trying
25  to -- he was yelling out orders, as well as trying to

41

1        Q.  Okay.
2        A.  I was at the front fender of the car facing
3   southwest.
4            So he was facing in this direction; I was facing
5   in this direction.
6            And again, in what we like to call a tactical L,
7   as much as I could achieve without being directly in
8   front of the vehicle, which was driving forward.
9            So I was at the front driver's side fender of
10  the suspect vehicle when it was turning toward me to
11  drive in my direction.
12       Q.  I see.
13       A.  Which it seemed to be the vehicle and the
14  driver's intent.
15       Q.  Yeah.  Well, we'll talk about that.
16       A.  Does that answer your question?
17       Q.  It does.
18       A.  Okay.
19       Q.  So you were behind Officer Key, but you were
20  also --
21       A.  To his left.
22       Q.  -- relatively to his left or to the north of
23  him?
24       A.  Yes.
25       Q.  I see.

43

1   open the door to remove the driver to stop the pursuit.
2            The vehicle was moving toward me to point back
3   out toward Highway 95.  He was still facing mostly
4   northbound, so the only place for me to stand was at the
5   front fender of the vehicle, which when it was moving
6   toward me the entire time backing up and then angling
7   toward me more, so turning more north, trying to turn
8   more northwest to get itself oriented away and out of the
9   off-ramp, which I was standing in.
10       Q.  Now, Officer Key, was he to the north or south
11  of you?
12       A.  He was directly in front of where I was facing.
13  I was facing southwest.
14       Q.  Okay.
15       A.  Or I'm sorry.  Southeast.
16           And he was beside the suspect vehicle facing
17  northeast, more east than north.
18       Q.  Okay.
19       A.  So I could see where he was.
20       Q.  And so you were directly behind Officer Key, or?
21       A.  So he was facing a different direction than I
22  was.
23           If I could show you with my hands, he was
24  facing -- if this is perfect north, he was facing kind of
25  like this, northeast.

42

1            And in relation to the Toyota Scion, you were at
2   the driver's side front bumper?
3        A.  Yes.
4        Q.  Okay.
5            And were you armed, and had you deployed your --
6        A.  My firearm was in my hand and was at a low ready
7   position, as I was issuing commands to the driver, as
8   well as Officer Key, to stop, turn off the vehicle, to
9   get out of the vehicle.
10       Q.  Okay.
11       A.  Those types of commands.
12       Q.  Okay.  Now let's go back to how you work.
13           Let's not go back.  Let's address how you work
14  with other officers from Payette County from different
15  jurisdictions.
16           Do you work tactically on these types of
17  things?
18       A.  So when there's two officers on a situation, we
19  have what we like to call a tactical L.  It's so that
20  there isn't cross-fire between the officers.  If there's
21  a dangerous situation, one officer faced the suspect
22  while the other officer to the left or right goes at a
23  90-degree angle to the suspect, so that he has a side
24  view of the suspect, so that there's two different
25  directions for the officers to control, as well as if

PAYETTE-22

44

1 they need to deploy a tool on their belt or a weapon, the
2 other officer should not be harmed by any type of
3 cross-fire situation.
4   Q.   Okay.  So the officers maintain a clear line of
5 fire?
6   A.   Yes.
7   Q.   From each other?
8   A.   Yes.  That is our goal every time.
9   Q.   Now, to the south of this movement are your
10 vehicles; is that correct?
11   A.   So when we were at the suspect door, our
12 vehicles would have been mostly behind us or west of
13 where we were on the suspect vehicle.
14   Q.   Oh.  Got you.
15   A.   Because they were parked here; the suspect
16 vehicle was here.  We were next to the suspect vehicle.
17   Q.   All right.
18        And have you done this tactical L or these
19 maneuvers with Officer Key before?
20   A.   Yes.  I've assisted him on many calls.
21   Q.   Okay.  Approximately how many times have you?
22   A.   I've assisted lots of officers many, many times.
23 At least two dozen times with Officer Key, if I had to
24 make a guess.
25   Q.   Okay.

45

1   A.   I've assisted him many times.
2   Q.   Okay.  And at this time as you were out of your
3 vehicle, your firearm drawn and you are establishing this
4 tactical L to the north and behind Officer Key, how close
5 were you to the Toyota Scion?
6   A.   If I could, I'd like to answer for what I saw on
7 Officer Key, because I saw he was right next to the
8 vehicle, touching it at times with his legs and body.
9 And when it was turning toward us, I thought he was going
10 to go under the vehicle at one point, because it was
11 turning toward him with its wheels turned in our
12 direction and moving in our direction, and then it moved
13 forward where I was standing.  And while that was
14 happening, he was touching the vehicle at certain points,
15 and I came very close to touching the vehicle and had to
16 move to keep from getting struck by the vehicle.
17   Q.   I see.  Okay.
18        So you are not comfortable answering the
19 question --
20   A.   So I would --
21   Q.   -- because the distance changed?
22   A.   Yeah.  It changed within eight inches, perhaps,
23 and as much as two to three feet away as well.  I mean,
24 there was movement.  I was moving; the vehicle was
25 moving.

46

1   Q.   All right.
2        Now, you were close enough to make observations
3 as to the occupants of the vehicle; is that correct?
4   A.   Yes, I was.
5   Q.   How many occupants were in the vehicle?
6   A.   There was one male occupant, adult.
7   Q.   And obviously if it was a single male, that was
8 the driver of the vehicle?
9   A.   That was.  He was in the driver's seat.
10   Q.   And can you describe how this driver looked
11 physically?
12   Q.   He was a male, white male with facial hair,
13 slightly overweight.
14        He looked right at me while I was issuing
15 commands with my gun drawn, smiled, and continued
16 driving.  Multiple times.
17   Q.   All right.
18        Now, is the person who was driving the Toyota
19 Scion on October 24th of '16 present in court today?
20   A.   He is.
21   Q.   Where is he seated?
22   A.   He is seated in his wheelchair, wearing blue.
23   Q.   Right in front of you?
24   A.   Right in front of me.
25   Q.   And you mentioned that as you and -- well,

47

1 Officer Key was also issuing verbal directions; is that
2 correct?
3   A.   Yes.  He also removed his baton at one point in
4 an attempt, because the door was locked or it would not
5 open for him when he tried the handle, to break the
6 window to get into the vehicle.
7   Q.   Okay.
8   A.   I'm not sure how long he did that, but he pulled
9 it out at one point.
10   Q.   And so both you and Officer Key were issuing
11 verbal commands to stop and to exit the vehicle?
12   A.   Something I didn't mention with that, if I
13 might?
14   Q.   Sure.
15   A.   Reserve Officer Higley had gone towards the rear
16 end of the vehicle.  And once he got to the other side of
17 Officer Key, I could not see him anymore.  So I also had
18 concern for Reserve Officer Higley, because first of all
19 I'm responsible for the reserve officer's safety, and I
20 did not know where he was.
21        But I knew the vehicle was backing up as well,
22 which is where Officer Higley was, was somewhere toward
23 the rear.
24   Q.   But at that time did you know where Reserve
25 Officer Higley was?

48

PAYETTE-23

45

1    A.  I did not.  I lost view of him after that point,
2  as I was focused on the suspect.
3    Q.  Well, after, if we are going to talk about
4  Officer Higley, when you exited the vehicle, did you
5  provide him any directions?
6    A.  I told him to offer support to Officer Key and
7  not get ran over.
8    MR. BISTLINE:  Excuse me.  Could you -- you
9  mumbled the last few words there.  Could you repeat that?
10    THE WITNESS:  I told him to assist, Officer
11  Higley, but not get run over as the vehicle was backing
12  up and moving forward and we had very limited area.
13    Q.  (BY MR. DOLTON)  All right.
14    So to clarify, you said you asked him to support
15  Officer Higley.
16    A.  I told Officer Higley to support Officer Key.
17    Q.  Okay.
18    A.  And not get ran over.
19    Q.  Okay.
20    A.  I'm not sure if that's the exact wording I used,
21  but that's the sentiment that was in my head when I was
22  issuing the commands.
23    Q.  Okay.  So as you were doing this tactical L with
24  Officer Key, at that time you didn't see and didn't know
25  where Reserve Officer Higley was?

49

1    A.  I did not.  He was not in my direct line of
2  sight, which was again southwest, and he would have
3  been --
4    Q.  All right.
5    A.  -- somewhere off to my right.  I didn't know
6  where he was.
7    Q.  So at the time you didn't know where Officer
8  Higley was?
9    A.  I did not.
10    Q.  Okay.
11    All right.  So the distance was close enough to
12  see the occupant, see the driver?
13    A.  Clearly.
14    Q.  Identify the driver?  At least by his physical
15  characteristics.  And you said he smiled?
16    A.  He looked directly at me, or what appeared to be
17  directly at me.  I could see his eyes.  I could see his
18  mouth.  And smiled as he continued driving in my
19  direction.
20    Q.  All right.
21    Now, his driving at the time you and Officer Key
22  were on foot approaching the vehicle, guns drawn, what
23  was going on with the Toyota Scion?
24    A.  It was backing up and turning forward toward our
25  position to point out toward Highway 95 again.

50

1    So basically trying to turn around and change,
2  completely change its trajectory or his position of
3  travel.
4    Q.  So would it be safe to say it would be a
5  multi-point turn?
6    A.  Yes.
7    Q.  Forward, reverse, forward, reverse?
8    A.  It took a few times of doing forward, reverse
9  actions to get pointed enough to point out, which is
10  where I was standing.  He eventually turned the vehicle
11  toward me to drive away.
12    Q.  And at this time of the maneuvering of the
13  vehicle or the multi points to turn around, you and
14  Officer Key were yelling commands to the driver?
15    A.  We were.
16    Q.  When you mentioned that he smiled or what you
17  believe is he smiled directly at you, how many times did
18  that occur?
19    A.  At least twice.
20    He didn't really ever frown that I noticed.  He
21  smiled and looked at me while he was driving, at least
22  two times.
23    Q.  All right.  So did this Toyota Scion operated by
24  the defendant you've recently identified, did it
25  eventually begin to drive forward to essentially be west

51

1  to northwest back onto the ramp?
2    A.  Yes.  Once the vehicle was positioned toward the
3  opening between my patrol vehicle, our patrol vehicles
4  and the opening left to Highway 95, the vehicle began
5  accelerating.
6    Q.  Okay.
7    A.  Quickly.
8    Q.  And where were you in relation to it
9  accelerating, heading back onto 95?
10    A.  In the position of travel.
11    Q.  Okay.
12    And in response to the vehicle approaching your
13  direction, what did you do?
14    A.  I attempted to get out of the way of the vehicle
15  so I wouldn't get ran over.
16    Q.  And in your attempt to get out of the vehicle's
17  way, which direction did you move?
18    A.  It would have been southwest.
19    Q.  And as you were moving southwest and the vehicle
20  was accelerating towards you, what did you hear or see
21  from Officer Key?
22    A.  I heard and saw the vehicle flash by.  I felt
23  the wind from the vehicle's motion on my leg.
24    Officer -- I heard gunshots, which were Officer
25  Key, as I was diving away, firing into the vehicle.

PAYETTE-24

52

49

Q. And as you moved out of the way, did you
maintain standing, or did you --

A. I believe I dove and just dove and landed on the
ground. I don't believe I stayed standing.

I don't remember 100 percent. I just remembered
diving out of the way to get out of the way as quickly as
possible.

Q. To the south? So it would be --

A. Southwest.

Q. -- to your right side?

A. Yes.

Q. Okay.

A. Or sorry.

No. I'm right. Southwest.

Q. Okay.

So you dove to your right side. You left your
feet and dove, hit the pavement?

A. That's what I remember.

Q. Okay.

At that point did you fear for your life and
safety?

A. Yes, I did. I feared for it throughout most of
that event.

Q. But if you were to specify a particular moment
where you did fear for your life and safety, at what

53

point --

A. When I dove out of the way, I was certain I was
going to be struck by the vehicle.

Q. So after you hit the ground and you heard
gunshots, what did you do?

A. Got up, yelled for Officer Higley to get in the
patrol vehicle. We got in our vehicle, turned it around.
I observed the suspect Scion driving northbound on
Highway 95 on the right side of the road. It was on the
median. Or not the median, the right side of the road,
off the road a little bit, appeared to be losing control.
I then, after Officer Higley and myself had got
in my vehicle, drove, went a little bit wide left to use
my speed bumper, or my push bumper to hit the suspect
vehicle in the back driver's side corner to force it off
the road.

And there was a large sign which I forced it
onto, which stopped the suspect vehicle.

At that point I put my vehicle in park. Officer
Higley and I got out of our vehicle. I yelled for
Officer Higley to stay with my patrol vehicle.

We waited for Officer Key. Officer Key got
there. We all three could not -- we saw this occupant
leaning slightly right in the driver's seat, was not
responding verbally that we could hear to our commands or

54

physically.

We approached the vehicle. Officer Higley on
the right side of the vehicle; Officer Key and I on the
left side of the vehicle, suspect vehicle, which was
facing away from us, guns drawn.

I announced on gun to notify Officer Key that I
would be maintaining my firearm if any movements need
taken so that he could take them, as I knew he would be
affected from the events.

Q. So you took the lead once the vehicle was
stopped northbound on 95?

A. Yes.

Q. And you eventually had to physically unrestrain
and remove the driver from the vehicle; is that
correct?

A. That is correct.

On approaching the vehicle, when we were at the
back, behind the center post of the vehicle, just behind
the driver's seat, I could observe the left hand of the
suspect who was sitting in front of me was clear. I
could not see his right hand. I advised Officer Higley,
who was on the right side, to clear his right hand a few
times. Officer Key -- Officer Higley. Excuse me.

It was cleared, and he said that the right hand
of the suspect was clear.

55

Officer Key and I believe it was a county
deputy, I couldn't say exactly which one, because I was
focused on the suspect, cut the seat belt. One of them
cut the seat belt. It was the county deputy that cut the
seat belt, I believe. Officer Key reached in, unlocked
the door, which was still locked, opened it, and together
they removed the suspect from the vehicle, placed him
into handcuffs, and began to administer first aid.

Q. Okay. Did you observe any injuries or what
appeared to be possible injuries on the driver?

A. Appeared to be gunshot wounds to the driver.

Officer Key was standing next to the driver's
side door, so the wounds were mostly going from an up to
downward or right angle through the suspect.

The suspect was also mumbling things such as I
can't say exactly, but they were negative comments about
our jobs and us.

Q. Okay.

And did the officers involved at that point of
clearing and restraining the driver render medical aid?

A. They immediately began to render first aid upon
securing of the suspect, Corporal Yates, two county
deputies, and Officer Key initially.

Officer Key was removed from the first aid, as
there was plenty of people doing it, due to the stress of

56

PAYETTE-25

1 the events, and backed away from the event with myself.
2        Q.  And then paramedics arrived and eventually
3 rendered aid as well?
4        A.  They did.
5        Q.  Okay.
6              Now, as part of your equipment, you have
7 obviously firearm, other equipment around your utility
8 belt; is that correct?
9        A.  That is correct.
10       Q.  And how you appear now, is it close to how you
11 were --
12       A.  It's nearly the same.
13       Q.  Okay.  So --
14       A.  Maybe a different shirt, but the patches and the
15 badge and the radio, the body camera, my belt with my
16 taser, my baton, my radio, my firearm, my extra
17 magazines, my handcuffs were all still present.
18       Q.  All right.
19             Now, let's talk about this body camera.  Was it
20 activated -- well, let me strike that.
21             Your body camera, when does it get activated in
22 regards to any sort of law enforcement activity?
23       A.  I activated it once we had pulled up to the
24 vehicle and had it stopped when I had rammed it off the
25 road.  I activated it at that point.  I had not activated

57

1 it earlier.
2        Q.  So you didn't activate it when you were in your
3 pursuit of this Toyota Scion?
4        A.  I did not.
5        Q.  And you didn't activate it as you exited the
6 vehicle on the off-ramp?
7        A.  I didn't.  I was focused on getting to the
8 vehicle to assist Officer Key.
9        Q.  And to activate your bodycam, you have to
10 manually do that?
11       A.  That is correct.
12       Q.  Okay.  It doesn't automatically happen?
13       A.  It does not.
14       Q.  Okay.  Do you have a camera in your patrol
15 vehicle?
16       A.  We had at the time, it was a pretty new system
17 to me.  It's called 10-8.  We used Watchguard before
18 this.  And as far as I knew, it was working correctly and
19 in working order.
20       Q.  Okay.  And subsequent to this incident, was that
21 confirmed, or?
22       A.  That was confirmed.  It had been working prior
23 to this incident.  I'm not sure at what point it stopped
24 working prior to this incident.
25       Q.  So it was not operational at the time?

58

1        A.  They were not able to retrieve video from it,
2 from this incident.
3        Q.  Okay.
4              So neither your bodycam nor your dashcam on your
5 vehicle recorded what occurred during this incident?
6        A.  It only recorded the end of us removing the
7 suspect from the vehicle, approaching the vehicle and
8 removing the suspect and the first aid given.
9        Q.  I see.  Okay.
10             Now, the pursuit, let's talk a little bit more
11 about the pursuit.
12             In your opinion as a law enforcement officer, at
13 any time during the pursuit was the vehicle traveling in
14 excess of 25 miles an hour of the posted speed limit?
15       A.  Yes.
16       Q.  Okay.  And particularly at the Vetter Flats
17 area?
18       A.  Yes.
19       Q.  Reached approximately 80-plus miles an hour.  So
20 that would be over, 25 over the speed limit, which is 55
21 on Vetter Flats.
22             Okay.  Officer Branham, I believe those are all
23 of the questions I have at this time.
24             Thank you.
25       A.  Thank you.

59

1        MR. DOLTON:  Your witness.
2        THE COURT:  Is your client doing okay?  Need a
3 break?
4        MR. BISTLINE:  He may have to change positions
5 every now and then, but otherwise we are fine.
6        Thank you, Your Honor.
7        THE COURT:  All right.  You may go ahead.
8        CROSS-EXAMINATION OF BEN BRANHAM (OFFICER)
9 BY MR. BISTLINE:
10       Q.  Officer, just maybe with respect to the cameras.
11 Where does your body camera mount on your body?
12       A.  That's kind of officer discretion with our
13 camera.  And I'll show you here.
14             It has a clip that can be turned horizontal or
15 sideways.  I generally position my body camera to the
16 right center, right side of my chest.
17       Q.  Okay.  Right pretty much between your breasts?
18       A.  More or less.  Slightly lower, generally.  But,
19 yes.  That's the general area.
20       Q.  And what does it take to activate that camera?
21       A.  I have to physically reach it, grab it, and pull
22 down the front slide of the camera.
23       Q.  There's a slide?
24       A.  There is.  I can show you here.  **PAYETTE-26**
25             You have to, while it's attached to your chest,

60

1  pull this down.  It then activates.  Push it back up to
2  turn off.
3      Q.  Okay.  And can you do that while you are wearing
4  it?  Can you just reach up there with your hand, right
5  hand, and slap that thing and pull it down?
6      A.  You can.
7      Q.  Now, the car camera, if I understand correctly,
8  you said it was working before you started this
9  pursuit?
10      A.  It was working prior to this day.  I had not
11  pulled out the -- so to check that it's working with this
12  new system -- because it will say recording.  It said
13  recording.  I thought it was recording this day.  But to
14  actually verify it's recording, you have to turn off the
15  car, take out the SD cards, put them into a computer, and
16  review the files that you had recorded previously.
17      So for some reason, and I do not know why, I
18  know that there was damage done to the camera after,
19  during the investigation of this event, and I had to
20  replace a part.  I don't know why that was damaged.  I
21  wasn't involved in that.  It was the front clasp.  It has
22  to be -- the front clasp has to be closed and locked for
23  it to record.
24      So it did not record, but it recorded after the
25  event once we replaced that piece.

61

1      So the only thing I can figure is either it was
2  not locked correctly after reviewing this after the event
3  and was told it was not working, is it was locked
4  incorrectly or the piece that locks was damaged, which is
5  the only reason I can figure it would be damaged further
6  after the pursuit.
7      Q.  And what does it take to turn on that car video
8  so that it starts?
9      A.  It automatically activates recording when the
10  lights are activated.
11      Q.  Okay.
12      So when you -- in theory when you flipped your
13  lights on back in --
14      A.  Vetter Flats.
15      Q.  -- Vetter Flats, that camera should have come
16  on?
17      A.  That is correct.
18      Q.  And it has a little light that says it's on
19  recording, and you saw that light?
20      A.  Okay.  So that's down in my center console, the
21  light for the recording.
22      Q.  Okay.
23      A.  I was focused on the pursuit.  I knew my
24  overheads were on.  I did not look down to verify the
25  recording light, as I was focused on where I was driving

62

1  and the safety of the traffic stop.
2      Q.  Okay.
3      So then you went through the whole thing, but
4  then your camera didn't record anything, but it did start
5  recording after you ran him off the road into the sign?
6      A.  No.  That was my bodycam.
7      Q.  Oh.
8      A.  My bodycam after I ran him off the road.
9      As far as I know as of right now, my vehicle did
10  not, my vehicle video did not work throughout the
11  pursuit.
12      Q.  Okay.
13      A.  If I'm wrong, I need to be corrected.  As far as
14  I know, that's the case.
15      MR. BISTLINE:  Could I mark a couple of things,
16  Judge?
17      THE COURT:  Sure.
18      MR. BISTLINE:  These chairs are a little tricky
19  to move.
20      We'll mark this one number one.
21      THE COURT:  It will be Defendant's A.
22      (Defendant's Exhibits A and B marked for
23      identification.)
24      Q.  (BY MR. BISTLINE)  Officer, I'm going to hand
25  you what I've marked as Defendant's Exhibit A and ask you

63

1  if from your experience in this neighborhood you can
2  identify the intersection depicted in Exhibit A.
3      A.  This appears to be the off-ramp at Exit 3 and
4  the Exit 3 exit of I-84.
5      Q.  And now Exhibit B, can you identify what this
6  is?
7      A.  This appears to be the westbound off-ramp at
8  Exit 3.
9      Q.  And is that where this incident that you've been
10  describing occurred?
11      A.  It is.
12      Q.  Okay.  So what I'd like to do, I think you
13  testified that when you arrived and got out of your car,
14  Officer Key had already parked his car and was out of his
15  car.
16      A.  That is correct.
17      Q.  And the Scion was in the act of turning
18  around?
19      A.  So it pulled into the off-ramp, turned
20  towards -- it would be the north side border or that
21  barrier of the off-ramp, stopped, and then began doing
22  the backing up, moving forward at that point to turn
23  around.
24      Q.  Okay.  What I'd like to do is get a picture of
25  the location of things at the point in time when you

64

PAYETTE-27

61

1  stepped out of your car.
2      A.  Okay.  I believe I drew a picture that night.
3  And if you want me to, I can attempt to draw what was
4  there.
5      Q.  Let's draw it on this, so we can kind of see --
6      A.  I believe I'm going to be using Exhibit B to do
7  this drawing.  This is going to be an approximation of my
8  memory from that event.
9      Q.  Okay.
10     A.  I'm going to put the initial position of the
11  suspect vehicle, and then I'm going to draw an arrow for
12  the direction of travel it took out of the exit.
13     Q.  Okay.
14     A.  Is that what you are asking me to do?
15     Q.  What I want right now is just a picture of your
16  best recollection of where everything was located when
17  you stepped out of your car.
18     A.  Okay.  I'm going to put an S on the suspect
19  vehicle
20     Q.  Okay.
21     A.  I'm going to put an F, the officer from
22  Fruitland's vehicle.
23         And I'm going to put a P where I positioned my
24  vehicle to the best of my recollection.
25     Q.  Okay.  So the suspect is across the ramp.

65

1  Fruitland you are saying is straight down the ramp?
2      A.  More or less straight down; yes.
3      Q.  That would be Keys?
4      A.  That is correct.
5      Q.  And you are facing sort of to the southeast?
6      A.  Southeast; yes.
7      Q.  And to the left of Fruitland?
8      A.  Yes.
9      Q.  Okay.  And so what do you estimate the distance
10  between the front end of the Fruitland vehicle and the
11  Scion at the time you stepped out of your car?
12     A.  This would be an approximation of -- if I had to
13  put it into feet, maybe let's say 50 feet
14  approximately.
15     Q.  Okay.
16         And now could you add a one to represent Officer
17  Key's position when you got out of the car?
18     A.  He was approximately beside the suspect vehicle
19  or on his way to the suspect vehicle.
20         You said put a 1?  I'm sorry.  I put an X.  I'll
21  put a 1 next to the X.
22     Q.  All right.  And then you would have been
23  stepping out of the driver's side door of your car at
24  that point; right?
25     A.  Yes.  I will put a 2 for my side.  I was exiting

66

1  the driver's side, which my vehicle was pointed in that
2  direction; his was pointed in that direction.
3         Initially the suspect vehicle was pointed -- I'm
4  putting arrows at the front of the vehicles to show the
5  direction they were more or less pointing.
6         I got out of the driver's side of my patrol
7  vehicle --
8      Q.  Don't get too far ahead of me.
9      A.  Okay.  Go ahead.
10     Q.  Yeah.  Thank you.
11         Okay.  So your distance from the suspect, the
12  Scion, at the time you stepped out of your car was about
13  what?
14     A.  It would have been further than Officer Key's
15  vehicle.  So 60 to 70 feet, perhaps.  This is an
16  estimation.
17     Q.  Okay.
18         And how far away were you from Officer Key at
19  that moment?
20     A.  Let's say 40 to 50 feet approximately.
21     Q.  Okay.  And he was downhill of you, down the
22  ramp?
23     A.  Would have been slightly downhill; yes.
24     Q.  He was -- let me look at something here.
25     A.  So upon exiting the vehicle, I would have been

67

1  on the driver's side of mine.  He would have been most of
2  the way to the suspect vehicle.
3      Q.  Okay.  So he was downhill from you, down the
4  ramp?
5      A.  That is correct.
6      Q.  Towards the interstate.
7         And if we had to orient him to your side, he was
8  actually slightly to your right?
9      A.  Straight ahead, slightly right.
10     Q.  Okay.
11         And the vehicle was moving.  At this point it's
12  going back and forth and trying to turn up along the
13  guard-rail --
14     A.  When Officer Key got out of his vehicle and
15  started approaching, the vehicle was parking at that
16  point, stopping so that it could begin its backward
17  motion.
18         From the time of me getting out of my vehicle
19  and beginning to run to support Officer Key, at some
20  point during that event of a couple seconds, it began to
21  back up and move forward and turn.
22     Q.  Okay.
23         So as the -- moving forward from this diagram,
24  as this vehicle is going back and forth, attempting to
25  turn, it's attempting to put itself alongside the

PAYETTE-28

68

1 guard-rail?

2     A. It's going to go between my patrol vehicle and

3 the guard-rail to exit back onto Highway 95.

4     Q. Okay. And was that pretty clear to you, that

5 that was what he was trying to do?

6     A. Once I had gotten to the vehicle, it was clear

7 that was happening.

8     Q. Okay.

9     A. Upon exiting my vehicle, right before stopping

10 my vehicle, when I had decided that we were going to have

11 to get out and assist Officer Key, I just knew it had

12 stopped on the off-ramp.

13     Q. Okay.

14     A. It was between the time of me getting out of my

15 vehicle and approaching that I saw it was backing up and

16 moving forward.

17     Q. He is starting to maneuver to come up the

18 guard-rail?

19     A. That is correct.

20     Q. Okay. And as you are coming down that hill

21 towards the vehicle, are you attempting to position

22 yourself in the path of the vehicle?

23     A. No. I was not. I was trying to get to the left

24 side of Officer Key.

25     Q. You were already on the left side of Officer

69

1 Key, aren't you?

2     A. Yes.

3        When I initially exited my vehicle, again, I was

4 looking straight ahead; he was slightly right. Once I

5 started moving toward the vehicle, I had -- and Officer

6 Higley was on the right side and approaching the right

7 side of Officer Key, so I was approaching and staying to

8 the left of Officer Key.

9     Q. Okay. So you are staying over towards the left

10 of Officer Key, which moves you towards the guard-rail

11 from his position?

12     A. Uh-huh. More or less; yes. I'm closer to the

13 guard-rail than Officer Key.

14     Q. More or less into the path of the Scion as it's

15 turning around?

16     A. In my initial approach of the vehicle, the Scion

17 was not pointed in my direction. It got pointed in my

18 direction while I was beside it.

19     Q. Right. But once it's turned around and you say

20 it's directly in front of you, you are to Officer Key's

21 left already?

22     A. That is correct.

23     Q. Do you remember having your statement taken by

24 an Officer Christensen from the Idaho State Police?

25     A. I do.

70

1     Q. Were you given a chance to review that statement

2 at any point in time?

3     A. I was.

4     Q. Did you consider it accurate?

5     A. Yes, I do.

6     Q. Did you have a chance to change anything or

7 suggest changes to anything that you didn't think was

8 accurate?

9     A. I did.

10     MR. BISTLINE: Can we mark this, please?

11     (Defendant's Exhibit C marked for

12     identification.)

13     Q. (BY MR. BISTLINE) Okay. I'm going to have you

14 look at Exhibit C and ask you, is that, as far as you can

15 tell, a copy of the report that was prepared following

16 your meeting with Officer Christensen?

17     A. Yes, it is.

18     Q. And to be clear, you've reviewed this?

19     A. I have.

20     Q. I'd like to have you look at Paragraphs 24 and

21 25 of this statement.

22     A. Paragraph 25? Which sentence?

23     Q. Paragraphs 24 and 25.

24     A. Okay. I'm there.

25     Q. Page 3 of 5.

71

1     A. I am there.

2     Q. Do you see those?

3        Now, these two paragraphs describe I think what

4 we were just talking about, your exit and what was going

5 on following your exit.

6     A. Yes.

7     Q. Correct?

8     A. That is correct.

9     Q. So when this vehicle is turned around, as

10 described in Paragraph 25, and pointed right towards you,

11 you tell, apparently told Officer Christensen that you

12 couldn't point your handgun at Grant, because he was

13 still behind and to the left of Officer Key.

14        And I'm having a hard time understanding that,

15 because you were still behind and to the left of Officer

16 Key.

17     A. So --

18     Q. And what I'm not understanding about that is if

19 you were behind and to the left, you are closer to the

20 guard-rail and the Scion is pointed directly at you and

21 why that would put you in the position that you

22 couldn't --

23     A. I can explain that very easily.

24        The vehicle was moving toward me. And this was

25 later in the event of the vehicle turning toward me. I

PAYETTE-29

72

1  was -- at this point the vehicle was pointed enough that
2  I was, instead of beside the vehicle, so on the side of
3  the vehicle, I was to the front and slightly right of the
4  suspect vehicle, meaning that if I'm looking at you and
5  you are the suspect, Officer Key is right beside you, and
6  I am at -- can I stand up to show?
7          THE COURT:  Sure.
8          MR. BISTLINE:  Please.
9          THE WITNESS:  Okay.  So you are the suspect
10 sitting in the vehicle.  Officer Key is standing right
11 beside you outside.  He'd stay put.
12     Q.   (BY MR. BISTLINE)  He is right here?  Officer
13 Key is right here?
14     A.   He is right there.
15     Q.   Okay.
16     A.   You are right here.
17     Q.   And I'm pointing right at you?
18     A.   And the vehicle was still at an angle.
19     Q.   I see.
20     A.   Slightly.
21     Q.   Uh-huh.
22     A.   Because I'm at the front quarter-panel of the
23 suspect vehicle.
24     Q.   So that would move you up here, wouldn't it?
25     A.   Negative.

73

1      Q.   If Key is standing at the door --
2      A.   He is standing at the door.
3      Q.   He is here?
4      A.   I was left of him, but the vehicle was
5  slanted.
6      Q.   But if you are at the front quarter-panel, you
7  are clear up here; aren't you?
8      A.   So, yes, if I was looking at directions of
9  distance, it would be approximately this far.
10     Q.   Okay.  And here is Officer Key?
11     A.   Yes.
12     Q.   And you couldn't point your gun at me?
13     A.   I did not feel safe doing so, because both
14 things are moving:  The vehicle is moving.  Officer Key
15 was moving towards the vehicle and away from the vehicle,
16 and at any point if I engaged my firearm with that
17 vehicle in between us, that bullet's trajectory will
18 change when it passes through, and I do not want to aim
19 my gun --
20     Q.   Okay.  So --
21     A.   -- in order to have a chance of firing my weapon
22 at ( inaudible).
23     Q.   Okay.  But your reasoning for not getting your
24 gun out was not --
25     A.   My gun was out.

74

1      Q.   -- because you were behind or to the left of
2  Key?
3      A.   For the record, my gun was out.  It was at the
4  low ready, which means in transition to a low ready,
5  instead of pointing right at you, is here.
6      Q.   Okay.  The reason you didn't bring your gun into
7  full ready was not because you were behind Key and to his
8  left.  You were actually, in terms of where the vehicle
9  was going, you were in front of Key.  And you were not
10 concerned about him being, you being left or right of
11 him, you were concerned about the fact that he was right
12 by the vehicle?
13     A.   I was concerned about the positioning of the
14 vehicle, Officer Key, and the closeness of the suspect
15 and the fellow officer.
16     Q.   Okay.
17     A.   And to my view, Officer Key was facing away from
18 me more or less.  I mean, he was more faced away than
19 toward me.  I was to the left and behind of him, because
20 I saw his back and side rather than his face.
21     Q.   Okay.
22          So then you say that, as in your statement here,
23 apparently that as the Scion was turning around, you
24 stepped back and attempted to aim your handgun at Grant.
25          So that's one step away from the guard-rail?

75

1      A.   So stepped back.  So if I'm facing the suspect,
2  I stepped backwards.
3      Q.   So more clearance between you and the vehicle?
4      A.   That's correct.
5      Q.   Okay.  And then you took another step back as
6  Grant began to speed up, which way is back in this
7  instance?
8      A.   If I'm staring at the vehicle, I was stepping to
9  the northwest.
10     Q.   Okay.
11          And --
12     A.   Probably more west than north.
13     Q.   And you took that step back because you were in
14 the path of the vehicle?
15     A.   That's correct.
16     Q.   So you remained in the path of the vehicle?
17     A.   That's correct.
18     Q.   And then in the next paragraph, Paragraph 27, it
19 says Grant then sped up and drove away; right?
20     A.   Yes.
21     Q.   So at this point you have moved from the
22 quarter-panel of the vehicle, two steps back to your --
23 maybe 10 feet maximum away from the front of the
24 vehicle?
25     A.   Perhaps.

**PAYETTE-30**

76

73

1    Q. Okay.
2       And at that point is when he starts to
3  accelerate, like he is moving up the ramp?
4    A. Yes.
5    Q. And it says here he stepped to the right just
6  prior to the shooting, which would also be just prior to
7  the vehicle coming past you; correct?
8    A. Yes.
9    Q. It doesn't say anything here about diving, does
10 it?
11   A. No.
12   Q. Did the driver of the Scion ever manipulate that
13 vehicle in a way that wasn't the most reasonable and
14 efficient way for him to get out of there?
15   A. Can you rephrase the question? I don't think I
16 understand it.
17   Q. Sure. Did the Scion ever do anything that
18 suggested it was doing anything more than trying to get
19 out of there?
20   A. I'm not sure how to answer that question.
21      The vehicle was driving exactly as I described.
22 There was people in its path. It drove at the people.
23      Are you asking me if it was just trying to exit
24 the ramp or if it was trying to hurt people?
25   Q. Did it ever do anything which wasn't consistent

77

1  with trying to exit the ramp?
2       MR. DOLTON: Objection. Speculation, Your
3  Honor.
4       MR. BISTLINE: He has got observations.
5       THE WITNESS: My observations --
6       THE COURT: Just a minute.
7       THE WITNESS: Sorry.
8       THE COURT: The objection is overruled.
9  You may answer the question.
10      THE WITNESS: Okay.
11      From my perspective, the vehicle was trying to
12 position itself to leave the ramp.
13   Q. (BY MR. BISTLINE) Okay. Did it ever swerve
14 toward you?
15   A. I was -- before it pointed directly at me, it
16 continued moving toward me.
17   Q. Okay.
18   A. In the forward direction at my position and
19 drove forward before I was clear of its front bumper.
20   Q. But when you started to move out of its way, it
21 didn't swerve towards you, did it?
22   A. I can't say consistently yes or no to that, as I
23 was trying to get out of the way of the vehicle, and that
24 was my focus at that point.
25   Q. It's curious to me. This is really probably

78

1  more curiosity. You use meters when most of the rest of
2  us use yards and feet.
3    A. I can explain that.
4       I'm in the military, and military uses meters.
5    Q. Oh, okay.
6    A. It's kind of engrained.
7    Q. All right.
8       It sounded to me in your description of what
9  we'll call the pursuit, that there were some vehicles
10 coming towards you and some vehicles going the same
11 direction, but that everybody was yielding to the police
12 lights as you were moving along --
13   A. Except for Mr. Grant.
14   Q. -- following this car?
15   A. Yes.
16   Q. Okay.
17      So I'd like to go back to Exhibit B. And I'll
18 try to understand this concept of a tactical L.
19   A. I can draw in the white margin if you'd like.
20   Q. Well, I guess what I'd like you to do is maybe
21 put a little box for at the time you are working to set
22 up your tactical L, a little box for Officer Key, who is
23 number one here, but also put a little box where he was
24 and then a little asterisk for number two, you, so that I
25 can see what this tactical L is supposed to look like.

79

1    A. You want a box for Officer Key?
2    Q. Yeah, a box.
3    A. I'm going to put the direction that he was
4  facing as well with an arrow.
5       And then you want an asterisk, which is a five
6  pointed star?
7    Q. For you.
8    A. For me?
9    Q. An asterisk is six points.
10   A. Six points.
11      THE COURT: Maybe it's seven.
12      THE WITNESS: Well, there's something on this
13 paper that might look like an asterisk.
14      MR. BISTLINE: Okay.
15      THE WITNESS: With my direction I was facing.
16      MR. BISTLINE: All right.
17   Q. (BY MR. BISTLINE) Okay. So the tactical L at
18 the time you were setting up this tactical L, was the
19 Scion still across, or was it making its --
20   A. It was foot faced, in that I would have been at
21 the front quarter panel of the vehicle, and he would have
22 been beside it.
23      So I was as far forward as I could be
24 reasonably.
25   Q. And the vehicle was no longer across the exit

**PAYETTE-31**

80

77

1  ramp but --
2      A.  It was changing directions to point in my
3  direction.
4      Q.  Okay.
5      A.  So from the beginning to the end, I stayed
6  mostly to the front quarter-panel of the suspect vehicle,
7  which was the closest I could get to a tactical L without
8  getting underneath the front bumper.
9      Q.  Okay.  When you got down into the position of
10  that, you are at here in this tactical L, this little, I
11  guess that's the asterisk, and you are facing down the
12  off-ramp, was the Scion 90 percent of the way around, 50
13  percent of the way around?
14         We consider around as the turn it made from
15  across the ramp to up the ramp.
16      A.  I would say that was the final position.  So
17  right before it went straight ahead.
18      Q.  Okay.
19      A.  So it was still facing the barrier a little bit.
20  It had to continue its turn to get straight in my memory,
21  or it would have scraped or hit the barrier.
22         How much turning it did, I'm not 100-percent
23  sure, because I was getting out of the way and more
24  focused on not getting hit.
25      Q.  Okay.  And you say I think at some point that as

81

1  the vehicle went by you, you felt it go by you?
2      A.  I felt the air.  Like when something goes by you
3  fairly quickly you feel movement, air, whatever you want
4  to call it, I have a memory of feeling that; yes.
5      Q.  And when you are at that point, do you recall
6  where Officer Key was?
7      A.  Again, this is when he was firing his weapon.
8  He was still beside the driver's window for the most
9  part, which is where the shots were fired from, and again
10  which is while I was moving away from the vehicle to get
11  out of its path.  So I wasn't staring at Officer Key.  I
12  was looking at the vehicle and moving away quickly.
13      Q.  Okay.
14         I have no other questions.  Thank you, Officer.
15      THE COURT:  Mr. Bistline, what would you like to
16  do with these three exhibits?
17      MR. BISTLINE:  Well, I'd like to admit them.
18      THE COURT:  Any objection?
19      MR. DOLTON:  No objection.  But I will be
20  inquiring further about them, just for clarification.
21      THE COURT:  Well, Defendant's Exhibits A, B, and
22  C are admitted.
23         (Defendant's Exhibits A, B, and C admitted.)
24      THE COURT:  You may redirect.
25      MR. DOLTON:  Thank you, Your Honor.

82

1      May I approach?
2      THE COURT:  Yes.
3      REDIRECT EXAMINATION OF BEN BRANHAM (OFFICER)
4  BY MR. DOLTON:
5      Q.  All right.  Officer Branham, Exhibits A and B,
6  are the conditions the same on Exhibits A and B as they
7  were --
8      A.  No.  They are not.
9      Q.  Okay.  How is that?
10      A.  It's day.  We were there at night when it was
11  dark, very dark.
12      Q.  And so the light that was available at the time
13  of the incidence, where would the light be emitted
14  from?
15      A.  The moon, what little there was.
16         I'm not sure exactly what size the moon was, but
17  it was fairly dark.  And our headlights were the only
18  thing providing light.
19      Q.  Okay.
20      A.  We might have had a flashlight out.  I don't
21  recall exactly if I had a flashlight at that point.  I
22  don't think I had one in my hand at that point.
23      Q.  And any sort of light resonating from either
24  the --
25      A.  The lights and sirens of our vehicles were

83

1  going.  So we had red, blue, and white light, all
2  strobing.  The white lights from our headlights, the red
3  and blue from our overhead lights, the light from -- I
4  believe there was a one of those lights that's over the
5  street.  Sorry.  A streetlight there as well.
6         I could see the vehicle clearly.  I could see
7  the suspect once I was up to the vehicle.
8      Q.  Okay.  Now I want to draw your attention back to
9  your statement to Officer Christensen.
10         Were you ever asked how you avoided being
11  struck?
12      A.  They asked me to recount the events, and they
13  asked clarifying questions.
14      Q.  Were any of those clarifying questions, did they
15  pertain to how you got out of the way of the Scion?
16      A.  I don't recall a specific question clarifying my
17  events of that event.
18      Q.  Okay.
19      A.  I just got out of the way.
20      Q.  And then you stated under cross that the Scion
21  had to turn further to straighten to get back up the
22  ramp?
23      A.  Yes.
24      Q.  And in what direction did it have to turn to
25  correct to go straight?

**PAYETTE-32**

84

81

1   A.  Towards me, or it would have been north and
2   west.
3   Q.  Okay.  Would that essentially be left, if you
4   were driving the Scion?
5   A.  Yes.
6   Q.  Okay.  So left and then -- correct, to go up the
7   ramp?
8   A.  Yes.
9   Q.  Okay.
10      And you said it was in your direction.  What do
11  you mean by that?
12  A.  If I had not moved when it drove forward, I
13  would have gotten ran over.
14  Q.  Okay.  Now, about your position.  You seem to
15  emphasize that your position was based upon supporting
16  Officer Key rather than obstructing the vehicle.
17  A.  Yes.  I wasn't going to leave Officer Key alone
18  to deal with a dangerous suspect.
19  Q.  As you were positioning yourself in relation to
20  Officer Key, did you also factor in the possibilities of
21  the vehicle's direction?
22  A.  Yes, but I couldn't leave --
23  Q.  Sure.
24      And is it a law enforcement policy to try to
25  physically obstruct with the human body, a vehicle?

85

1   your position?
2   A.  Negative.  I don't believe he could see me.
3       Again, he was focused on not getting -- he had
4   to move himself and did move to keep from going
5   underneath the vehicle.  Because again, it was moving in
6   my direction, but it was also moving left, or would have
7   been mostly west, as well as trying to straighten more
8   north.  So had he not moved while that was going on, the
9   vehicle was covering ground he was on as well, so.
10  Q.  It's possible that if he did move, he would have
11  been under the rear tires?
12  A.  It would have been the front tire.
13      I thought he was going underneath.  Because
14  again, he was at the driver's side door.  So he was much
15  closer to the front tires than the back.  And while it
16  was moving, those tires were angled forward and left, so
17  I thought he was going to go underneath that portion of
18  the car, between the tire and the front door.
19  Q.  Okay.  And that was prior to you taking action
20  to avoid --
21  A.  Yes.
22  Q.  -- being struck?
23      All right.  And for clarification, where were
24  you when you heard the shots being fired?
25  A.  I was moving to get out of the line of sight.

87

1   A.  No.
2   Q.  Okay.  And what is the policy if you are in the
3   direction of the vehicle?
4   A.  If you can get out of the way safely, do so.  Or
5   if it's threatening your person or life and it clearly
6   knows you are there, that you have the legal means to use
7   deadly force.
8   Q.  But you didn't have the means.  You had your gun
9   positioned at a low ready; right?
10  A.  I knew in my head that I had the legal means to
11  use deadly force, but I was not willing to injure Officer
12  Key.  I would much rather have myself get injured than
13  injure a fellow officer.
14  Q.  So as you were at the low ready and the vehicle
15  was coming towards you, you didn't raise the weapon.  You
16  chose to --
17  A.  I may have raised it at one point.  I remember
18  thinking I'm going to have to shoot this suspect or get
19  ran over.  But I was not comfortable doing so with
20  Officer Key that close to the suspect and the angle I
21  had, so I chose to try to get out of the way with the
22  little time I had.
23  Q.  Now, in your position behind Officer Key,
24  besides yelling verbal commands along with Officer Key,
25  was there any communication you had with (inaudible) to

86

1   It was while the vehicle had started its final movement
2   forward that the shots were fired.  I was attempting to
3   get out of the way of the vehicle.
4   Q.  Okay.  So that was before you changed positions
5   in relation to the car?
6   A.  Yes.  It was right almost at the same time as I
7   started to move the shots rang out.
8   Q.  Okay.
9   A.  It was almost simultaneously.
10  Q.  Okay.
11      MR. DOLTON:  No further questions.
12      THE COURT:  Any other questions, Mr. Bistline?
13      MR. BISTLINE:  I need to look at something.
14      I think just one question, officer.
15      RE-CROSS-EXAMINATION OF BEN BRANHAM (OFFICER)
16  BY MR. BISTLINE:
17  Q.  As we look at Exhibit B, as this vehicle is
18  turning around, is in the process of turning around and
19  Officer Key is moving from position one to the square,
20  where the square is --
21  A.  That is not an accurate representation of where
22  he ended up.  I just didn't want to put it super close to
23  the other one.
24      Basically -- I'll try to explain this.
25      From my initial position, I had to move more or

88

PAYETTE-33

1  less backwards of my position.  So this would have been
2  kind of in the direction of this yellow line.
3      Q.  Right.
4      A.  And then a little toward my patrol vehicle.  So
5  that would be --
6      Q.  To your right?
7      A.  A little bit right.
8          And he would have had to move less, because he
9  was more at the center point of the car.  So he probably
10  had to move backwards a little bit.
11      Q.  Okay.  But as he's in those positions --
12      A.  Yes.
13      Q.  -- signified by the one in the box and in that
14  general area?
15      A.  In that general area; yes.
16      Q.  Is there anything behind him that keeps him from
17  getting out of the way of the vehicle?
18      A.  Just him trying to stop the person from leading
19  us on a further pursuit.
20      Q.  Okay.
21      A.  And putting other people in danger.
22      Q.  Okay.
23          And then also, as you are in the position
24  getting out of your car and moving down to the front of
25  the vehicle and then backing away from the vehicle, was

89

1  there anything that kept you from stepping out of the
2  way?
3      A.  Only my training in law enforcement not to leave
4  an officer behind in a dangerous circumstance.
5      Q.  But by the time you are stepping back, the
6  vehicle is already turned around and pointed straight at
7  you; correct?
8      A.  This happened over the seconds of the event.
9  This didn't happen immediately.
10      Q.  I understand.  But as you are stepping back from
11  that vehicle, it's pointed straight at you?
12      A.  So again, I was at the front quarter-panel.  So
13  straight at me?  I wasn't at the center of the vehicle.
14      Q.  Okay.  You were at the --
15      A.  I was at the edge.  The vehicle was still in
16  front of me.  Part of the vehicle was in front of me.
17      Q.  And Officer Key was also out of the way?
18      A.  He is at the side of the vehicle.
19      Q.  Right.
20          So if the vehicle moves straight forward, it's
21  not going to touch Officer Key, is it?
22      A.  Again, it wasn't pointed perfectly.  It still
23  was pointed partially at the barrier.  It had to turn
24  further to avoid the barrier.
25      Q.  Okay.

90

1      A.  So it still had to move in his direction, a
2  little bit in that direction.
3          Would it have hit him?  At that point when it
4  drove toward me in that event, probably not.
5      Q.  But by the time it's driving forward towards
6  you, it's straightened out, isn't it?
7      A.  Again, it was aimed still at the barrier.  It
8  still had to turn.  It just had enough movement and
9  enough positioning to turn as it moved forward so it
10  didn't have to back up anymore.
11      Q.  Okay.  And at that point Officer Key is standing
12  alongside of it?
13      A.  He is at the driver's side door.
14      Q.  Okay.
15      MR. BISTLINE:  I have no other questions.
16      THE COURT:  May I see the exhibits?
17      MR. DOLTON:  Your Honor, we'll retain Officer
18  Branham for the present time, in case we need to re-call
19  him.
20      THE COURT:  I may have a question.
21      MR. DOLTON:  Oh.  Sorry.
22      THE COURT:  I'm going to hand you Exhibit B,
23  Officer.
24      THE WITNESS:  Yes, Your Honor.
25      THE COURT:  There's some kind of material that I

91

1  can't tell what it is.
2          This would be as you are coming off the off-ramp
3  on the right side.  So it would be along the north, I
4  believe the north and south area.  Is that -- is it a
5  metal barrier?
6      THE WITNESS:  It is a metal guard-rail with the
7  wood posts and the metal guiding.
8      THE COURT:  And how far does that extend past
9  the white line?
10          I guess is that the stop line?
11      THE WITNESS:  Stop line of the exit ramp.
12          Again, this is a car.  So a car is
13  approximately, let's say, 20 feet.  Approximation.  I
14  don't know which car that is, but we'll say --
15      THE COURT:  It goes around the corner.
16      THE WITNESS:  It does.  It goes until --
17  basically at the point where the hill gets kind of steep
18  or the overpass is where it kind of starts more or less.
19  So it's about 200 to 300 feet after the curve.
20      THE COURT:  This is my question:  What was the
21  clearance between that guard-rail and your vehicle at the
22  time you said Mr. Grant had straightened out and was
23  going towards you?
24      THE WITNESS:  Approximately two car widths,
25  maybe a little more.  Perhaps two-and-a-half car

PAYETTE-34

92

1 widths.
2          THE COURT:  And car width is?
3          And what would a car width -- how many meters is
4 that?
5          THE WITNESS:  We'll say a meter and a half.
6          A meter is approximately six feet.  So we'll say
7 seven feet is a car width.
8          THE COURT:  One meter is six feet?
9          THE WITNESS:  Three feet.
10         Sorry.  Thank you.
11         Again, I haven't slept in a while.  I worked all
12 last night.
13         So, yes.  A meter is a little over three feet.
14 A yard is three feet, more or less.
15         THE COURT:  Thirty-nine something inches per
16 meter.
17         THE WITNESS:  Yes.
18         And so probably two meters about for one car
19 width.
20         Again, this is a car facing you.
21         So two trucks --
22         THE COURT:  So you think two car widths, four
23 meters of distance between your vehicle and this
24 guard-rail?
25         THE WITNESS:  I would assume at least that much.

93

1          THE COURT:  That's -- well, I have one other
2 question.
3          THE WITNESS:  Yes, Your Honor.
4          THE COURT:  Was there any other traffic on the
5 off-ramp during this event?
6          THE WITNESS:  During the time we were on the
7 off-ramp, there was no vehicles that drove up to where we
8 were at and stopped.  That I remember.
9          THE COURT:  Did you see anybody stop on the
10 interstate, or?
11         THE WITNESS:  I was faced -- I was faced on the
12 car.  I wasn't looking at the interstate.  I really
13 didn't pay attention to the interstate or the traffic
14 behind me on Highway 95.
15         I heard vehicles, so potentially a vehicle or
16 two passed us while this was going on behind us on 95.
17         I did not look at the interstate.  I was focused
18 on the suspect vehicle.
19         THE COURT:  In light of my questions, does the
20 State have any other questions?
21         MR. DOLTON:  Redirect.
22         RE-REDIRECT EXAMINATION OF BEN BRANHAM (OFFICER)
23 BY MR. DOLTON:
24    Q.  In regards to traffic on Interstate 84, you
25 didn't have any recollection or weren't focusing on it.

94

1          Were there any vehicles that were just
2 essentially parked on the off-ramp at the time that you
3 were --
4    A.  Not that I recall.
5    Q.  Okay.
6          MR. DOLTON:  That's all I have, Your Honor.
7          THE COURT:  Okay.
8          Mr. Bistline, re-recross?
9          MR. BISTLINE:  Yeah.
10         RE-RE-CROSS EXAMINATION OF BEN BRANHAM (OFFICER)
11 BY MR. BISTLINE:
12    Q.  Just to be clear, a vehicle coming up that
13 off-ramp would have seen all of these lights flashing?
14    A.  Oh, yes.
15    Q.  And they would have also been decelerating
16 because they were entering, approaching an
17 intersection?
18    A.  I would hope so.
19    Q.  And there's a stop sign at that intersection?
20    A.  There is.
21    Q.  Okay.
22         MR. BISTLINE:  I have no other questions.
23         THE COURT:  Okay.  Thank you.
24         You are subject to re-call.
25         THE WITNESS:  I understand, Your Honor.  I'll

95

1 remain here.
2          THE COURT:  And you are not to discuss any of
3 your testimony with any of the other witnesses.
4          THE WITNESS:  I understand, Your Honor.
5          THE COURT:  Thank you very much.
6          MR. BISTLINE:  Your Honor, I'm not going to have
7 any further examination.  I covered all of my points.
8          THE COURT:  Okay.
9          MR. BISTLINE:  Since he's been up all night,
10 maybe he'd like to go.
11         THE WITNESS:  I can wait for whatever is needed.
12 It's fine.
13         MR. DOLTON:  We'll have him wait just a little
14 bit longer.
15         We are going to call Officer Higley up, and I
16 anticipate after Officer Higley's testimony (inaudible).
17         THE WITNESS:  I'm more than capable of staying
18 awake.
19         THE COURT:  Can you go take a nap?
20         We can't even give you the jury room.  They have
21 got a trial going on.
22         THE WITNESS:  I'll be okay.
23         Thank you, Your Honor.
24         THE COURT:  Okay.  We are going to take -- how
25 much of a recess would you like, Mr. Bistline, at this

96

PAYETTE-35

1  point?

2          MR. BISTLINE:  Doesn't matter to me.

3          THE COURT:  Ten minutes?  Fifteen minutes?

4          Let's come back at 11:25.

5          MR. BISTLINE:  You have the exhibits?

6          THE COURT:  We have got them all.

7          MR. DOLTON:  And they are admitted, too, Your

8  Honor?

9          THE COURT:  Yeah.

10         Court is in recess.

11         (Brief recess was taken.)

12         THE COURT:  We are reconvening in case 2017-660,

13  *State of Idaho versus David Michael Grant.*

14         Mr. Dolton, if you'd like to call your next

15  witness.

16         MR. DOLTON:  Thank you, Your Honor.

17         State calls Duane Higley.

18         THE COURT:  Come up here.  The clerk will put

19  you under oath.

20         (Witness sworn.)

21         THE COURT:  Mr. Higley, if you'd like to have a

22  seat in that chair.

23         MR. DOLTON:  May I proceed, Your Honor?

24         THE COURT:  You may.

25         MR. DOLTON:  Thank you.

                                                          97

1      **DIRECT EXAMINATION OF DUANE HIGLEY (OFFICER)**

2  BY MR. DOLTON:

3      Q.  Can you please state your name, spell your last

4  name for the record.

5      A.  Duane Charles Higley, H-i-g-l-e-y.

6      Q.  All right.

7          And Mr. Higley, how are you involved with the

8  Payette City Police Department?

9      A.  I'm a reserve police officer.

10     Q.  And as a reserve police officer, what does that

11  consist of?

12     A.  You go through training and become a Level II

13  Reserve, and then you have to work at least 10 hours a

14  week -- or 10 hours a month, every month.

15     Q.  Okay.  Now what responsibilities does a reserve

16  officer have at the Fruitland Police Department?

17     A.  The Payette Police Department?

18     Q.  Yes, Payette.

19         Thank you.

20     A.  Just to assist an officer.

21         You always have to ride with an officer, and

22  then you assist and help out in any way that they need

23  your help.

24         Usually you cover in the other side of a

25  vehicle.

                                                          98

1      Q.  And are you permitted to carry firearms?

2      A.  Yes.

3      Q.  Okay.  Are you trained in firearms with law

4  enforcement?

5      A.  Yes.

6      Q.  Do you go to POST to get that training, or do

7  you get it within the department?

8      A.  With the firearms instructor within the

9  department.

10     Q.  Okay.  And how long have you been a -- what

11  level of reserve officer are you?

12     A.  Level II.

13     Q.  And how long have you been a Level II reserve

14  with Payette City?

15     A.  Just a little over two years.

16     Q.  Okay.  And is Level I higher or lower than Level

17  II?

18     A.  Higher.

19     Q.  Okay.

20         And so is it safe to say that your duties as a

21  Level II reserve officer with Payette City Police

22  Department are to assist, accompany patrol officers while

23  they are on duty?

24     A.  Yes.

25     Q.  And so you don't actively write citations or

                                                          99

1  conduct criminal investigations; correct?

2      A.  Correct.

3      Q.  Okay.

4          And I want to draw your attention to October

5  25th or October 24th, in the early morning hours of

6  October 25th, 2016.

7          Are you ready?

8      A.  Yes.

9      Q.  All right.  Do you recall whether you were

10  acting as a Level II reserve officer at that time?

11     A.  Yes, I was.

12     Q.  Okay.  And who were you -- what patrol officer

13  were you assisting?

14     A.  Officer Branham.

15     Q.  Okay.

16         And were you with him during his whole shift?

17     A.  From the start of his shift until the time of

18  the incident.

19     Q.  Okay.  So when did you start your shift with

20  Officer Branham?

21     A.  9:00 p.m.

22     Q.  All right.  And you concluded your shift at what

23  time?

24     A.  After we got done, about 5:00 a.m.

25     Q.  Okay.  And so we keep bouncing around.

                                             **PAYETTE-36**

                                                          100

```
 1        After you got done and whatnot, did you
 2 participate with Officer Branham in a pursuit of a 2013
 3 black Toyota Scion, or Scion?
 4    A. Yes.
 5    Q. And you were a passenger in Officer Branham's
 6 patrol vehicle; correct?
 7    A. Yes.
 8    Q. And at that time you were following a vehicle
 9 with some assistance from other law enforcement agencies
10 in the area?
11    A. Yes.
12    Q. Okay.
13    A. Not at first.
14    Q. Sure.  Sure.
15       And what was the basis for the pursuit of this
16 2013 Toyota Scion?
17    A. The vehicle passed us and ran a stop sign.
18       Stoplight.  Excuse me.  A stoplight.
19    Q. All right.
20       And did Officer Branham activate his lights?
21    A. Yes.
22    Q. Do you know at what point he did so?
23    A. Right after the vehicle ran the stoplight on --
24 right there at Vetter and 95.
25    Q. Okay.  And did Officer Branham employ his sirens
                                                      101
```

```
 1 as well?
 2    A. Yes.
 3    Q. Was that at the same time, before, or after his
 4 lights?
 5    A. Same time, I would say.
 6    Q. Okay.  And this pursuit, did it occur in Payette
 7 County, State of Idaho?
 8    A. Yes.
 9    Q. And did it conclude at Exit 3 on Highway 95 and
10 Interstate 84?
11    A. Yes.
12    Q. Okay.  Let's draw your attention to Exit 3.
13       At that time did Officer Key kind of take over
14 the pursuit?
15    A. Before that, as we were leaving Fruitland.
16    Q. Okay.  But he was in the lead?
17    A. Yes.
18    Q. All right.
19       And then after taking lead, the vehicle stopped
20 at an off-ramp entering Interstate 84; is that correct?
21    A. Yes.
22    Q. Did you exit the vehicle along with the other
23 officers?
24    A. Yes.
25    Q. Okay.  So let's talk about when you exited the
                                                      102
```

```
 1 vehicle.
 2       Where did you go?
 3    A. I started to go around the suspect's vehicle to
 4 cover the side of the door on the other side, because we
 5 didn't know if there were more than one person in the
 6 vehicle.
 7       And as I started to go around it, the vehicle
 8 went in reverse and came towards me.
 9    Q. Okay.
10    A. Tried to run me over.
11       MR. BISTLINE:  Objection.  Foundation.
12       THE COURT:  Yep.
13       MR. BISTLINE:  Move to strike.
14       MR. DOLTON:  Withdraw, Your Honor.
15       THE COURT:  Okay.
16       THE WITNESS:  It came towards me --
17       THE COURT:  And that answer is stricken.
18       MR. DOLTON:  Hold on.  Hold on.
19       THE WITNESS:  Came toward me, and then I --
20       THE COURT:  Just a minute.
21       You have to wait until I'm through.
22       THE WITNESS:  I apologize.
23       THE COURT:  So that answer is stricken.
24       Go ahead, Mr. Dolton.
25       MR. DOLTON:  Okay.  Thank you, Your Honor.
                                                      103
```

```
 1    Q. (BY MR. DOLTON)  So when you say you went
 2 around, can you give us some directions as to north,
 3 south, east, west as you exited Officer Branham's
 4 vehicle?
 5    A. I headed east to go around the suspect's vehicle
 6 to cover the passenger side door.
 7    Q. Okay.
 8    A. As I started to go around it, the vehicle was in
 9 reverse and came toward me, and then I jumped back behind
10 the patrolcar that I was in.
11    Q. So as you exited Officer Branham's vehicle, did
12 you receive any instruction from Officer Branham?
13    A. Before he told me that it was going to be a
14 felony take-down and so I needed to have my weapon drawn
15 and keep my eye on the passenger, cover the passenger
16 side.
17    Q. Okay.
18       And as you approached this vehicle on the
19 off-ramp, Exit 3 off-ramp, who exited first, you or
20 Officer Branham?
21    A. The same time, I would say.
22    Q. All right.
23       And as you were going eastward toward the
24 vehicle, did you pass any other vehicles?
25    A. No.
                                                      104
```

**PAYETTE-37**

101

1 Q. Okay. Now, did Officer Key, he had his own
2 vehicle as well?
3 A. Yes.
4 Q. And where was it in relation to you as you were
5 approaching the suspect vehicle?
6 A. I don't recall.
7 Q. Okay.
8 When you came near the Toyota Scion, how was it
9 positioned?
10 A. It was sideways on the road.
11 Q. Okay. And so directionally, where was it
12 facing?
13 A. Facing north.
14 Q. Okay. So the rear was to the south?
15 A. Correct.
16 Q. And how far did you get around the Scion before
17 it started to move?
18 A. I was behind the Scion.
19 Q. Okay. And so behind. You mean the rear of the
20 vehicle?
21 A. Correct.
22 Q. And what was behind you?
23 A. What was behind me?
24 Q. Yes.
25 A. Guard-rail on the other side of the road.

105

1 Q. Okay.
2 And then what did the vehicle do at that time?
3 A. It started to drive in reverse towards me.
4 Q. All right. And what action did you take in
5 response to it?
6 A. I jumped back the way I came behind the patrol
7 vehicle.
8 Q. Okay. So would that be to the west or to the
9 northwest?
10 A. To the west.
11 Q. Okay. Did you provide any verbal commands to
12 the driver of this vehicle?
13 A. I was yelling, "Stop the vehicle."
14 Q. And as you were approaching the vehicle from the
15 rear, did you hear any commands from either Officer
16 Branham or Officer Key?
17 A. Similar commands, stop and to get out of the
18 vehicle.
19 Q. Okay.
20 And were you able to get around on the passenger
21 side of the Scion?
22 A. No.
23 Q. Okay.
24 After the vehicle was in reverse heading towards
25 you and you went what would be westbound, westward or

106

1 backtracked from where you came?
2 A. Correct.
3 Q. What happened in regards to Officer Branham and
4 Officer Key? What did you observe?
5 A. I did not observe. I know that they were there,
6 because I was watching the side of the vehicle that I was
7 supposed to be watching.
8 Q. Okay.
9 A. So exactly what happened over there, I couldn't
10 tell you.
11 Q. Okay. When you approached the vehicle, you
12 mentioned you had your firearm at ready?
13 A. Correct.
14 Q. Did you have any other things in your possession
15 in your hands?
16 A. No.
17 Q. Okay. Now, your firearm. Is it equipped with a
18 flashlight?
19 A. No.
20 Q. How would you describe the light in the area
21 that you were approaching the vehicle from?
22 A. There was a streetlight right there. So the
23 lighting was good.
24 Q. Okay. Now, this happened around midnight on the
25 24th?

107

1 A. Correct.
2 Q. Or 25th.
3 It was dark outside?
4 A. Yes.
5 Q. Were there shadows that you were in and out of
6 as you were approaching the vehicle?
7 A. I do not recall.
8 Q. Okay. As you are approaching the vehicle to get
9 around to the passenger side, did you see Officer Branham
10 or Officer Key?
11 A. Out of the corner of my eye; yes.
12 Q. Okay.
13 A. But my focus was on the passenger side.
14 Q. Sure. Okay.
15 When the vehicle was put into reverse and was
16 heading your direction, when you got out of the way, how
17 did you do so?
18 A. Quickly.
19 Q. Okay. That's good. Good response.
20 As far as did you maintain on your feet? Did
21 you stay on your feet?
22 A. Yes.
23 Q. Okay. How did you get out of the way? Did you
24 lunge, step, jump?
25 A. I moved in -- backwards, quickly.

**PAYETTE-38**

108

1   Q.  Okay.

2   A.  So kind of backwards ran.

3   Q.  Okay.

4       And then after the vehicle moved and you moved

5   in response to it, did you have any further observations,

6   not visual, but maybe auditorially?

7   A.  I heard gunshots, and I did not know who was

8   shooting.

9   Q.  Okay.  And were there any visual obstructions in

10  your way to where you thought Officer Branham and Key

11  were?

12  A.  When I heard gunshots, I ducked.  And so the

13  vehicle, the patrolcar was between me and the incident.

14  Q.  Okay.  So you ducked.

15      Is it safe to say you ducked behind the

16  vehicle?

17  A.  Yes, when I heard gunshots.

18  Q.  Okay.  And then after you heard the gunshots,

19  what happened?

20  A.  Officer Branham told me to get back in the

21  vehicle, because the car took off.

22  Q.  Okay.  And you complied?

23  A.  Yes.

24  Q.  And did you assist Officer Branham in stopping

25  this vehicle?

109

---

1   A.  Yeah.  I was in the passenger seat while he

2   stopped the vehicle.

3   Q.  Okay.  And then after the vehicle stopped, did

4   you exit the vehicle again?

5   A.  Yes.

6   Q.  And then what did you do when you exited the

7   vehicle?

8   A.  I drew my weapon and covered the passenger side

9   of the vehicle.

10      And this time I had my flashlight out so that I

11  could look into the vehicle and see if there was any

12  weapons or anything.

13  Q.  Okay.  And the driver of the vehicle, did you

14  see him?

15  A.  Yes.

16  Q.  Okay.  Could you identify him from your

17  observations on the 24th today?

18  A.  Yes.

19  Q.  Okay.  Is he present in the courtroom?

20  A.  Yes.

21  Q.  And where is he?

22  A.  He is seated right there.

23      MR. DOLTON:  Okay.  And may the record show he

24  is pointing in the direction of the defendant that is

25  essentially right in front of the witness, slightly to

110

---

1   the right?

2       THE COURT:  Record will reflect that.

3       MR. DOLTON:  Thank you, Your Honor.

4   Q.  (BY MR. DOLTON)  And the driver of the vehicle

5   was eventually removed from the vehicle, restrained, and

6   rendered aid; is that correct?

7   A.  Correct.

8   Q.  Now, you mentioned this streetlight, or this

9   light above the road.  Where was it located in relation

10  to you as you approached the Scion?

11  A.  I don't know.

12  Q.  Okay.  Was your path to the Scion illuminated

13  from this light?

14  A.  Yes.

15  Q.  Okay.  When you say you don't know, is that like

16  you don't exactly know where it is?

17      Are you comfortable giving an estimate as to

18  where that light could be?

19  A.  I'm thinking there was one behind me and one in

20  front of me.

21  Q.  I see.

22  A.  But I could be wrong.  I didn't check out the

23  location of the lights.

24  Q.  Sure.

25      When you were in the vehicle during the pursuit

111

---

1   with Officer Branham, were you able to make any

2   observations as to Officer Branham's speed of the vehicle

3   you were in?

4   A.  Like, I noticed that we were speeding up and

5   slowing down.  I think we got as fast as 80, 80 miles an

6   hour.

7   Q.  And you have no training as to the estimates of

8   speed for purposes of patrol?

9   A.  Correct.

10  Q.  Okay.  I believe that's all the questions I have

11  at present.

12      Thank you, Officer.

13      THE COURT:  Okay.  Thank you.

14      Mr. Bistline?

15      CROSS-EXAMINATION OF DUANE HIGLEY (OFFICER)

16  BY MR. BISTLINE:

17  Q.  Okay.  So do you know of an intersection called

18  the Y, where apparently 16 comes into, basically Highway

19  95 comes into Business 95?

20  A.  Yes.

21  Q.  And where in relation to that Y were you when

22  the light was run?

23  A.  We were stopped at the light.

24  Q.  Okay.  And which lane were you in there?

25  A.  We were in the right lane.

**PAYETTE-39**

112

109

1    Q. So that would have, if you had stayed on the
2 right lane, you'd have gone northwest on Business 95,
3 northeast on Business 95?
4    A. No.
5    Q. Okay.
6    A. You cannot take a right turn there.
7    Q. Okay. So you are forced left.
8       You would have gone down towards the freeway?
9    A. Correct.
10    Q. Okay.
11       That evening immediately prior to this
12 encounter, first encounter with the Scion, were you
13 looking for anything in particular, or were you guys just
14 cruising?
15    A. We were patrolling for suspicious
16 circumstances.
17    Q. Okay. So there wasn't any particular suspicious
18 circumstance that you were aware of?
19    A. No. We just...
20    Q. Okay.
21       So the Scion turns down the off-ramp, followed
22 how closely by Officer Key?
23    A. I don't recall.
24    Q. Okay. And then followed how closely by you and
25 Officer Branham?

113

1    A. I don't recall.
2    Q. Okay.
3       From the time when you pulled in, which side of
4 Officer Key did you and Officer Branham go?
5    A. I don't recall. I went to the right when I got
6 out of the vehicle.
7    Q. Okay. You don't recall where the vehicles were
8 located with respect to each other?
9    A. I believe we were parked to the right of Officer
10 Key.
11    Q. Okay. And in terms of how far away was Officer
12 Key from the guard-rail that would have been to his left
13 or front?
14    A. I would say 10 yards.
15    Q. Okay.
16       And that's the space that the Scion ultimately
17 went through?
18    A. Yes.
19    Q. Do you remember which direction Officer Key's
20 vehicle was pointed?
21    A. I believe it was pointed, slanted, I would say
22 northeast direction.
23    Q. Okay. So relative to the ramp itself, was it
24 pointed kind of across the ramp?
25    A. It was slanted at an angle.

114

1    Q. Across the ramp and pointed toward the orchard
2 that's out there towards the north and east?
3    A. Yes.
4    Q. Okay. So when you got out of the patrol vehicle
5 you were in, what was the Scion doing at the point it
6 stopped to the point where you would jump out?
7    A. At the point that I jumped out?
8    Q. Uh-huh.
9    A. It was -- I believe it was stopped.
10    Q. And in what position?
11    A. It was -- when I got out, I would say it was
12 headed, pointed north.
13    Q. Okay. And relative to the ramp itself, what
14 position was it in?
15    A. Perpendicular.
16    Q. Okay.
17       And what was its first move as you got out? Was
18 it backwards or forwards?
19    A. I -- it didn't move until I started to go
20 around.
21    Q. And that first move then was backwards?
22    A. Backwards.
23    Q. So your goal was to get around the vehicle to
24 get to the passenger side?
25    A. Correct.

115

1    Q. And when the vehicle backed up, you abandoned
2 the attempt to go around it and just focused on the
3 passenger side from where you were?
4    A. I avoided being hit. And, yes. I got out of
5 the way to avoid being hit, and I still focused on the
6 side that I was told to focus on.
7    Q. Okay. And by then you'd ascertained there
8 didn't appear to be anybody in the passenger seat; hadn't
9 you?
10    A. I did not know.
11    Q. Did you ever see anybody in the passenger
12 seat?
13    A. No.
14    Q. Okay. Could you see the passenger side of the
15 vehicle?
16    A. Yeah.
17    Q. Okay. How far back did the vehicle move when it
18 moved backwards?
19    A. I don't recall.
20    Q. How far was it from the back of the vehicle to
21 the fog line on what would be the south side of the
22 on-ramp?
23    A. I don't recall. I was still watching the
24 passenger side.
25    Q. Okay. And was there anything which obstructed

**PAYETTE-40**

116

1 your movement away from the vehicle when it started to
2 back up?
3     A.  No.
4     Q.  Was it at a dead stop when it started to back
5 up?
6     A.  Yes.
7     Q.  Do you recall being interviewed by  Officer Ici,
8 icky (phonetic), of the Idaho State Police, or a Matthew
9 Sly?
10     A.  Yes.
11     Q.  And did you ever see the report that they filed
12 respective to that interview?
13     A.  Yes.
14     Q.  Did you have an opportunity to review it and
15 make any corrections or suggestions?
16     A.  Yes.
17         MR. BISTLINE:  If I could mark this.  I guess we
18 are up to D.  That's Exhibit E to be marked.
19         (Defendant's Exhibits D and E marked for
20         identification.)
21     Q.  (BY MR. BISTLINE)  Officer, I'm going to hand
22 you what has been marked for identification purposes as
23 Defendant's Exhibit D and ask you if that appears to be
24 the report that you reviewed that was prepared by the
25 Idaho State Police?

117

1     A.  The first time, or after they made the
2 corrections?
3     Q.  The first time.
4     A.  Probably about 10 days.
5     Q.  Okay.  So you gave the report, and then about 10
6 days later you had a chance to -- or gave the interview,
7 and about 10 days later you had your chance to review
8 Exhibit D?
9     A.  Correct.
10     Q.  Did you make some corrections?
11     A.  Yes.
12     Q.  Okay.  And then did you get to review the report
13 again after making those corrections?
14     A.  No.
15     Q.  Okay.  Did they accept your corrections, or do
16 you know?
17     A.  Yes.
18     Q.  And if I'm understanding your testimony
19 correctly, once you got out of the way of the vehicle and
20 positioned yourself by the front of your patrol vehicle,
21 from that point on you were really focused on what you
22 could see, could or could not see in the passenger
23 seat?
24     A.  Correct.
25     Q.  You didn't see what the vehicle did with respect

119

1     A.  Yes.
2         MR. BISTLINE:  Move for the admission.
3         THE COURT:  Any objection?
4         MR. DOLTON:  No, Your Honor.
5         THE COURT:  Exhibit D is admitted.
6         (Defendant's Exhibit D admitted.)
7     Q.  (BY MR. BISTLINE)  So in filing this, in being
8 interviewed, was it your goal to make certain that you
9 reported everything that you thought was important to the
10 officer from the Idaho State Police?
11     A.  Yes.
12     Q.  And this occurred, as I understand it, within
13 three or four days of the incident; is that correct, this
14 interview?
15     A.  Yes.
16     Q.  In fact, it might have occurred -- when did it
17 occur?  Was it the next day or the same night?
18     A.  It was the same night.  The next morning.
19     Q.  Okay.
20         And had you had a chance by the time you were
21 interviewed to calm down and collect your thoughts?
22     A.  I don't know.
23     Q.  Okay.  And how long after you gave this
24 interview did you have your opportunity to review the
25 report?

118

1 to the officers, the other officers?
2     A.  Well, I know that the vehicle moved forward
3 after it had backed up.
4     Q.  Okay.
5     A.  Because it was between me and me watching the
6 passenger side.
7     Q.  Did it move backward and forward more than
8 once?
9     A.  I don't recall.
10     Q.  So when you guys got back in the patrolcar and
11 chased the Scion down the road, did you have any trouble
12 catching it?
13     A.  No.
14     Q.  Did it go off the road because you guys got on
15 it and pushed it off the road?
16     A.  Yes.
17         MR. BISTLINE:  I have no other questions.
18         THE COURT:  Any redirect?
19         MR. DOLTON:  Slight, Your Honor.
20    REDIRECT EXAMINATION OF DUANE HIGLEY (OFFICER)
21 BY MR. DOLTON:
22     Q.  Now, these questions, this report of your
23 statement that's Exhibit Delta for the defense, was it
24 essentially a spontaneous statement you provided, or was
25 it aided by questions asked by the investigating

PAYETTE-41

120

117

1 officer?
2     A. Both.
3     Q. Okay. And are there questions that are being
4 asked today that are different than the questions that
5 were asked of you by the investigator?
6     A. Yes.
7     Q. So they are different?
8     A. Yes.
9     Q. Okay. And your statement pertains to, from the
10 initial point of the stoplight on Business 95 and Highway
11 95, all the way up to the point of rendering aid to the
12 driver of the Scion; is that correct?
13     A. A little before and a little after that too.
14     Q. Okay. All right.
15        And we haven't asked you about that full
16 spectrum of questions today, have we?
17     A. Correct.
18     Q. Okay. Now, you paused a little bit as to when
19 you were interviewed by the State Police a couple days
20 after the incident as to whether or not you had collected
21 yourself to give a statement.
22        Do you recall that?
23     A. Yes.
24     Q. Are your thoughts collected today?
25     A. I'm nervous.

                                                      121

1     Q. Okay.
2     A. This is my first time ever in a courtroom, so.
3     Q. Okay.
4        But are your thoughts collected today?
5     A. Yes.
6     Q. You have a clear idea of the incident and your
7 perceptions of that incident?
8     A. Yes.
9     Q. Okay.
10        Is it safe to say that this incident, even
11 though it occurred close to a year ago, still has a
12 traumatic impact upon you and your ability to answer
13 questions today?
14     A. Yes.
15     Q. Thank you.
16        MR. DOLTON: Nothing further.
17        THE COURT: Mr. Bistline?
18        MR. BISTLINE: No questions.
19        THE COURT: I have one question.
20        Mr. Higley, you know what I'm referring to when
21 I talk about the Gayway junction.
22        THE WITNESS: Yes.
23        THE COURT: Do you recall what color the traffic
24 light was at the time the Scion approached that
25 intersection?

                                                      122

1        THE WITNESS: No.
2        THE COURT: Okay. That's the only question I
3 had.
4        Do you have any questions there, Counsel?
5        MR. DOLTON: I believe with the answer, it's a
6 no, Your Honor.
7        MR. BISTLINE: Well, because I don't live here,
8 is the Gayway junction where 30 comes in? Am I
9 remembering that right?
10        THE COURT: It's the Whitley and 16, the road
11 that goes over to Ontario. It's not the interstate.
12        MR. BISTLINE: Okay.
13        THE COURT: The one right in the middle of
14 Fruitland.
15        MR. BISTLINE: Yeah. Okay.
16        Thanks.
17        No further questions.
18        THE COURT: All right. May this witness be
19 excused?
20        MR. DOLTON: Yes, Your Honor.
21        MR. BISTLINE: Yes.
22        MR. DOLTON: And we move to excuse Officer
23 Branham as well.
24        THE COURT: Okay.
25        MR. BISTLINE: No objection.

                                                      123

1        MR. DOLTON: We have one final witness, Your
2 Honor.
3        THE COURT: You want to get started with that
4 before lunch and if it goes a long time we can take a
5 break, or do you want to wait and start it this
6 afternoon?
7        MR. DOLTON: I can proceed, Your Honor.
8        THE COURT: What's your preference and your
9 client's preference, Mr. Bistline?
10        MR. BISTLINE: Okay. We can go on.
11        THE COURT: All right.
12        If you'd like to call your next witness.
13        (Witness sworn.)
14        THE COURT: You may have a seat.
15        And then you may proceed, Mr. Dolton.
16        MR. DOLTON: Thank you.
17        <u>DIRECT EXAMINATION OF BENJAMIN KEY (OFFICER)</u>
18 BY MR. DOLTON:
19     Q. Want a different chair?
20     A. Yeah.
21        No. They are good.
22     Q. We can switch it out.
23     A. It's fine.
24     Q. You sure? You might be there for a while.
25     A. It's okay.

                                            **PAYETTE-42**
                                                      124

121

1    Q.  Can you please state your name, spell your last
2 name for the record.
3    A.  Benjamin Key.  Spelling of the last is K-e-y.
4    Q.  And Mr. Key, are you a law enforcement officer
5 with the Fruitland City Police Department?
6    A.  Yes, I am.
7    Q.  And how long have you been with Fruitland
8 City?
9    A.  Almost 10 years.
10    Q.  Prior to the 10 years with Fruitland City, do
11 you have prior law enforcement experience?
12    A.  No.
13    Q.  And in the 10 years with Fruitland Police, have
14 you gone to POST?
15    A.  Yes, I have.
16    Q.  Okay.  And what certification do you hold with
17 POST?
18    A.  Currently I hold an intermediate certificate.
19    Q.  So you got your basic and then received your
20 intermediate?
21    A.  Yes.
22    Q.  And what is your current rank with Fruitland
23 City Police?
24    A.  Sergeant.
25    Q.  And when did you become a sergeant with

125

1 Fruitland?
2    A.  I believe it was February of this year.
3    Q.  Okay.  And what are your -- prior to being a
4 sergeant, were you a patrol officer?
5    A.  Yes.
6    Q.  What are your duties as a patrol officer with
7 Fruitland PD?
8    A.  Protect the citizens and property in Fruitland,
9 investigate crimes, also canine officer.  So they deploy
10 canines around vehicles when needed.
11    Q.  Okay.  And by to protect the public and the
12 residents of Fruitland City, is that to enforce the city,
13 county, state, and federal laws of our country?
14    A.  Yes.
15    Q.  Okay.
16       Now, Sergeant, I want to direct your attention
17 to October 24, 2016.
18       Do you recall that date in question?
19    A.  Yes, I do.
20    Q.  Okay.  Were you on duty?
21    A.  I was.
22    Q.  Were you in uniform?
23    A.  Yes, I was.
24    Q.  And on patrol?
25    A.  Yes.

126

1    Q.  What was your shift at that time?
2    A.  It was a graveyard shift.
3    Q.  Okay.  And graveyard shift with Fruitland PD is
4 from what hours to what hours?
5    A.  2100 to 07.
6    Q.  Okay.  And so your shift would go into the
7 following day?
8    A.  Yes.
9    Q.  So go into the 25th of October of '16?
10    A.  Yes, it would.
11    Q.  Okay.
12       Now, as an officer of Fruitland PD, does your
13 jurisdiction only pertain to the city limits of
14 Fruitland, or elsewhere?
15    A.  My jurisdiction pertains to the City of
16 Fruitland; however, I am also deputized with the Payette
17 County Sheriff's Office.
18    Q.  Okay.  So you can either assist or to continue
19 to pursue criminal investigations out of Fruitland, go
20 into the county?
21    A.  Yes.
22    Q.  Okay.
23       So on that graveyard shift between October
24 24th/25th of 2016, did you receive a request from Officer
25 Ben Branham with Payette City Police to assist in a

127

1 pursuit of a 2013 black Toyota Scion, or Scion?
2    A.  Yes.
3    Q.  And upon that request, what did you do?
4    A.  I attempted to get to a place where I could set
5 up our spike strips, a tire deflation device.
6    Q.  And where and in what direction was Officer
7 Branham's pursuit occurring?
8    A.  It had started somewhere in the Payette area and
9 was traveling southbound on Highway 95.
10    Q.  Okay.  So essentially going through your city?
11    A.  Yes.
12    Q.  Okay.
13       And did you deploy these said spike strips?
14    A.  Yes, I did.
15    Q.  Okay.  And where did you deploy them?
16    A.  It's a complex we refer to as Centennial Plaza.
17 It's near the intersection of Northwest 16th Street and
18 Highway 95.
19    Q.  And that's commonly referred to by old residents
20 of Payette County as Gayway Junction?
21    A.  Yeah.
22    Q.  Okay.  And where in that area were the spike
23 strips deployed?
24    A.  It would be on the north, northwestern corner of
25 the intersection.

**PAYETTE-43**

128

125

1      There is a business that used to be here called
2  The Salsa Grill.  I don't know what the exact address is,
3  but I was near that parking lot there.
4      Q.  And to the north is kind of like an ATV repair
5  and salvage?
6      A.  It would have been south of that location, but
7  yes.
8      Q.  Okay.
9      All right.  So Centennial Plaza, is that where
10  the old pink bowling alley used to be and now it's called
11  a strip mall?
12      A.  Yes.
13      Q.  All right.
14      And those strips, what lane of the southbound
15  traffic were the strips deployed?
16      A.  Way I deploy them is I put them out into the
17  median, and then I drag the rope across as the vehicle
18  comes closer.  So I'm not sure exactly what lane they
19  were in at the time.
20      Q.  Okay.
21      Oh, I see.  So the strip isn't laid out in both
22  lanes but is kind of set.  There was a trigger, and then
23  you pull it?
24      A.  Yes, because if there's other traffic, you don't
25  want to catch a vehicle not involved, so you try to pull

129

1  them out at the last minute so you only get the suspect
2  vehicle.
3      Q.  Okay.  Got you.
4      And how long after you got these strips ready
5  for deployment did this vehicle described by Officer
6  Branham approach?
7      A.  Oh, it wasn't long.  I'm not sure of the exact
8  time, though.
9      Q.  Okay.  What information did you have from
10  Officer Branham prior to deploying the strips that you
11  had to assist him?
12      A.  Basically that he was just in pursuit with a
13  vehicle.
14      Q.  And was the vehicle description provided by
15  Officer Branham?
16      A.  I believe he said it was a black, black vehicle.
17  And I remember him saying it had Kootenai County
18  plates.
19      Q.  And the distinguishing part of Kootenai County
20  plates is there's a K on the license plates.
21      A.  Yes.
22      Q.  Typically.
23      Okay.  Just as in Payette we have a 1P.
24      A.  Yes.
25      Q.  Okay.  And so based upon the description of the

130

1  vehicle, you identified that vehicle by the plates and
2  the color?
3      A.  Yeah.  I couldn't really see the color and the
4  plates of the vehicle at night at that time.  It was more
5  identified by the fact that Officer Branham was pursuing
6  that vehicle.
7      Q.  Okay.  And so when you say Officer Branham was
8  pursuing the vehicle, how did you know that?
9      A.  Lights and siren.
10      Q.  And so the vehicle right in front of him you
11  presumed was the vehicle being pursued?
12      A.  Yes.
13      Q.  I see.
14      And then you deployed the strips?
15      A.  Yes.
16      Q.  Okay.  And did those strips have an affect upon
17  the vehicle?
18      A.  I'm not sure if they actually did.  I believe
19  that I heard the vehicle hit the strips.  So I had called
20  a good spike at that point to notify Officer Branham that
21  I believed he had hit the spikes.
22      Q.  Okay.  And then what did the vehicle do after
23  proceeding past the strip of spikes?
24      A.  It continued southbound on Highway 95.
25      Q.  And what did you do as a result?

131

1      A.  I had started to gather my spike strips up to
2  put them back in my vehicle when I realized that there
3  was another officer in the pursuit with Officer Branham.
4  At that time rather than trying to collect the strips and
5  get all of the spring and everything back up, I threw
6  them off the road into a pile of bushes, and I got back
7  in my car and tried to catch up to the pursuit.
8      Q.  All right.
9      Now, is there a policy amongst the
10  jurisdictional agencies in Payette County as to when
11  primary pursuit changes hands?
12      A.  Not that I'm aware of; no.
13      Q.  Okay.
14      All right.  So did you give chase as well to
15  this vehicle?
16      A.  Yes.
17      Q.  All right.  And was there a time where you took
18  lead in pursuing the vehicle?
19      A.  Yes.
20      Q.  And when did that occur?
21      A.  I believe it was around southwest Second Street.
22  Officer Branham had asked me to take over the pursuit I
23  believe because he wasn't familiar with the area.
24      Q.  Okay.  Were you able at any time during the
25  pursuit to estimate speeds of the vehicle you were

132

PAYETTE-44

1 pursuing?

2    A. At that point I just took over pursuing the
3 vehicle, being the lead vehicle in the pursuit, and I
4 believe Officer Branham was calling the pursuit at that
5 point.

6    Q. Okay. Were you able to check to see what speed
7 you were going as you were pursuing the vehicle?

8    A. I don't recall if I did.

9       Can I reference my report?

10    Q. Your report as in the State Police report?

11    A. Yes.

12    Q. Okay. Do you have a copy with you?

13    A. Yes, I do.

14    Q. All right. If it would refresh your
15 recollection, please take a look at it.

16       When you are done, let me know.

17    A. I don't see anything in my report that indicated
18 speed.

19    Q. Okay. And so you were basing your pursuit
20 trusting in Officer Branham's information?

21    A. Yes.

22    Q. Okay. When you were involved in the pursuit in
23 the lead, do you recall any other vehicles going
24 northbound or in your same direction?

25    A. Involved in the pursuit, or absent the pursuit?

133

1    Q. Well, just standard motorists in the area.

2    A. I don't.

3    Q. Okay.

4       And so where did the pursuit go? What areas in
5 the county did the pursuit continue while you were
6 involved in it?

7    A. It continued southbound through Fruitland
8 through an area that we refer to it as the S curves.
9 It's a bendy stretch in Highway 95 before you leave the
10 Fruitland City limit, and then it opens up into -- it's a
11 straight stretch that's approximately two to three miles
12 long coming up to Interstate 84 at Exit 3.

13    Q. And from the period that you deployed the spike
14 strips to the exit ramps to the interstate, do the speed
15 limits vary in those areas?

16    A. Yes.

17    Q. And so from the time of the spike strip, what
18 was the speed limit there?

19    A. At the time of the spike strips, it was 35 miles
20 an hour.

21    Q. Okay. And when does it change heading
22 southbound through Fruitland?

23    A. Approximately it's on the south side of that
24 intersection. I don't know how many feet that would be,
25 but it changes to 45 from there.

134

1    Q. Okay. And as you are approaching the city
2 limits or the city center of Fruitland, is there another
3 change of speed?

4    A. No. It remains 45 until you've actually exited
5 the city limits of Fruitland.

6    Q. Okay. So the S curve is 45?

7    A. Yep, the S curve is 45 miles an hour.

8    Q. And then after you are still heading southbound
9 on 95 out of Fruitland, it changes to 55?

10    A. Yes.

11    Q. At around North Pennsylvania?

12    A. Yeah. It's past North Pennsylvania. It's
13 closer to Northwest Second Avenue.

14    Q. And the pursuit, how did the pursuit end?

15    A. The pursuit end?

16    Q. Yes.

17    A. The vehicle started to go eastbound on the
18 westbound off-ramp. It had turned around. We thought
19 that it was stopping. We started to do a felony stop,
20 and then it started moving again.

21       I tried to position my vehicle to keep it from
22 going anywhere else.

23    Q. So how did you position your vehicle to prevent
24 it from going anywhere else?

25    A. Well, at the time that I thought that we were

135

1 making a felony stop, I was behind the vehicle. As the
2 vehicle started to move again, I moved my vehicle to keep
3 it from being able to move up, back up the off-ramp.

4       My vehicle would have been not necessarily
5 perpendicular to the off-ramp, but it was getting close
6 to blocking traffic.

7    Q. And as you were positioning your patrol vehicle,
8 what was the position of this vehicle you were pursuing,
9 this Scion?

10    A. It was attempting to turn back up the off-ramp
11 and travel back westbound.

12    Q. Okay. So prior to stopping and maneuvering your
13 vehicle as this pursuing vehicle, I'll refer to it as a
14 Scion, what did it do once it went or was heading
15 eastbound on a westbound freeway exit?

16    A. I'm sorry. Can you repeat that?

17    Q. Yeah.

18       So what did the Scion do after it exited onto
19 this westbound exit to the interstate? What were its
20 movements?

21    A. Well, it initially stopped, then it started to
22 turn to the -- it would have been to the north to turn
23 and come back up the off-ramp.

24       I moved my vehicle to stop it from being able to
25 move back up the off-ramp, and then the vehicle started

PAYETTE-45

136

133

1 to make a series of forward and backward movements in an
2 attempt to be able to move past my vehicle.
3     Q.  Okay.  And after you had positioned your
4 vehicle, I presume you parked it?
5     A.  Yes.
6     Q.  And did you exit your vehicle?
7     A.  I did.
8     Q.  And as you exited your vehicle, what did you
9 do?
10     A.  I had my gun out at that point.  I was screaming
11 commands to the driver to stop, to put his hands up.  You
12 know, to basically stop all movement at that point.
13         The driver continued to move back and forth on
14 the roadway, forward and backward, trying to move around
15 my vehicle.
16     Q.  And where were Officer Branham -- where was
17 Officer Branham at this time?
18     A.  I believed Officer Branham was behind me to it
19 would have been to the right of my location.
20     Q.  Okay.  Now, when the vehicle exited onto that
21 off-ramp, where was Officer Branham as you were
22 continuing to pursue this vehicle on the off-ramp?
23     A.  He was behind me.
24     Q.  Approximately how far?
25     A.  I'm not sure.

137

1     Q.  Okay.  When you exited your vehicle, how did you
2 know if at all Officer Branham exited his vehicle?
3     A.  I had actually observed Officer Branham at one
4 point when we were screaming commands, and then I lost
5 track of him.
6     Q.  When you observed Officer Branham after exiting
7 your vehicle, was he out of his vehicle as well?
8     A.  Yes.
9     Q.  All right.
10         And did you -- at what side of your -- where did
11 you see him in proportion to where you were when you were
12 both outside of your vehicles?
13     A.  To the left of me.
14     Q.  Okay.
15         Is there any pertinence in your training and
16 experience of having an officer to the left of you?
17     A.  Well, to the left or the right wouldn't
18 necessarily.  It would depend on the situation.
19         I would say it would more depend on a situation
20 like that is you don't want to be in the other officer's
21 line of fire in a situation where if you were having to
22 use deadly force, you wouldn't want to put the other
23 officer between you and the suspect.
24         They call it a tactical L, where we train them
25 that basically if you had the suspect in front of one

138

1 officer, another officer would be in line to form almost
2 an L between the three of them to give you two different
3 angles, basically where neither one of you is in the line
4 of fire of the other one.
5     Q.  Okay.
6         And so did you visually see Officer Branham
7 outside of his vehicle as you were approaching this
8 Scion?
9     A.  Yes.
10     Q.  Okay.  So would that require you to turn around
11 to look or something else?
12     A.  It would have been as I was getting out of my
13 vehicle.
14     Q.  Okay.  You looked back as you were exiting your
15 vehicle?
16     A.  Yes.
17     Q.  Would that be fair to say?
18     A.  Yeah.  Once I approached the suspect vehicle, I
19 was focused on the suspect vehicle.
20     Q.  Sure.
21         Did you have any communications with Officer
22 Branham as you were approaching the vehicle?
23     A.  No.  I don't believe so.
24     Q.  Okay.  You mentioned that you were providing
25 verbal commands to the driver of the vehicle.

139

1     A.  Yes.
2     Q.  Was anyone else providing commands to the
3 vehicle?
4     A.  Yes.
5     Q.  Who?
6     A.  I believe Officer Branham was.
7     Q.  Okay.  Based upon those commands, were you able
8 to make an estimate as to his location?
9     A.  That's part of the reason I believed he was to
10 the left of me.
11     Q.  Okay.  Now, so Officer Branham is to the left of
12 you; you were in the middle.
13         Where were you as you were approaching this
14 Scion in relation to the Scion?
15     A.  On the driver's side door.
16     Q.  Okay.
17         As you were approaching the vehicle, closing
18 distance to it, what was the vehicle doing?
19     A.  It was still maneuvering to move back up the
20 off-ramp.
21     Q.  Okay.  Do you recall whether the driver's side
22 window was up or down?
23     A.  It was up.
24     Q.  Okay.
25         As the vehicle was continuing to move, did you

**PAYETTE-46**

140

1  approach it to attempt to open the door?
2     A.  I did.
3     Q.  Okay.  As you were approaching the door, what if
4  any commands were you giving?
5     A.  I was still telling the driver to stop.
6     Q.  Do you recall whether you heard Officer Branham
7  providing similar commands?
8     A.  At that point, no.
9     Q.  Besides the verbal commands, were there any
10  other noises in the area?
11     A.  Honestly, I don't remember.
12     Q.  Okay.
13        During your pursuit, did you have your lights
14  and sirens activated?
15     A.  I did.
16     Q.  Okay.  And after you exited the vehicle, did you
17  terminate your lights and sirens?
18     A.  No.
19     Q.  Okay.  After attempting to open the driver's
20  side door of this vehicle, what did you do?
21     A.  I continued to yell at the driver who was still
22  continuing to move back and forth.
23     Q.  Did you make any sort of visual contact with the
24  driver?
25     A.  Yes.

141

1     Q.  Did you get any what you would interpret as
2  responses from the driver?
3     A.  I don't know what I would interpret it as, but
4  he looked right at me and smiled as he continued to move
5  forward and backward.
6     Q.  Did you make eye contact with the driver?
7     A.  Yes.
8     Q.  How many times would you estimate you had eye
9  contact with the driver?
10     A.  One or two.
11     Q.  Okay.  And of those one or two times you
12  mentioned a smile, how many times were you, quote, smiled
13  at?
14     A.  One or two.
15     Q.  Okay.
16        So window up.  Try the door.  The door isn't
17  working.  The car is still maneuvering.  What direction
18  was the car maneuvering?
19     A.  It would have been maneuvering to move back
20  westward on the off-ramp.
21     Q.  Okay.
22        And how many times did it change directions to
23  maneuver to that?
24     A.  Honestly, I don't know.
25     Q.  Okay.  Do you know how many times it reversed to

142

1  correct?
2     A.  I don't.
3     Q.  Okay.  So you don't know, then.  You wouldn't
4  know how many times it moved forward to correct?
5     A.  No.
6        I mean, it was enough that if I had to guess, at
7  least four or five times.
8     Q.  Okay.  The vehicle eventually began to progress
9  up on the ramp; is that correct?
10     A.  Yes.
11     Q.  And as a response, what did you do?
12     A.  Told the officer -- or I told the driver to stop
13  again.
14        I had to move to the right to move away from the
15  vehicle as he was moving up the off-ramp.  And as the
16  vehicle continued up, I fired three rounds.
17     Q.  Okay.  And why did you discharge your firearm?
18     A.  Because I believed at that time he was about to
19  run over Officer Branham.
20     Q.  Okay.  And so the vehicle was going to your
21  left?
22     A.  Yes.
23     Q.  Okay.  How close were you to the vehicle as it
24  began to proceed forward up the ramp to your left?
25     A.  Two to three feet.

143

1     Q.  When the vehicle was moving forward up the ramp,
2  did you have to change your position to avoid being
3  struck by the vehicle?
4     A.  Yes.
5     Q.  Okay.  If you would have held your ground, so to
6  speak, what do you think would have been the outcome?
7     A.  I'm not sure.
8     Q.  Okay.  Would you have been overcome and run over
9  by the vehicle?
10     A.  Possibly.
11     Q.  Okay.
12        And the person to your left, Officer Branham,
13  was your firearm discharged in order to prevent further
14  progress to your left, where you thought Officer Branham
15  was located?
16     A.  Yes.
17     Q.  Okay.  But you mentioned -- how many times did
18  you discharge your firearms?
19     A.  I originally believed three times.
20     Q.  Okay.  And since then, has it changed?
21     A.  Yes.
22     Q.  Okay.  Do you know how many times you actually
23  did fire?
24     A.  It was four rounds total.  **PAYETTE-47**
25     Q.  After you fired the four rounds, what

144

1 happened?

2    A.  I remember hearing Officer Branham notifying

3 dispatch that shots had been fired.

4        The vehicle continued westbound on the off-ramp

5 and then turned northbound on Highway 95, and it went

6 approximately 200 yards before it slowed down and went

7 off the side of the road and stopped.

8    Q.  Okay.  Now, you said you heard Officer Branham

9 report.

10        Did you see that, or did you hear it from your

11 radio?

12    A.  I heard it.

13    Q.  Okay.

14        After you discharged your firearm and the

15 vehicle progressed back up the ramp, did you see Officer

16 Branham at all?

17    A.  I don't recall seeing Officer Branham at that

18 point.

19    Q.  Okay.  Did you continue your pursuit from that

20 point forward?

21    A.  Yes.

22    Q.  Okay.  Was there any other officers ahead of you

23 in that pursuit?

24    A.  There was as I pulled around the corner and got

25 behind the suspect vehicle, there was already a vehicle

145

1 there, but I don't remember whose vehicle that was.  I

2 don't know if that was Officer Branham's vehicle or one

3 of the other assisting officers.

4    Q.  On the off-ramp, do you recall when you -- was

5 Officer Branham's vehicle still there as you continued

6 your pursuit?

7    A.  I believe it was.

8        THE COURT:  Excuse me.  What did you say?

9        THE WITNESS:  I believe it was.

10        I'm not sure.

11    Q.  (BY MR. DOLTON)  Now, back on the 24th and 25th

12 of October, 2016, you said you were on duty and in

13 uniform.

14        Were you in a similar uniform that you are

15 today?

16    A.  Yes.  This is a standard uniform for us.  I was

17 wearing a vest carrier at the time, but it still has a

18 badge, whistle chain, identification.

19    Q.  And so the equipment that you usually have when

20 you are on patrol, is it any different than the equipment

21 that you had then from today?

22    A.  Yeah.  The only thing that's different

23 equipment-wise is the pistol that was involved in the

24 incident has -- I believe it's still in evidence with the

25 Idaho State Police.

146

1    Q.  Okay.  So outside of the pistol involved in the

2 incident, you had your dispatch radio?

3    A.  Yes.

4    Q.  Badge.

5        Did you have an asp or a baton?

6    A.  I had an asp, taser, two sets of handcuffs,

7 spare flashlight, and my firearm.

8    Q.  Okay.  Besides your firearm, did you deploy any

9 other aspect on your utility belt or any of your

10 equipment?

11    A.  Not until the vehicle was stopped.  Handcuffs,

12 that was later on.

13    Q.  At any time did you deploy your baton or asp?

14    A.  No.

15    Q.  Did you have a chest-cam?

16    A.  Yes.

17    Q.  Do you have a chest-cam on today?

18    A.  I don't today.

19    Q.  So there is another difference:  With the

20 pistol, the chest-cam.

21    A.  Right.

22    Q.  And were you able to record this contact with

23 the chest-cam --

24    A.  Yes.

25    Q.  -- back in October of last year?

147

1    A.  Yes, I was.

2    Q.  Have you had the opportunity to review this

3 video?

4    A.  Once.

5    Q.  Okay.

6        And how long ago was that?

7    A.  It's been a while ago.

8    Q.  All right.  And where did you review that

9 video?

10    A.  It was at the Fruitland Police Department.

11    Q.  Okay.  So the video itself, when you were

12 watching it, what features -- how does it start?  What

13 features are there?

14        MR. BISTLINE:  Objection.  I think the video

15 itself is the best evidence.

16        MR. DOLTON:  Yeah.  Okay.

17        THE COURT:  Any response to that?

18        MR. DOLTON:  No objection, Your Honor.

19        My intent is to play the video, so I was trying

20 to simply establish a foundation for it.

21        THE COURT:  That objection is sustained.

22        MR. DOLTON:    All right.  May I approach, Your

23 Honor?

24        THE COURT:  Yes.

25        MR. BISTLINE:  We going to do it on there?

**PAYETTE-48**

148

1 MR. DOLTON: Yes.
2 MR. BISTLINE: How do you want to do that?
3 Actually, I have a projector, but I'd have to
4 have a wall to project to.
5 MR. DOLTON: I can position it on those books,
6 and then we can --
7 THE COURT: Are you going to be asking questions
8 of the officer as the video is playing?
9 MR. DOLTON: It's possible; yes.
10 MR. BISTLINE: Can you stop it when you do that?
11 MR. DOLTON: Oh, absolutely.
12 MR. BISTLINE: Are you going to be able to see
13 if it's there?
14 THE COURT: I can move over there if I need
15 to.
16 MR. BISTLINE: And I can move over there too.
17 THE COURT: You can move wherever you want,
18 Mr. Bistline.
19 MR. DOLTON: All right. May I approach, Your
20 Honor?
21 THE COURT: Yes.
22 Q. (BY MR. DOLTON) So do you recall the duration
23 of this video?
24 A. I don't.
25 MR. DOLTON: Okay. You want me to just start at

149

1 the beginning? It's about a half hour, from my review.
2 MR. BISTLINE: So this is the car-cam, or the --
3 THE COURT: Do you want me to move out of the
4 way?
5 MR. DOLTON: The chest-cam.
6 MR. BISTLINE: I would say start it when he
7 pulls into the Y, but.
8 MR. DOLTON: Yeah. So I have it about two
9 minutes 30, seconds, and my review is when he exits the
10 vehicle.
11 MR. BISTLINE: Okay.
12 THE COURT: No objection to it starting there?
13 MR. DOLTON: At the Y, as in --
14 MR. BISTLINE: No. I think when he arrives at
15 the off-ramp.
16 MR. DOLTON: Yeah. So I have it about 2:30, and
17 my understanding is it concludes about 10.
18 MR. BISTLINE: Yeah. We aren't going to need to
19 watch. I don't have any need to watch anything after the
20 intersection.
21 MR. DOLTON: Yeah. Okay.
22 THE COURT: Just before you start, let's make a
23 record.
24 This is, what you are playing is Sergeant Key's
25 bodycam?

150

1 MR. DOLTON: Yes.
2 THE COURT: Which was on near Exit 3 on
3 October 24th, 2016, it looks like.
4 Is that time an accurate time?
5 THE WITNESS: I don't know if that's an accurate
6 time or not.
7 THE COURT: It says 23:55:56.
8 MR. DOLTON: About two minutes and 31 seconds
9 into the full video.
10 And I intend to show 2:30 on to about 10
11 minutes, when this video is about a half-hour total.
12 THE COURT: Okay.
13 MR. DOLTON: And so what I plan to do, Your
14 Honor, is offer it as State's Exhibit 1, that snippet,
15 and I'll have it edited and sent to the defense for
16 approval.
17 THE COURT: And you'll review it. And if it's
18 satisfactory, then I'll admit that.
19 MR. BISTLINE: Okay.
20 MR. DOLTON: Okay.
21 MR. BISTLINE: Uh-huh.
22 MR. DOLTON: All right. So I'll get the volume
23 up.
24 I'll proceed to play it.
25 (Video playing.)

151

1 MR. BISTLINE: I don't see any relevance to this
2 going on.
3 MR. DOLTON: I'm stopping the video at 4:50,
4 Your Honor.
5 So from 2:30 to 4:50 is what I intend to offer.
6 THE COURT: So 4:50 also ends up being 23:58:16
7 on the clock on this.
8 Is there any objection to offering that piece?
9 MR. BISTLINE: No.
10 THE COURT: Okay. Like I said, once it's on a
11 disc and there is no other objections, then it will be
12 admitted as State's Exhibit No. 1.
13 MR. DOLTON: Okay. Thank you, Your Honor.
14 Q. (BY MR. DOLTON) Now, you've testified prior to
15 watching that video. Is there any additional material
16 you would like to add to your testimony after its
17 review?
18 A. No.
19 Q. And so after you removed and restrained the
20 driver, were you able to get a positive identification on
21 that person?
22 A. I did not; no.
23 Q. Okay. Do you recognize the person, anyone in
24 this courtroom that is in the video? **PAYETTE-49**
25 A. Yes.

152

Q. And who do you recognize?

A. The defendant.

Q. Okay.

And you did not know his name at any time during this investigation; is that correct?

A. No. I didn't.

Q. And you've since been informed of who the person is?

A. Yes.

Q. Okay. And after that part of the video, you did render aid until you were excused by other assisting officers; correct?

A. Yeah. Yes, they kept pulling me away from the scene.

Q. Okay. Were there any statements made by the driver of the vehicle as you were rendering aid?

A. Yes.

Q. What were those statements?

A. He wanted to know why he was in handcuffs.

MR. BISTLINE: Sorry. What was that again?

THE WITNESS: He wanted to know why he was in handcuffs.

Q. (BY MR. DOLTON) Okay. Outside of that statement, any other statements --

A. Not to me.

153

Q. -- that you recall? Okay.

All right, Sergeant. I believe that's all the questions I have at this time.

Thank you.

THE COURT: Mr. Bistline.

MR. BISTLINE: What time is it, Your Honor?

THE COURT: It's like 12:35.

MR. BISTLINE: Okay. Okay.

So I think I'm going to need a break before I finish, but I can certainly start and get maybe most of the way through and then.

THE COURT: Oh. Go ahead and start. And whenever you feel that you need a break, we'll break then.

MR. BISTLINE: Okay.

CROSS-EXAMINATION OF BENJAMIN KEY (OFFICER)

BY MR. BISTLINE:

Q. Sergeant, watching that video we just watched, which I understand was your bodycam --

A. Yes.

Q. -- it didn't appear to me that Mr. Grant, when you got to the point where his car had been run off the road and hit the sign and you were all surrounding the car trying to figure out if he had a weapon or something in his off hand, it doesn't appear to me Mr. Grant moved

154

at all.

A. At which point are you talking about, sir?

Q. He has run into the sign.

A. Okay.

Q. You guys are surrounding the car. You are trying to figure out what is in his right hand.

A. Uh-huh.

Q. It appears to me he is slumped over, and he's not moving. Is that what the situation was?

A. At that point, yes.

Q. Okay. And did he, when you cut his seat belt, did he move at that point?

A. No.

Q. When you dragged him out of the car, did he resist in any way?

A. No.

Q. So whatever may have happened that might be criminal conduct, once he was stopped at that sign, he didn't do anything wrong?

A. Well, sir, at that point he was still considered a threat.

Q. I know, but he didn't break the law.

A. In which aspect?

Q. Once he is at the sign and he is keeled over, he didn't assault anybody, did he?

155

MR. DOLTON: Judge, objection. Relevance.

MR. BISTLINE: He knows the law.

THE COURT: Your response?

MR. BISTLINE: I want to make sure that we are not talking about that this crime that's been alleged doesn't involve anything that happened at that point. It only involves what happened back at or before he hit that sign. I want to make sure that they are not saying he took a swing at an officer, pulled a weapon on an officer, did anything.

THE COURT: You can inquire into that.

Objection is overruled.

MR. BISTLINE: Thank you.

Q. (BY MR. BISTLINE) So while you are extracting him from the vehicle, did he do anything to threaten any officer?

A. No.

Q. Okay. So if I'm understanding your testimony correctly, when he pulled onto the off-ramp, you were behind him and initially thought everybody was just going to pull over and you were going to get him there; is that correct?

A. My initial thoughts were actually that he was going to drive the wrong way down the off-ramp into oncoming traffic.

PAYETTE-50

156

153

1    Q. Okay.  And so, but he didn't do that?
2    A. No.
3    Q. What was his first move other than turning on to
4 the off-ramp and starting down it?
5    A. Well, once he turned on to the off-ramp and
6 started down it, he stopped.
7    Q. Stopped?
8    A. Yes.
9    Q. Straight down?  Pointing straight down the
10 off-ramp?
11    A. No.  He had started to go slightly to the right,
12 almost like he was pulling over or off the roadway.
13    Q. Okay.  And so then you thought you could pull up
14 behind him and everything was going to stop there?
15    A. I had hoped.
16    Q. Okay.
17        And then what did he do after he pulled to the
18 right and looked like he was going to stop?
19    A. He started to move again.
20    Q. And where did he go?
21    A. He started to turn back and forth like he was
22 going to come back up the off-ramp.
23    Q. Okay.  And so at that point you moved your
24 vehicle over to where you thought between there would be
25 no room between your vehicle and the guard-rail?

157

1    A. Yes.
2    Q. And that would be the north side guard-rail?
3    A. Yes.
4    Q. And did you see where Officer Branham parked his
5 vehicle?
6    A. I didn't.
7    Q. Okay.
8        Now, you are parked in a position where you
9 think you are going to be able to block him and he is not
10 going to be able to get past you.  And he is going back
11 and forth, back and forth, and back and forth; correct?
12    A. Uh-huh.  Correct.
13    Q. Did he strike your vehicle?
14    A. No.
15    Q. And your vehicle, at that point it was more or
16 less sideways to the line of the off-ramp?
17    A. I wouldn't say sideways.
18    Q. 45?
19    A. Yeah, maybe 45.  I was trying to keep him from
20 moving any farther forward back up the off-ramp.
21    Q. But your vehicle was not parked straight up and
22 down the off-ramp.  It was at an angle?
23    A. Yes.
24    Q. Okay.
25        As he is maneuvering his vehicle to go back and

158

1 forth, back and forth, back and forth.  Did he ever turn
2 his vehicle on a line that was towards the, was more than
3 perpendicular to the guard-rail?
4        In other words, did he turn more to the left
5 like he was going to go away from the guard-rail, or did
6 he stop once he was pointing straight down the
7 guard-rail?
8    A. I'm not sure I understand your question, sir.
9    Q. All right.  So he is making his way between your
10 car and the guard-rail; correct?
11    A. Yes.
12    Q. And once he has got himself lined up so that he
13 can pass past your car and the guard-rail, did he make
14 any more turns towards his left, or did he just follow
15 the guard-rail?
16    A. I don't know that he necessarily did either at
17 that point.  I'm not sure what you are getting at.
18    Q. Well, I'm just -- when he exited from this, once
19 he got himself positioned (inaudible) down the
20 guard-rail, what route did he take?
21    A. He went back up the off-ramp.
22    Q. Following the guard-rail?
23    A. I don't know.
24    Q. Did he turn back towards the left or the middle
25 of the --

159

1    A. I know his vehicle actually struck the
2 guard-rail at one point, but.
3    Q. Right.
4        And did he turn, move back towards the middle of
5 the off-ramp at all, or did he follow the guard-rail
6 up?
7    A. I don't know.
8    Q. Okay.
9        Now, it looked to me from that bit of the body
10 camera that you were maybe forward of the front door a
11 little bit and back of the front door, but you were in
12 that range to his vehicle the whole time.
13    A. Forward of the front door.
14    Q. Just a little forward of the front door to a
15 little back of the front door?
16    A. Yeah.  I could say that; yeah.  Somewhere in
17 that area.
18    Q. But you kind of moved forward at first, and then
19 when he was almost all the way around, you moved back and
20 tried to grab the door handle?
21    A. Right.
22    Q. Is that accurate?
23    A. Yeah.  I would say that's accurate.
24    Q. Okay.  While you were telling him to stop
25 alongside his vehicle there as it was maneuvering to get

160

PAYETTE-51

157

1  around your car, I understand -- I learned today there's
2  two, at least two different positions of holding your
3  gun.  One is ready, and I guess the other is aimed.  What
4  were you doing with your gun?
5      A.  I think you are referring to either low ready or
6  pointed at, on target.  I'm asking -- I'm not sure what
7  you are --
8      Q.  Yeah.  Yeah.  Were you in low ready, or were you
9  pointed at target?
10     A.  I believe I was pointed at target at that
11 point.
12     Q.  Pretty much the whole time he was maneuvering
13 his vehicle?
14     A.  Yes.
15     Q.  And you said you saw, when you positioned your
16 vehicle to block his path and got out, you saw Officer
17 Branham at that point briefly; is that correct?
18     A.  Yes.
19     Q.  How far away from you was he?
20     A.  Honestly, I don't know.
21     Q.  And after that initial sighting of him, you
22 don't really know where he went?
23     A.  I don't.
24     Q.  Now, when the vehicle pulled away, did you at
25 any point see Officer Branham again as the vehicle went

161

1  away?
2      A.  I believe I saw him up at the off-ramp.  But
3  like I said, at that point I was focused on getting back
4  in my car.
5      Q.  Okay.  And when you saw him up at the off-ramp
6  as you were getting ready to get back in your car, do you
7  remember how far away he was?
8      A.  I don't.
9      Q.  So as you are observing the vehicle go back and
10 forth, what is your sense of what he was trying to do?
11     A.  At that point I didn't know what he was trying
12 to do.
13     Q.  Okay.  When he got himself pointed up the
14 guard-rail and took off, did it become clear what he was
15 trying to do by maneuvering his car back and forth?
16     A.  Yes.
17     Q.  He was trying to get out of there; correct?
18     A.  Well, I'm not sure what he was trying to do at
19 that point, sir.
20     Q.  But as he is driving off, you said it became
21 clear what he was trying to do.
22     A.  It became clear to me that Officer Branham was
23 in his way.  I don't know what his intentions were at
24 that point.
25     Q.  Well, you don't know where Officer Branham was,

162

1  so how was it clear to you that Officer Branham was in
2  the way?
3      A.  You are right.  I don't.  I believe I know where
4  he was because I believed he was to my left.
5      Q.  Okay.  So it's your belief that Officer Branham
6  was in his way, but you don't know that?
7      A.  Correct.
8      Q.  Because you didn't see him?
9      A.  Well, I saw him when I first got out of my car,
10 but as you said, then I lost track of him.
11     Q.  Right.
12         So did you see Officer Higley at all?
13     A.  I don't remember seeing Officer Higley.
14     Q.  When you were in the initial pursuit, you've --
15 well, let me back up to the spike strips.
16         I gather you pile them into the median where
17 they won't get run over by anybody?
18     A.  Right.
19     Q.  And as the suspect vehicle approaches, you pull
20 them out?
21     A.  Right.  They are attached to a spring so you
22 can --
23     Q.  Okay.
24         And then apparently after the suspect vehicle
25 went by, you pulled them all the way out of the street?

163

1      A.  Right.
2      Q.  How does Officer Branham know where they are in
3  terms of your pull in order to steer around them?
4      A.  I had told him where I was going to be set up.
5      Q.  Okay.  So did he have to go left of the median
6  in order to keep from hitting the pile?
7      A.  I don't believe he went left.  I think he just
8  slowed down.
9      Q.  Okay.  And by then you had pulled them out of
10 the way?
11     A.  Correct.
12     Q.  Now, did it turn out that any of the tires had
13 been spiked?
14     A.  I don't know.
15     Q.  As you guys are pursuing the vehicle from the
16 spike strip area, you catch up and eventually pass
17 Officer Branham to take the lead; correct?
18     A.  Yes.
19     Q.  Are you monitoring the same radio channel that
20 he is talking on as you are doing that?
21     A.  Yes.
22     Q.  So everybody is on the same channel?
23     A.  Yes.
24     Q.  Did you hear him advise that he was allowing you
25 to take the lead?

**PAYETTE-52**

164

1  A. He asked me to take the lead.
2  Q. Okay. Did you hear anybody from his department
3  object to him turning over the lead?
4  A. I don't think so.
5  Q. So when you first got the first call that
6  Officer Branham was in pursuit, what were you doing?
7  A. I believe I was just driving down the highway,
8  honestly, at that point.
9  Q. Okay. Were you guys engaged in any kind of
10  search or investigation that you can recall at that
11  moment in time?
12  A. I don't think so.
13  Q. Okay. So at the point where Mr. Grant is
14  jocking back and forth to get turned, take up ramp, you
15  are facing towards the north and maybe a little to the
16  east as he is doing that; is that correct?
17  A. Yeah.
18  Q. So behind you would be south; is that correct?
19  A. South. South to southwest; yes.
20  Q. Okay. And left of you would be to the west,
21  northwest?
22  A. Yes.
23  Q. Okay.
24  So if Officer Branham were behind you and to the
25  west, northwest, how would the vehicle moving up the

165

1  off-ramp have been a threat to him, because you were a
2  vehicle-width away at least from the, or from the
3  guard-rail itself. So if he is behind you and to your
4  left, how is he at risk as that vehicle moves up the
5  guard-rail?
6  A. Well, I would say based on the way that the
7  driver was driving, you wouldn't know what he was going
8  to do.
9  Q. Okay.
10  A. As I had previously said where I believed
11  Officer Branham was, you know, a foot one way or the
12  other, whether the vehicle had bounced off a guard-rail,
13  I mean, there's a lot of hypotheticals there you could
14  throw in as to what could have happened, but.
15  Q. Okay. But you've got your report there?
16  A. Yes.
17  Q. I mean your interview.
18  Is there some reason that you guys didn't
19  prepare reports?
20  A. Yes.
21  Q. What's that?
22  A. It's our department policy when we have an
23  officer involved in a shooting, that we do not actually
24  write the reports ourself. We are interviewed by State
25  Police detectives.

166

1  Q. Okay. Did you review this report?
2  A. Yes.
3  Q. And did you have an opportunity to comment on it
4  before it was finalized?
5  A. Yes.
6  Q. Did you make any corrections?
7  A. I don't believe we did.
8  Q. Did you have the understanding that you could
9  have suggested corrections?
10  A. Yes.
11  Q. But you don't recall suggesting any?
12  A. I don't.
13  Q. And is it fair to say that you thought the
14  report fairly captured what you had to say about this
15  incident?
16  A. Yes.
17  Q. All right. So let's have a look at a couple
18  things there. Let me find what I'm looking for.
19  Okay. So I think you say -- let's have a look
20  at No. 33, just for clarification here.
21  Officer Branham had been there giving him
22  commands.
23  So the him there is Mr. Grant; correct?
24  A. I believe the him they are referring to is me.
25  Q. Officer Grant had been there giving you

167

1  commands?
2  A. No, Officer Branham had been there with him. I
3  think they are referring to me giving commands.
4  Q. Okay. Oh, I see. I'm sorry. Misreading on my
5  part.
6  A. I think.
7  Q. As the vehicle started to back off the ramp, he
8  moved to the right.
9  Who is he?
10  A. That would be me.
11  Q. Because he, that's you again?
12  A. Yeah.
13  Q. Thought he was too close to the car for it to
14  move forward?
15  A. Yes.
16  Q. Why were you moving? You thought your car was
17  too close to the car to move forward, or you thought you
18  personally were too close to the car for it to move
19  forward?
20  A. I thought I was personally too close. I was
21  already out of my vehicle at that point.
22  Q. Okay. So it appeared to you that that car was
23  going to move forward?
24  A. Yes.
25  Q. And you got out of the way?

**PAYETTE-53**

168

1    A.  Yes.

2    Q.  And then in 34, you say that Grant started to

3 accelerate, even though you were yelling at him?

4    A.  I'm sorry.  34?

5    Q.  34.

6    A.  34.  Okay.

7    Q.  You indicate you continued yelling at Grant.  It

8 says he, but that's you; correct?

9    A.  Yes.

10    Q.  But Grant decided to accelerate, pulling away.

11       At that point he is pulling up alongside the

12 guard-rail; is that correct?

13    A.  He was moving forward up the off-ramp.

14    Q.  And he is pretty well pinned up against the

15 guard-rail by your car, isn't he?

16    A.  That I couldn't tell you.  I couldn't see the

17 other side of the car.

18    Q.  Okay.

19       So he starts moving forward, and you thought

20 Branham was still to your left rear; is that correct?

21    A.  Yes.

22    Q.  The vehicle never moved towards your rear, did

23 it?  It followed the guard-rail up?

24    A.  I already said, sir.  I don't know if it

25 followed the guard-rail or if it moved away from the

169

1 guard-rail as it was moving up the ramp.

2    Q.  Okay.  Where did it brush the guard-rail?

3    A.  Further up the ramp.

4       MR. BISTLINE:  All right.  Your Honor, the only

5 thing I think I have left is I want to watch the car

6 video, but it's going to take me a little while to get

7 that set up.

8       Actually, I can do it on a computer screen, but

9 if I want to use the projector, it will take a little

10 while.

11       So if we want to just --

12       THE COURT:  Do you want to use the projector,

13 take a break and you can set that up, or you can do it on

14 the computer?

15       MR. BISTLINE:  I'm happy -- it's a smaller

16 computer than what we saw, but I'm happy to just do it on

17 the computer.

18       Oh, here is the computer.  It's only this big,

19 but if we think we can use it.

20       It will still take a minute to get into the

21 thing.

22       I don't see any reason to watch the spiking and

23 the first part of the chase.  I'm only concerned with

24 pretty much what happens at the off-ramp.

25       THE COURT:  Okay.  How much time would you like?

170

1       MR. BISTLINE:  It will take me 10 minutes.

2       We can stop and I can get it, or we can stop and

3 I can get it, can just get it right now.

4       THE COURT:  Let's just stop so you can get it

5 lined up.

6       We'll re-commence at 1:15.

7       MR. BISTLINE:  Okay.

8       And the only thing before we go off the record,

9 the only other thing I'm going to have -- I assume you

10 are going to rest when we are done with this witness?

11       The only other thing I have is the deposition of

12 Robert Blank, who was a witness.

13       And we've deposed him.  We deposed him in my

14 view pursuant to an agreement that was reached the last

15 time we were here for a preliminary hearing.

16       And the State has since objected to that.  I

17 don't know what their position is now.  I didn't feel

18 like they took the appropriate path of objecting, so I

19 went right ahead and took it.

20       So I guess at some point we are going to have to

21 talk about that, but I have both the video of that

22 deposition, which we could watch; I have the transcript

23 of that deposition, which I could just give the Court.  I

24 don't have a final transcript, the certified transcript

25 yet because the guy hasn't had a chance to read and sign.

171

1       So I'm not quite sure what the best approach

2 would be to that, but that's...

3       THE COURT:  Was there a motion made to the Court

4 to take that deposition?

5       MR. BISTLINE:  Yes, Your Honor.

6       Well...

7       THE COURT:  I didn't see one in the file.

8       MR. BISTLINE:  Right.  What happened was we were

9 at the preliminary hearing discussing whether we were

10 going to go forward, and we said, well, we have got this

11 witness we want to take a deposition of.  He is in

12 California.

13       And it was decided that we should get that done

14 before we proceeded.

15       At that hearing it's my understanding that

16 Mr. Pittman agreed that we could go ahead and get that

17 deposition and that we vacate the hearing so that we

18 could go ahead and get that deposition.

19       After the fact, he objected.  And I think he said

20 something in his moving papers.

21       Well, they weren't really moving papers, but in

22 his documents he said something about having not had an

23 adequate opportunity to review it and therefore he

24 changed his mind.

25       But in my view, that would have required them to

**PAYETTE-54**

172

1 have moved at that point for a protective order or to
2 amend the Court's order, and there was never a motion.
3 There was paperwork going back and forth, but never a
4 motion.
5          THE COURT:  Well, ICR 15, as I read it, requires
6 a motion to even take a deposition.
7          MR. BISTLINE:  Yes, Your Honor.  And I believe
8 we made that in court.
9          I mean, that was, I believe that was the whole
10 point of the discussion that we move to stop the hearing
11 and go take the deposition so that we could have the
12 deposition ready at the time of the hearing.
13          So in my view we made that motion, and they
14 agreed to it.  So we didn't file a formal motion, but
15 it's, we can look at the record.
16          THE COURT:  Okay.
17          Do you recall the date that that was done?
18          MR. DOLTON:  Your Honor, I was a present party.
19 I wasn't a participating party for the State, but I was
20 present.
21          THE COURT:  Okay.
22          MR. DOLTON:  And I do recall the verbal motion
23 being made, and we did initially agree to it.
24          I think we filed an objection because we were
25 concerned that it would be drawn out too far and we

173

1 needed to figure out when it was going to get done, when
2 we would get the prelim done.  And we did participate in
3 the deposition.  We did ask questions of the deposed
4 witness, so.
5          THE COURT:  So there's no objection --
6          MR. DOLTON:  No.
7          THE COURT:  -- from the State, then?
8          MR. DOLTON:  No.
9          THE COURT:  Okay.  Then that takes care of any
10 issue on that.
11          As far as whether to watch the -- how long is
12 the video?
13          MR. BISTLINE:  Well, it's -- yeah, we've got a
14 mini transcript.
15          Have you got the time?
16          THE COURT:  It should be on the front.
17          MR. DOLTON:  October 9 of '17 is the date.  The
18 time expended?  I accessed it.  But I can print it off
19 again.
20          THE COURT:  Did you want me to see the video, or
21 will the transcript be sufficient?
22          MR. DOLTON:  I reviewed the transcript, Your
23 Honor.  I'm comfortable submitting the transcript.
24          THE COURT:  You are.
25          Is Mr. Bistline?

174

1          MR. DOLTON:  Oh, I'm sorry.  I thought you were
2 asking me.
3          THE COURT:  No.  I was.  I've got one that says
4 yes.  I need both.
5          MR. BISTLINE:  Yeah.  Your Honor, the only thing
6 that is a problem with the transcript is that the exhibit
7 wasn't attached to the transcript.  I think it's on the
8 video.
9          But I have a copy of the exhibit, if we could
10 agree on that.
11          THE COURT:  If the exhibit could be attached to
12 that, then.
13          MR. DOLTON:  I have I think 3 and 2, and then
14 there was a 1; right, which is the Google map?
15          MR. BISTLINE:  Right.
16          And these are the ones that were important,
17 because they were -- Mr. Blank, as it turned out, was a
18 surveyor.  So we have, like, a nice little cad.
19          Either one of 2 or 3 is fine.  And 1 was just
20 identifying the intersection.  So if we just put one of
21 those in, along with the transcript, I'm happy to loan
22 you my copy of the transcript.  And if I do that, Judge,
23 you'll also have the discs in case you want them.
24          MR. DOLTON:  Which one did you want submitted, 2
25 or 3?

175

1          MR. BISTLINE:  I don't care.
2          MR. DOLTON:  Let's do 3.
3          MR. BISTLINE:  Okay.
4          So if that's the case, we won't have any time
5 spent on that, and all we'll have to do is get this video
6 queued up, which I'm sort of struggling with, because
7 it's not my computer.
8          THE COURT:  Well, we'll start back here if
9 everything is running properly at 1:20 on that clock.
10          MR. DOLTON:  Okay.
11          MR. BISTLINE:  Thank you, Your Honor.
12          THE COURT:  Court is in recess.
13          (Brief recess was taken.)
14          THE COURT:  Back on the record in 17-660.
15          Go ahead.  Are you ready on that?
16          MR. BISTLINE:  Right.
17          So I decided --
18          THE COURT:  I'll come back and sit over there
19 with you guys.
20          MR. DOLTON:  Open chair for you, Judge.
21          MR. BISTLINE:  I decided to project, because the
22 screen is so dirty here, I'm ashamed to let anybody see
23 it, so.
24          THE COURT:  We can wash it off for you.
25          MR. BISTLINE:  This I think will be good.

176

PAYETTE-55

1    And so I'm going to start it just briefly, so
2 that Officer Key can verify that we have got the right
3 thing.  And I'll stop it again in just a second.
4    So here we go.
5    THE COURT:  Is this going to be an exhibit?
6    MR. DOLTON:  I think it's E, Echo.
7    MR. BISTLINE:  Why won't it start?
8    Well...
9    Well, now we've gone back to the beginning.
10    (Video playing.)
11    Q.  (BY MR. BISTLINE)  So this is where you are
12 spike stripping, Officer Key?
13    A.  Yes.
14    Q.  Okay.  I'm going to move it forward, if I can
15 get it to do that rather than watching.
16    This may take a second.
17    Is the clock moving?
18    No.  The clock is not moving.
19    Great.  God damn thing.
20    Now the clock is moving.  All right.
21    Just for the record, Officer Key, what is
22 happening right now?
23    A.  This must have been after I deployed the spike
24 strips.
25    Q.  All right.  I'm going to try to move this thing

177

1 forward a bunch here, because I don't really want us to
2 have to watch the whole thing.
3    Well, it's probably going to be easier just to
4 watch the whole thing.
5    You are pursuing at this point down the highway
6 to catch up with Officer Branham?
7    A.  Yes.
8    Q.  And that's him flashing there in front of you?
9    A.  Yeah.  That's him.
10    Q.  Okay.  This is going to be okay.
11    This is where you move around him; is that
12 correct?
13    A.  Yes.
14    Q.  And this is the Scion that you are now behind?
15    A.  Yes.
16    Q.  And are you going through the S turn at this
17 point?
18    A.  Yes.  This is the S curves.
19    Q.  Is there four lanes at this juncture?
20    A.  Yes, two lanes north, two lanes south, with a
21 median.
22    Q.  Now he has moved into the left lane, and you are
23 approaching the freeway?
24    A.  We are; yeah.  We are close.
25    Q.  And I believe as we get past the Chevron Station

178

1 here, you pull up on his left side, and then he
2 accelerates and goes around you; is that correct?
3    A.  Yes.
4    Q.  And now you are heading on down the road, back
5 to where the vehicle is?
6    A.  And that's where the vehicle stopped.
7    Q.  Is run off.
8    All right.  I have no further need for this at
9 this point.
10    MR. BISTLINE:  Did you want to run it for
11 any more?
12    MR. DOLTON:  No.  I'm fine.
13    MR. BISTLINE:  Okay.
14    So for the record, Your Honor, what I'm going to
15 do is give you a thumb drive.  It has both what you just
16 saw and it has the 10-8 video, exe program.  So you can
17 watch what you just saw if you want to.  And good luck
18 using that program.
19    THE COURT:  It's taken a while just to get to
20 this point.
21    MR. BISTLINE:  It's not easy to use.
22    THE WITNESS:  I believe that those files
23 actually will play on a Windows media player as well.
24    MR. BISTLINE:  I tried to play them last night
25 and couldn't get it to, but.

179

1    THE WITNESS:  Okay.
2    MR. BISTLINE:  But maybe he can call you and you
3 can come over and do it for him.
4    That's all I have for this witness, Your
5 Honor.
6    THE COURT:  Any redirect?
7    MR. DOLTON:  Thank you, Your Honor.
8    THE COURT:  I'm sorry.  Was this Exhibit E?
9    MR. BISTLINE:  Yes.
10    THE COURT:  And Exhibit E is the thumb drive?
11    MR. BISTLINE:  The thumb drive.
12    THE COURT:  Which includes what we just saw.
13 It's the camera that was in Sergeant Key's car?
14    MR. BISTLINE:  Yes, Your Honor.
15    THE COURT:  Okay.
16    MR. BISTLINE:  And then I think -- I guess we
17 would have exhibit -- oh, yeah.  First we'll rest.  Yeah.
18    I have no further questions of this witness.
19    MR. DOLTON:  So redirect, Your Honor?
20    THE COURT:  Go ahead.
21    MR. DOLTON:  Okay.  Thank you.
22    <u>REDIRECT EXAMINATION OF BENJAMIN KEY (OFFICER)</u>
23 BY MR. DOLTON:
24    Q.  Officer Key, now, the Defense Exhibit E was your
25 dashcam video; is that correct?

180

PAYETTE-56

1    A.  Yes.

2    Q.  And did you observe further traffic violations

3  as you were pursuing the vehicle?

4    A.  I did at this point.  I honestly didn't remember

5  them from --

6    Q.  So watching the video, though, I saw a failure

7  to maintain lane?

8    A.  Yes.

9    Q.  There's no estimate as to speed, of course.  And

10 you've previously testified you didn't even bother

11 considering that.  You were just focusing on the

12 pursuit?

13   A.  For some reason, our 10-8 system there, they

14 normally are hooked into the vehicle where they record

15 speeds.  I don't know why that didn't, but.

16   Q.  But your focus wasn't on speed.  It was on

17 stopping the pursuit?

18   A.  Correct.

19   Q.  Okay.

20        Let's see here.  Going back.  So when you

21 watched your bodycam and there was a question about your

22 positioning in relation to the Scion, whether you were at

23 the front of the driver's side front door or towards the

24 rear, is it possible that at that time the car was moving

25 back and forth, which changed --

181

---

1    A.  The car was moving back and forth.

2    Q.  Okay.  So the explanation could be it wasn't you

3  moving but the vehicle was moving?

4    A.  Sure.

5    Q.  Okay.

6    A.  Yes.

7    Q.  The vehicle was not static as you were

8  approaching it, was it?

9    A.  No.  It wasn't static.

10   Q.  Okay.

11        Now, on cross we also talked about your use of

12 your weapon.

13        Given the circumstances, hindsight being 20/20,

14 were there any alternative methods under the

15 circumstances?

16   MR. BISTLINE:  Object, Your Honor.

17        On cross-examination, I didn't say a word about

18 the use of his weapon, and I did that on purpose, because

19 that has nothing to do with this crime, and I'm not

20 asking for anybody to make any determinations about that.

21 It was on direct.  It did not come up on cross.  I object

22 to the question.

23   THE COURT:  Your response?

24   MR. DOLTON:  As to there was a discussion about

25 position of weapon being low ready or pointed at target.

182

---

1  Officer Key stated it was pointed at target, so I think I

2  can work into within the scope of that question

3  alternative methods, since on direct we had discussed

4  what equipment he had on his person.

5    THE COURT:  Objection is overruled.

6    Q.  (BY MR. DOLTON)  Did you consider using other

7  weapons, your baton, your taser, under those

8  circumstances?

9    A.  No.

10   Q.  Why was that?

11   A.  They wouldn't have been effective.

12   Q.  Okay.  Window was up.  Was that part of your

13 equation?

14   A.  Yes.

15   MR. BISTLINE:  Objection.  Leading.

16   Q.  (BY MR. DOLTON)  And why --

17        I'll withdraw, Your Honor.

18   THE COURT:  Okay.

19   Q.  (BY MR. DOLTON)  Why were the alternatives, your

20 baton and your taser, not used in your opinion?

21   A.  A baton wouldn't stop the vehicle from moving.

22 I could see using a baton to break the window if the

23 vehicle was stationary and we were attempting to get him

24 out, but since the vehicle was still moving, it wouldn't.

25 It wouldn't do anything.

183

---

1        And a taser wouldn't deploy through the door or

2  window.  And even if the window was rolled down, tasing

3  someone behind the driver's seat with the car in drive

4  would not be necessarily a good idea either.

5    Q.  Okay.

6        All right.  Now, there was a discussion on cross

7  about what if anything you could glean the driver was

8  intending to do.

9        Was he complying with any of your lawful orders

10 to stop and to exit the vehicle?

11   A.  No.

12   Q.  In regards to Officer Branham's position behind

13 you and to your left, would there be any rhyme or reason

14 for him to be to your right or directly behind you

15 tactically speaking?

16   A.  No.

17   Q.  Was there any obstructions to your right as you

18 were approaching the Toyota Scion?

19   A.  My vehicle.

20   Q.  Okay.

21   A.  In the way it was positioned.

22   Q.  And as you approached the vehicle and the

23 vehicle was beginning to head up the ramp again, before

24 you discharged your firearm, what were you focused on

25 doing?

PAYETTE-57

184

181

1     A.  Stopping the vehicle from running over Officer
2  Branham.
3     Q.  When you were firing your weapon, what were you
4  focusing on?
5     A.  Stopping the threat.
6     Q.  Okay.
7          And so is it safe to say your focus were
8  preoccupied with those aspects, not the circumstances of
9  where Officer Branham was or what direction the vehicle
10 was going?
11    A.  Yes.
12         MR. DOLTON:  No further questions, Your Honor.
13         THE COURT:  Mr. Bistline?
14         MR. BISTLINE:  No questions.
15         THE COURT:  May this witness be excused?
16         MR. DOLTON:  Yes, Your Honor.
17         MR. BISTLINE:  Yes.
18         THE COURT:  Okay.  Thank you, Sergeant.
19         MR. DOLTON:  No further witnesses.
20         We rest, Your Honor.
21         MR. BISTLINE:  Your Honor, we only have
22 Mr. Blank's deposition, which I guess I'd submit.
23         Are you going to return the exhibits after you
24 complete your consideration in this?
25         THE COURT:  They are supposed to go to District

185

1  Court.
2          MR. BISTLINE:  Okay.  I'm wondering if...
3          MR. DOLTON:  I can print.
4          What transcript do you want me to print off, the
5  long form, or?
6          MR. BISTLINE:  I only have the mini-script.
7          MR. DOLTON:  Okay.  I can print that all.
8          MR. BISTLINE:  I might have -- actually, I
9  might have the whole thing here.  Just a second.
10         No.  I don't.
11         Yeah, so we will give you when we are done here
12 an exhibit.
13         THE COURT:  F?
14         MR. BISTLINE:  F, a copy of the mini-script,
15 four to a page of the deposition of Robert Blank, which
16 will include Exhibit 3, and that will be Exhibit F.
17         And that will be our case, Your Honor.
18         We would rest.
19         Well, I move for the admission of Exhibit F.
20         THE COURT:  Any objection to that?
21         MR. DOLTON:  No, Your Honor.
22         THE COURT:  I think that's been discussed a few
23 times.
24         F is admitted, which is the deposition and
25 accompanying exhibit that goes with that.

186

1          (Defendant's Exhibit F admitted.)
2          THE COURT:  I obviously would like to take some
3  more time.  I want to review the video, the dashcam.
4  I'll need to read the deposition.
5          So I'm not going to be able to make a decision
6  for you right now, but I would like to do that probably
7  this week.
8          What I would probably do is I could do it
9  orally.  I could even appear by phone if you wanted to
10 hear it that way.  Or come back to court.
11         I just, I don't want it languishing.  I'd like
12 to just sit down with all of this and get to work on
13 it.
14         MR. BISTLINE:  Would you have any anticipation
15 that we would do our argument after you had a chance to
16 review those things?
17         THE COURT:  Are you prepared to do that now?
18         MR. BISTLINE:  I can do it now.
19         THE COURT:  Why don't we do that now, and then I
20 can always go back and I can review the audio.  I'll have
21 everything.
22         MR. BISTLINE:  Okay.
23         MR. DOLTON:  Okay.
24         THE COURT:  So.
25         MR. BISTLINE:  Or I'm happy to come back if it

187

1  turns out you want to hear more or you have questions you
2  want to address.
3          MR. DOLTON:  We can proceed with closing, Your
4  Honor.
5          THE COURT:  Okay.  If you'd like to go,
6  Mr. Dolton.
7          MR. DOLTON:  Thank you.
8          Your Honor, we've had a pretty lengthy
9  preliminary hearing on this matter.  The preliminary
10 hearing was based upon a complaint that the State filed
11 alleging fleeing or attempt to elude a peace officer,
12 Count 1; and Count 2 of the complaint is aggravated
13 assault.  Both are felonies.
14         Most of my closing argument will be based upon
15 whether or not the State had substantial evidence on each
16 of the material elements of the case.
17         I think we have clearly established in both
18 cases when the incident occurred, on or about
19 October 24th, 2016.
20         We also clearly established it was not refuted
21 the venue occurring in the County of Payette, State of
22 Idaho, Highway 95, Vetter Flats, City of Fruitland, City
23 of Payette are all within the County of Payette, and the
24 officers have attested that the activities all were
25 within the County of Payette.

**PAYETTE-58**

188

1     As far as identity is concerned, I don't think
2 that's refuted as to who was the driver of the Toyota,
3 2013 black Toyota Scion.  Both Officers Branham and Key
4 have identified the defendant, David Michael Grant, as
5 the driver of the vehicle.  I believe that can also be
6 established in the Court's independent review of the
7 videos, State's Exhibit 1, and also Defense Exhibit F.
8     Where the rubber hits the road, Your Honor, is
9 essentially the activities and the intents of Mr. Grant
10 in his conduct on that night in question.
11     Traveling in speeds of excess of 25 miles per
12 hour over the speed limit and driving the wrong way down
13 an interstate ramp and directly, driving directly at
14 peace officers.
15     The testimony of Officer Branham establishes
16 that there was approximately 80 miles per hour being
17 achieved on Vetter Flats in a 55-mile-an-hour zone, which
18 we believe is sufficient evidence for purposes of
19 preliminary hearing to show that he was exceeding the
20 speed limit in excess of the 25 miles per hour.
21     Driving the wrong way down the interstate ramp,
22 the exhibits will show that he, Mr. Grant, did take a
23 left onto an exiting westbound interstate ramp and then
24 driving directly at peace officers.  We would say the
25 whole situation is illustrative of what the act was in

189

1 regards to eluding police officers.  The distance that
2 was covered, the speeds that were achieved, and the
3 activities and conduct exhibited by Mr. Grant in the
4 evidence show he had no regard or intent whatsoever to
5 comply with any lawful directives by Officer Key or
6 Officer Branham.
7     Driving directly at officers kind of spills over
8 into the aggravated assault count.  What we have is
9 testimony and some video which can in some ways support
10 the testimony that there was an established pattern or
11 tactical approach employed by both Officer Branham and
12 Officer Key in approaching the vehicle to get it to stop
13 and for the driver to exit the vehicle.
14     As stated previously, Mr. Grant did not comply
15 with any of these orders.  Officer Key believes that
16 Officer Branham was to his left and behind him; Officer
17 Branham confirmed that he was to his left and behind
18 Officer Key in a low fire position.
19     And essentially what happened at that point goes
20 into Count 2 of the aggravated assault.  Officer
21 Branham's testimony is pertinent primarily in this matter
22 whether there was an intentional, unlawful, or apparent
23 ability to threaten by word or act to do violence upon
24 the person, that would be of Officer Branham, with deadly
25 weapon.

190

1     We assert the deadly weapon was the black 2013
2 Toyota Scion.  That's evident in the testimony, in the
3 videos as exhibits.
4     Create a well-founded fear in Officer Branham
5 that such violence was imminent.
6     Officer Branham testified that he had to get out
7 of the way of the approaching vehicle.  And by getting
8 out of the way, he had to essentially jump and dive out
9 of the way to the right or possibly to the south of the
10 ramp to avoid being struck.
11     As to driving directly at the peace officers,
12 we've heard testimony from all three officers involved on
13 the elude that they had to take affirmative action to
14 avoid the path of the vehicle, whether it was in reverse
15 or was correcting to go forward from both Officer
16 Branham, Officer Key, and Reserve Officer Higley.  There
17 we go.  I got it.
18     Your Honor, we believe that we have achieved
19 sufficient probable cause and have substantially
20 established the elements, the material elements to both
21 counts.  We ask Your Honor to consider all evidence in
22 its analysis, and we ask Your Honor to find the necessary
23 probable cause to those elements and bind the defendant
24 over to District Court on said charges.
25     Thank you.

191

1     THE COURT:  Thank you.
2     Mr. Bistline.
3     MR. BISTLINE:  Your Honor, I think at the outset
4 I'd like to get back to my interpretation of the statute,
5 or of the Rule that guides your determination here.
6     I don't think there's -- I'm not intending to
7 argue that there's no probable cause to believe that
8 whatever acts were committed were committed by Mr. Grant.
9 I think you have sufficient evidence to establish that is
10 true.
11     So the question then becomes whether or not a
12 crime occurred and a public offense has been committed.
13 And I think that's where we have a bunch of trouble, so.
14 But let's take the pleading.
15     The complaint here alleges a felony eluding, and
16 it cites all four, 1404(2)(a), (b), (c), and (d).
17     And I'm looking at the statute, which I just
18 confirmed is the most recent version of the statute, and
19 (a) is, travels in speeds of 30 miles per hour above the
20 posted speed limit.
21     I don't think we have any evidence that allows
22 us to make that determination.
23     The most we have got is around 80 and maybe a
24 little in excess of 80 in a 55.  But otherwise, I
25 couldn't follow the testimony.

PAYETTE-59

192

189

1    Now, maybe somebody who knew all of these
2    streets by heart and knew where the signs were would be
3    able to, but it's like, well, there's this speed, but
4    where was he going at this speed.  I don't think it's at
5    all clear.
6    But in any event, the most I think they have
7    ever established is 25 miles an hour, and that's not a
8    crime.  That's not a felony offense.  That's a
9    misdemeanor fleeing, but not a felony.
10   Number two, causes damage to property of another
11   or bodily injury.  He didn't hit anybody.  And he didn't.
12   So he didn't cause any damage to property and didn't
13   cause a bodily injury.
14   Drives a vehicle in a manner as to endanger or
15   likely to endanger.
16   I'm going to come back to that.  That's (c).
17   And leaves the State.  No evidence that he left
18   the State.  Didn't even leave the county.
19   So drives this vehicle in a manner as to
20   endanger.  Well, you can watch the video, and you can see
21   there's no cars that are in danger.
22   Likely to endanger?  Well, I mean if I'm driving
23   Mr. Grant's car and I see everybody pulling over to the
24   side because the cops are coming, as it's clear they were
25   doing, I probably don't feel like I'm endangering

193

1    anybody.
2    If I turn left on the on-ramp of the freeway and
3    go a long ways down, then I may be risking endangering
4    somebody, but if I turn left, and as happened in the
5    video, immediately recognize my mistake and correct it, I
6    don't think that's either endangering or likely to
7    endanger.
8    So then we get down to the officers.  And
9    that's, that really in my view relates to both offenses.
10   And let's take officers in order.
11   Higley.  I don't think that there is any
12   evidence that my client had any idea that Mr. Higley was
13   behind him.  And the statute we were dealing with here,
14   Your Honor, according to what has been pled, and I'll go
15   back to the pleading, aggravated assault.  I see 901(b)
16   and 901(a).  901(a) says, "A unlawful attempt, coupled
17   with apparent ability, to commit a violent injury on the
18   person of another."
19   There is no, nothing about well-founded fear in
20   (a).  There's nothing about anything that's been argued.
21   It's an unlawful attempt to commit a violent injury.
22   I'm not going to argue that he didn't have the
23   ability.  He was driving a car for Christ sake.  But an
24   unlawful attempt to commit?
25   In order to attempt to commit on Officer Higley,

194

1    he'd have to know he was back there.  Just accidentally
2    hitting him or hitting him when he was doing something
3    else is not an attempt.  Attempt implies that you know
4    something is there and you are trying to do something
5    about it.  So Officer Higley sneaking around behind him,
6    there is no evidence that he saw him or that he was
7    actually backing up trying to hit him.
8    I think if you watch the video, he is backing up
9    a few feet and correcting and backing up a few feet and
10   correcting and backing up a few feet.  Officer Higley
11   has, if you look at it, it's a fairly wide section of
12   pavement there.  He has plenty of room to move behind
13   without being at risk.  So if he cut right behind my
14   client, whether my client was attempting to hit him or
15   not, would require some evidence that my client knew he
16   was there, and there's none of that.  There's no evidence
17   that he saw or could see him.  Looked in his rear-view
18   mirror?  There's nothing.
19   In fact, if you look at the video, it looks like
20   he pretty much is focused on what it's going to take to
21   get around that car.
22   I mean, you will see his face, and he is looking
23   at the car, and he is driving around the car.
24   I don't even see the instance where he looks at
25   the officer and smiles, but.

195

1    So that takes care of Officer Higley.
2    Then we go to Officer Key.  And if you look at
3    the video, there's really very little chance my client
4    could hit Officer Key, because he'd have had to almost do
5    a 180-degree turn.
6    Officer Key's car is parked, and he is behind it
7    moving up and down or staying put with the other car
8    moving up and down, but he is behind his car.
9    So for my client to hit him, he'd have had to go
10   past parallel of the guard-rail and actually turn around
11   the front of Officer Key's car, and there's no evidence
12   that he attempted to do that.
13   It's pretty clear his attempt was to get out of
14   there.
15   So then that brings us to Officer Key.  So the
16   evidence is Officer Key, we have officer -- I'm sorry.
17   Officer Branham.
18   We have Officer Key alongside the vehicle.  The
19   vehicle is moving around in front of him, and he thinks
20   that Officer Branham is over here, to his left and back.
21   The vehicle never goes there.  We've got Mr. Blank, who
22   brings the vehicle right up the guard-rail, a little wide
23   of the guard-rail in making the turn, but never, but only
24   moving away from the guard-rail as he gets past the
25   position that this guy Blank sees Officer Branham.  He

PAYETTE-60

196

1 squeezes by along the guard-rail until he is past
2 everybody.
3          And if Officer Branham is here relative to
4 Officer Key, he doesn't get near him.
5          Now, Officer Branham said, "I had to dive out of
6 the way."
7          Well, I think that's gilding the lily a little
8 bit, Your Honor.
9          Because the statement he gave to the State
10 Police, which he had an opportunity.  How many times do
11 people charged with crimes get an opportunity to review
12 the police report and correct them?
13          But he had an opportunity to look at the report
14 from his interview and correct the report from his
15 interview, and he doesn't mention diving out of the way,
16 but that's a pretty important fact to the charge they
17 have made.
18          If you wanted -- if you wanted to charge
19 somebody with attempting to hit you, you probably
20 wouldn't say that in order to avoid it, I stepped back.
21 You would say, I had to dive out of the way, or he
22 swerved towards me, or he made a move in my direction, or
23 something.  But all my client was trying to do was get up
24 the guard-rail and get out of there.
25          Now, I don't think we have to deal with why that

197

1 was the case, but the issue is whether he was attempting
2 to hit anybody.
3          And for Officer Branham to say he had to dive
4 out of the way when he said nothing to that effect, when
5 it was simply, I stepped back to be sure he couldn't get
6 me.
7          If you read Mr. Blank's deposition, it's pretty
8 clear that he wasn't even close to him.
9          So in my view, if they want to charge somebody
10 with an unlawful attempt, they should either charge
11 somebody besides Mr. Grant, because they don't have the
12 evidence to charge him with that offense, and I don't
13 think they have that evidence on the level of
14 preponderance, which I think is the level you should
15 apply it on, but I don't think they actually even have
16 any substantial evidence of every material element,
17 because a material is here is my client's intent.  A
18 material element is that he was attempting to hit
19 somebody as opposed to attempting to get out of there.
20          A material element is that he drove forward when
21 there was actually somebody in front of him that he would
22 hit.  And there is no evidence of that, because Officer
23 Branham was behind and to the left, and the car goes
24 across the front.
25          And Mr. Blank will fill in that blank, if you

198

1 will.  I didn't mean to do that, once it was in front of
2 me.
3          So, Your Honor, I think it's really important to
4 understand here that this is more than a rubber stamping
5 opportunity.  You are a gatekeeper here, and you are
6 going to send somebody, if you bind Mr. Grant over on one
7 or both of these charges, you are going to send him
8 upstairs to deal with a very serious problem, a felony
9 offense.  And given what we are faced with in the
10 language of the rule, I think you need to do that
11 cautiously and with a recognition that there are gaping
12 holes in this case.  And they are not holes that I think
13 they can fill.
14          Thank you.
15          THE COURT:  Thank you.
16          I'd like to set a date for a decision just so we
17 don't lose track, you know.
18          MR. DOLTON:  Your Honor, would you permit me a
19 response?
20          THE COURT:  Oh, yeah.  I'm sorry.
21          Go right ahead.
22          MR. DOLTON:  Thank you.
23          First off, we'd acknowledge that we are not as
24 keenly specific in our complaint as could be expected.
25 We acknowledge that the 30 miles an hour is the statutory

199

1 limit.  My argument would be that the alleged conduct
2 would be under subsection (c) only, and I would assert
3 that the inclusion of sub (a), sub (b), and sub (d) in
4 the elude is simply a scrivener's error.
5          We haven't alleged, nor do we have any evidence
6 that he left the State.  He stayed in Payette County.
7 And if he stayed in Payette County, he definitely stayed
8 in the State of Idaho.
9          What we would allege, the conduct to be under
10 subsection (c) would be that traveling in excess of
11 speeds of 25 miles per hour and had been driving in the
12 wrong way on an interstate ramp and then driving directly
13 at peace officers.  Directly at.
14          We would assert through the testimony of the
15 officers as they were in the way essentially and by being
16 in the way they had to move in order to not, to avoid
17 being struck, as they were performing their lawful duties
18 to get a person to stop on the basis of a traffic
19 violation, multiple traffic violations as it turned out.
20          As to the assault argument, the Court can make
21 reasonable inferences as to the conduct perceived and
22 interpreted.
23          Rarely do we have the opportunity to pry into
24 the intent of a defendant, unless they simply admit to
25 the criminal conduct.

**PAYETTE-61**

200

197

1     This is not a fox hunt.  We are not or the
2  officers were not pursuing an animal.  This is a human
3  being who has motivations and intent to do anything for
4  self preservation, so what we have is a case where there
5  was no obedience to any lawful, visual, auditorially cues
6  from law enforcement to stop the vehicle.  He was simply
7  running away from authority.
8     When that authority caught up to him and
9  essentially was nearing the trap, the intent can be
10 inferred as to all of the evidence that you have before
11 Your Honor:  The smile, the smirk, whatever you want to
12 call it in the video.
13    It was quite evident to me that there were
14 multiple opportunities for Mr. Grant to refrain from
15 trying to escape the situation.  He was given multiple
16 commands.  There was the presence of a firearm and
17 commands to do so, and he simply did not acknowledge any
18 of this and proceeded to do what he wanted to do in the
19 face of lawful authority.
20    The Blank deposition, I did not go into in my
21 initial closing argument, as although Mr. Blank has some
22 information to provide, you have to consider the context.
23    Mr. Blank was heading southbound and was
24 continuing to drive southbound as he was looking back as
25 to what was going on at the off-ramp that he had passed,

201

1  and then he turned around after he got over the bridge of
2  the interstate and drove back to see the aftereffects of
3  Mr. Grant being removed, detained, and rendered aid.
4     Mr. Blank's observations, given the fact that it
5  was between 11:00 to 12:00 at night, the only light that
6  could be provided was through overhead lights and the
7  siren or the lights from the patrol vehicles, he only
8  acknowledged seeing one person out of the vehicle.
9     Well, I think we can easily establish there were
10 three people out of the vehicle.  So we could therefore
11 establish that he really didn't have a good look at the
12 situation as he was driving away from that said
13 situation.
14    The material elements of the intent.  Like I
15 said, intent is always the issue when it comes to
16 criminal matters.  And outside of an admission, the
17 intent usually has to be inferred based on the
18 circumstances of the case and the evidence as presented
19 for Your Honor.
20    I believe a reasonable inference could be made
21 that Mr. Grant had no intent whatsoever to comply with
22 anything or any action done by law enforcement, and that
23 intent can be furthered to he would do anything he could
24 to avoid contact with law enforcement and being by the
25 personnel involved.

202

1     I agree with defense as to the importance of
2  magistrate court gate-keeping the situation, but in my
3  experience this case and its evidence are fairly strong
4  if you look at the forest rather than the trees.  The
5  trees are there, the forest is there.  There is ample
6  evidence to show that at least for purposes of probable
7  cause and substantial evidence that the material elements
8  have been met for purposes of this hearing.
9     Thank you, Your Honor.
10    THE COURT:  Thank you.
11    MR. DOLTON:  Your Honor, can you set a deadline
12 so we can get you that stuff?
13    THE COURT:  Can't you get that to me today?
14    MR. DOLTON:  I would like to, but my office is
15 in a felony trial over there, so I think our resources
16 are being focused there.
17    THE COURT:  I would like all of the material by
18 Friday at noon.
19    MR. DOLTON:  Okay.
20    THE COURT:  This Friday at noon, which is the
21 20th.
22    I'd like to give you my oral decision -- you
23 will have it by Wednesday, the 25th.
24    MR. BISTLINE:  Your Honor, I have a mediation
25 that day.  I would imagine that if we need to have a

203

1  phone conference in the afternoon, typically things get
2  moving faster as you know towards the afternoon, but.
3     THE COURT:  Depends who the mediator is.
4     MR. BISTLINE:  I would imagine that if we -- I
5  mean we have a fixed time that I can work it around
6  that.
7     THE COURT:  Take a break?
8     MR. BISTLINE:  Because I don't think it's going
9  to take very long.
10    THE COURT:  Your mediation?
11    MR. BISTLINE:  No, your discussing the
12 decision.
13    THE COURT:  Well, you never know.  I might find
14 many things to talk about.
15    How about 3:00 o'clock?
16    And you can appear by phone.  You will not have
17 to be here.
18    MR. BISTLINE:  Okay.
19    THE COURT:  You can also appear by phone if you
20 wish, Mr. Grant.
21    MR. BISTLINE:  Normally, just for the sake of
22 the record, I arrange for him to be available by phone
23 also.
24    THE COURT:  Okay.
25    MR. BISTLINE:  Just so we don't run into...

**PAYETTE-62**

204

201

1    I suppose it shouldn't be my concern to raise
2 this, but just so we don't run into a critical phase
3 proceeding argument (inaudible.)
4    THE COURT:  Is there a phone number that we
5 could reach you at?
6    MR. BISTLINE:  I think my cell phone is going to
7 be best for me.  331-2100.  (208) 331 -- no.  Wait a
8 minute.  That's my office.
9    (208) 989-7771.
10    THE COURT:  Mr. Grant, where can we reach you?
11    MR. GRANT:  (208) 697-9456.
12    THE COURT:  Okay.  Somebody from your office
13 could be here?
14    MR. DOLTON:  We'll be present, Your Honor.
15    THE COURT:  Okay.  Let's shoot for 3:00 o'clock.
16    If I'm not prepared, I'll let you know and
17 reschedule it.  Otherwise, we'll meet on 10/25 at 3:00.
18    State have anything further today?
19    MR. DOLTON:  We do not, Your Honor.
20    Thank you.
21    THE COURT:  The sooner you can get me that
22 information, I could use it to get started.
23    MR. DOLTON:  Yes.
24    Now, I know I did offer Mr. Bistline to produce
25 the transcript, but are you going to do that on your own?

205

1    MR. BISTLINE:  Do you have a copy for me at this
2 time?
3    Well, but I need that one back, because that's
4 got the disc.  So I guess I could take the discs out.
5    THE COURT:  How many pages are there?
6    Why don't we just make a copy of it.
7    MR. BISTLINE:  Sure.  That's great.
8    MR. DOLTON:  And then you can have the exhibit
9 you want.
10    MR. BISTLINE:  You know, if you want, you can
11 just take the disc out and download the disc.
12    THE COURT:  You are asking us to do something?
13    THE CLERK:  I think I can do that, Judge.  I
14 think I can do it really quick for you.
15    THE COURT:  Okay.  Thank you.
16    MR. BISTLINE:  Well, there's actually two
17 versions of it.  One is synchronized to the transcript,
18 and the other is just the transcript.
19    THE CLERK:  Okay.
20    MR. BISTLINE:  It's just the actual video.
21 Synchronized to the transcript might be best.
22    THE CLERK:  As soon as we recess, I'll go in the
23 office and try to put it on.
24    THE COURT:  Okay.  we can give this back to you,
25 then, before you leave.

206

1    MR. BISTLINE:  Okay.  I'll be here for a few
2 minutes.
3    MR. DOLTON:  And I'll get you that snippet for
4 that 2:30 to 4:50 or something like that.
5    THE CLERK:  Yeah.  It ended at 23:58.
6    MR. DOLTON:  Okay.
7    All right.  We can do that.
8    THE COURT:  Thank you.  Court is in recess.
9    (Conclusion of proceedings.)
10    -  -  -  o  0  o  -  -  -

207

1 STATE OF IDAHO        )
                        )ss.
2 COUNTY OF PAYETTE     )
3
4    I, LEDA WADDLE, State-certified and licensed
5 transcriber, do hereby certify:
6    That the foregoing transcript is a transcript of a
7 disc made of the proceedings in the matter of State of
8 Idaho vs. David Michael Grant, Payette County
9 Case No. CR-2017-660, before the Honorable
10 Robert Jackson, Magistrate of the Magistrate Division of
11 the District Court of the Third Judicial District of the
12 State of Idaho, in and for the County of Payette; that
13 the foregoing Pages 1 through 207 of this transcript
14 contains as accurate and complete a transcription of said
15 disc as I was able to make.
16    IN WITNESS WHEREOF, I have hereunto set my hand this
17 24th 20th day of April, 2018.
18
19
20    **LEDA WADDLE**
21    _____
      LEDA WADDLE
22    Official Court Reporter
      Idaho CSR License No. 758
23    Transcriber
24
25

**PAYETTE-63**

208

**ROSS D. PITTMAN**
Prosecuting Attorney
1115 1st Avenue North
Payette, ID 83661
(208) 642-6096
(208) 642-6099



FILED
THIRD JUDICIAL DISTRICT COURT
PAYETTE COUNTY, IDAHO

FEB 1 6 2018

BERTA DRESSEN, CLERK
BY_____DEPUTY

IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF

THE STATE OF IDAHO, IN AND FOR THE COUNTY OF PAYETTE

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | CASE NO.:  CR-2017-660 |
| Plaintiff, | ) | |
| | ) | PLEA AGREEMENT |
| v. | ) | |
| | ) | |
| DAVID MICHAEL GRANT, | ) | |
| | ) | |
| Defendant. | ) | |

1.  I, DAVID MICHAEL GRANT, the Defendant in the above referenced matter, have been

informed by my attorney and in open court on this date of my constitutional rights in the

above entitled case, and I have read and fully understand the following:

2.  I understand that this plea agreement reflects the entire agreement reached by the parties

and stipulate to it being made a part of the record in this matter. I FURTHER

UNDERSTAND THAT THE JUDGE IS NOT BOUND BY THE SENTENCING

RECOMMENDATION.

3.  I have received and read a copy of all parts of the Information or Indictment in this matter

and I understand the nature of the charges that have been made against me.  I have

discussed the same with my attorney and I have told my attorney all I know about the

matters referred to in it.

Plea Agreement 1



EXHIBIT
*B*

**PAYETTE-7**

4.  My attorney has explained my constitutional rights, and the punishment that could be imposed by the court upon my plea of guilty.

5.  I understand that if I plead not guilty to any count or counts in the Information or Indictment, the following will occur:

    a.  I would be presumed innocent of the charges against me in such count or counts;

    b.  I would be entitled to a speedy and public jury trial by an impartial jury in which the burden would be upon the State to establish my guilt beyond a reasonable doubt to the satisfaction of all twelve (12) jurors; and

    c.  Upon such trial 1) I would be entitled to remain silent and no inference could be drawn against me because of my silence; 2) I could, if I wished, testify on my own behalf; 3) I would be entitled to confront and cross-examine all witnesses against me; 4) I would be entitled to compulsory process of the court to obtain witnesses and evidence to be offered in my defense.

6.  My decision to plead guilty is made freely and voluntarily.  I have not been induced to plead guilty by any force, coercion, pressure, or fear.

7.  If I am not a naturalized citizen of the United States, the entry of a plea or making of factual admissions could have consequences of deportation, exclusion of admission to the United States, or denial of naturalization.

8.  I understand the following conditions apply to this plea agreement:

    a.  At sentencing, the State is free to discuss the contents of the pre sentence investigation and to facilitate victim impact statements.

Plea Agreement 2

**PAYETTE-8**

b. This State's offer is contingent upon my attending all pre-sentence interviews as scheduled and upon appearing at sentencing as scheduled by the court.  If I fail to appear at any scheduled hearing, the sentencing and/or plea agreement may be withdrawn by the State.

c. The State's offer is contingent upon my not receiving any additional and/or new charges prior to the sentencing on this matter.

d. This offer is contingent upon my having only a prior DUI conviction in Benewah County in 1995 and the criminal history reflected in the State's Response for Discovery.  If I fail to disclose criminal history not reflected in the State's response or if prior criminal convictions are later discovered, the sentencing and/or plea agreement may be withdrawn by the State

9. **I am currently charged under the Criminal Information filed is this action with FLEEING OR ATTEMPTING TO ELUDE A PEACE OFFICER (Felony) and AGGRAVATED ASSULAT (Felony).  I understand that in exchange for my agreement, made herein, to plead guilty to an Amended Criminal Information in the form attached hereto, charging only FLEEING OR ATTEMPTING TO ELUDE A PEACE OFFICER (felony) the Prosecuting Attorney will file that Amended Criminal Information and I will enter a plea of guilty thereto.  I agree that should I fail to enter a plea of guilty to the Amended Criminal Information in the form attached hereto, the Prosecuting Attorney shall be entitled to withdraw the Amended Criminal**

Information with the effect that I would be again subject to the original Criminal Information for all further proceedings in this action.

    a.  **At sentencing, the State will recommend penalties as follows: An aggregate term of confinement of five (5) years, with the first two (2) years fixed and the remaining three (3) years indeterminate, suspended; a five (5) year term of probation; a fine in the amount of $3,000 ($2,000 suspended); and a suspension of driving privileges for 3 years.**

**I am not bound by this sentencing recommendation and may argue for a lesser sentence.**

10.    In exchange for the above terms, I agree as follows:

    a.    To waive my right to appeal this case and subsequent sentence;

    b.    To waive my right to file a motion to reduce or amend my sentence pursuant to Idaho Criminal Rules, Rule 35;  and

    c.    To waive my right to file a motion to withdraw my plea once a plea has been entered.

11. I have discussed all the elements of this plea agreement with my lawyer and he or she has explained every detail of the plea agreement to me to my satisfaction.

12. I am satisfied with my lawyers representation of me in this matter and do not believe he or she is incompetent or apathetic to the outcome of my case.

13. I am not under the influence of any substance, such as a narcotic or alcohol, that would affect my ability to understand the nature and consequences of my action in entering a guilty plea.

Plea Agreement 4

14. I understand that plea negotiations recognize the economic considerations of limited prosecutorial resources. I understand that the State does not punish a citizen for asserting the right to a jury trial, but the State makes concessions as to charging and/or sentencing recommendations in exchange for a swift and certain resolution of a case.

15. Finally, I understand that the Judge is not bound or obligated to follow the sentencing recommendations of the prosecutor when determining what sentence he or she will impose and is free to impose whatever sentence he or she deems just and fit.

Dated this 16TH day of February, 2018.

_David M. Grant_
DAVID MICHAEL GRANT
Defendant

I, Bruce Sherman Bistline, the attorney for the above named defendant, have reviewed the foregoing with and have explained to David Michael Grant the nature of the charges against him, his constitutional rights and the punishment that could be imposed upon his guilty plea.

_Bruce S. Bistline_
Bruce Sherman Bistline
Attorney for Defendant

Offered this 1st day of February, 2018. This offer is open only until 5:00 p.m. on the day of the pre-trial. Acceptance of this offer must be in writing prior to the above deadline.

ROSS D. PITTMAN
PAYETTE COUNTY PROSECUTING ATTORNEY

By: _____
    Ross D. Pittman  Ryan S. Hunter
Dep. Prosecuting Attorney

Plea Agreement 5

**PAYETTE-11**