**MICHAEL J. KANE**
**MICHAEL KANE & ASSOCIATES, PLLC**
4355 West Emerald Street, Suite 190
Post Office Box 2865
Boise, Idaho 83701-2865
Telephone:  (208) 342-4545
Facsimile:  (208) 342-2323
Email:  mkane@ktlaw.net
Idaho State Bar No. 2652

ATTORNEYS FOR PAYETTE CITY DEFENDANTS

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID M. GRANT,         ) | |
| ) | |
| Plaintiff,     ) | |
| ) | Case No. 1:18-cv-00411-CWD |
| vs.     ) | |
| ) | |
| BENJAMIN KEY, in his official and individual ) | OBJECTION TO SUBSTITUTION |
| capacities, CITY OF FRUITLAND, a political ) | OF PARTIES AND PAYETTE CITY |
| subdivision of the State of Idaho, FRUITLAND ) | DEFENDANTS' ALTERNATIVE |
| CITY POLICE DEPARTMENT, a department ) | MOTION FOR STAY OF |
| of the City of Fruitland, J.D. HUFF, in his ) | PROCEEDINGS |
| individual and official capacity, CITY OF ) | |
| PAYETTE, a political subdivision of the State ) | |
| of Idaho, PAYETTE POLICE DEPARTMENT, ) | |
| a department of the City of Payette, BEN ) | |
| BRANHAM, in his individual and official ) | |
| capacity, DUANE HIGLEY, in his individual ) | |
| and official capacity, MARK CLARK, in his ) | |
| individual and official capacity, JOHN or JANE ) | |
| DOES #1-10, whose true identifies are presently ) | |
| unknown, and other Employees of the City of ) | |
| Fruitland, the City of Payette, or Payette ) | |
| County,, ) | |
| ) | |
| Defendants.     ) | |
| ————————————————— ) | |

COME NOW Defendants CITY OF PAYETTE, PAYETTE POLICE DEPARTMENT, BEN BRANHAM, DUANE HIGLEY and MARK CLARK (collectively "Payette City Defendants"), by and through their attorney of record, Michael J. Kane of the firm Michael Kane & Associates, PLLC, and hereby provide the following objection to Plaintiff's *Amended Motion for Substitution of Plaintiff* (Dkt. 39) and said Defendants alternatively move for a stay of proceedings.

## I.

## INTRODUCTION

The tragic death of Mr. Grant has changed the analysis as to the Payette City Defendants. In considering the ramifications of the motion brought by the Mr. Grant's estate, it is to be remembered that the motion is simply one to change parties, not change claims. In other words, while the parties may be different, the estate stands in place of the deceased as to previous acts of the deceased, and previous orders and rulings of the court. See *Brook, Weiner, Sered, Kreger & Weinberg v. Corq, Inc., 53 F3d 851, 852 (7ᵗʰ Cir. 1995).*

Moreover, while the issue of causation of the death is relevant to this court's analysis as to the substitution motion, the discussion should not morph into whether new claims may be brought by way of an amended complaint. As well explained by Judge Curiel in *Estate of Lopez v. Torres,* 105 F. Supp. 3d 1148 (S.D. Cal. 2015) n. 4:

> Wrongful death actions involve claims by relatives of the decedent to recover for their own injuries, caused by the death of their loved one….Survivor actions are based upon the decedent's own individual claims that he would have been entitled to file for his own injuries…Both arise under state law. The difference, essentially, is a question of to whom the damages accrue.

> However, only a survivor action may be brought in a 42 U.S.C. § 1983 action.

> "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Thus, the general rule is that only the person whose Fourth Amendment rights were violated can sue to vindicate those rights. *Smith v. City of*

*Fontana,* 818 F.2d 1411, 1417 (9th Cir.1987). In § 1983 actions, however, the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action. 42 U.S.C. § 1988(a); *Smith,* 818 F.2d at 1416–17.

With that in mind, the central issue before this court is how the current claims against the Payette City Defendants should be viewed in light of the substitution motion. Those claims are 1) excessive force, 2) conspiracy to conceal unlawful conduct and 3) *Monell* liability. No pendant state claims exist. Federal Rule of Civil Procedure 25(a)(1) is written in permissive, not mandatory, terms. By definition, the court has the authority to examine the filings already before it in making its determination as to the Payette City Defendants.

## II.

### STANDARD OF REVIEW

If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. F.R.C.P. 25(a)(1).

Where the alleged constitutional violation under 42 U.S.C. § 1983 ("§ 1983") is the cause of death, a survivor action is allowed to proceed, despite Idaho's lack of a survivor statute. *Van Orden v. Caribou County,* 2011 WL 841438 (D. Idaho 2011)*, citing Brazier v. Cherry,* 293 F.2d 401 (5th Cir.1961); *Bell v. Milwaukee,* 746 F.2d 1205 (7th Cir.1984); *Berry v. City of Muskogee,* 900 F.2d 1489, 1501 (10th Cir.1990).

If the death is not caused by the constitutional violation, the application of state law abating an action upon the death of the plaintiff does not conflict with the policies underlying the civil rights action. *Community House, Inc. v. City of Boise,* 2012 WL 3686001 (D. Idaho 2012).

## III.

## ARGUMENT

A.     **Substitution should not be allowed as to the Excessive Force Claim against Payette City Defendants.**

One of the more frustrating aspects of this case is the Plaintiff's counsel lumping together several officers from two jurisdictions into a generalized complaint of "excessive, lethal force." This, despite the fact that the Payette City Defendants did not discharge their firearms during a rapidly unfolding event in which Mr. Grant was acting in a transparently irrational and dangerous manner, including a high speed attempt to elude, driving the wrong way on a freeway on ramp, and ignoring officer's commands.  For this reason, the Payette City Defendants filed a motion for summary judgment with this court on April 18, 2019, which motion was accompanied by affidavits demonstrating unequivocally that no Payette officer fired his weapon, and accompanied by a preliminary hearing transcript in which the event was described in detail.  Yet Plaintiff's counsel still insists upon speaking in the collective in the most current pleadings, asserting that the various defendants should not be insulated from injuries "they" caused. Plaintiff's Amended Memorandum (Dkt.39-1, p.2).

As the crucial question before this court is whether the Payette City officers caused the death, something more than generalities should be required from the estate.  This court has the authority to take judicial notice of the pleadings in its own file.   F.R.E. 201; *United States v. Author Services,* 804 F.2d 1520, 1523 (9th Cir.1986).  The various documents filed in support of the motion for summary judgment demonstrate unequivocally that the officers did not fire, let alone shoot and injure Mr. Grant.  The authorities and arguments cited in the pleadings will not be repeated here, but it should also be pointed out that alleging presence at a scene of a police shooting is not enough to maintain a § 1983 claim.  *Chuman v. Wright,* 76 F.3d 292, 294–95 (9th

Cir.1996) (An officer who was a "mere bystander" or who simply was part a "team" that collectively caused the constitutional violation is not on that basis alone considered fundamentally involved).  There is nothing in the complaint or other pleadings before the court so much as hypothesizing planning, invitation, encouragement, supervision or anything else that might lead the court to believe the Payette officers did anything except attempt to arrest a dangerous subject.

Following the logic of *Van Orden* and *Community House*, this court should deny the motion to substitute as to the excessive force count, since no action was taken by these officers that could remotely be described as a constitutional violation of excessive force causing the death of Mr. Grant.

        **B.**       **Substitution should not be allowed as to the Conspiracy Count.**

Mr. Grant's second count is based upon a purported conspiracy to cover up the truth regarding the facts of the shooting.  The conspiracy theory was arrived at by comparing police reports to videos or preliminary hearing testimony, and the discovery of purported inconsistencies. Mr. Grant asserted that this conspiracy led to a prosecution for a crime he did not commit, and that it compromised his civil claim.  The damages alleged are either emotional or reputational.  Citing *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984), in its recent memorandum in support of substitution, the estate now seems to assert a violation of the constitutional right of access to courts.

As discussed in *Estate of Victorianne v. County of San Diego*, 2016 WL 411292 (S.D. Cal 2016), obstructing access to the courts is a constitutional violation.  Therein, the *Bell* case was briefly mentioned as standing for the proposition "conspiracy to cover up a killing, thereby obstructing legitimate efforts to vindicate the killing through judicial redress, interferes with the

due process right of access to courts....This constitutional right is lost where...police officials shield from the public and the victim's family key facts which would form the basis of the family's claims for redress." Here, of course, there was no killing for an estate to vindicate, and nothing stood in the way of Mr. Grant pursuing his civil claim in the courts.

As pointed out in the Payette City's motion for summary judgement, Mr. Grant's claim of damages for having to attend a preliminary hearing are unavailing. The witnesses are entitled to absolute testimonial immunity, and Mr. Grant agreed to a plea bargain in which he agreed to plead guilty to one felony (eluding) while the other felony (aggravated assault) would be dismissed. While attending one's own preliminary hearing is not a pleasant experience, one cannot make out a claim of denial of access to the courts. After all, Mr. Grant admitted to one of the felonies for which he was bound over to the district court. There is no right to a certain kind of criminal investigation or prosecution. *Burns v. City of Concord*, 2014 WL 5794629 (N.D. Cal 2014), citing *Flores v. Satz,* 137 F.3d 1276, 1278 (11th Cir. 1998) ("That the prosecution did not investigate properly or prosecute expeditiously the charges against him does not violate clearly established constitutional rights.").

Having said all that, the critical point missing from the estate's analysis is that there is simply no way for it to assert that the purported conspiracy caused Mr. Grant's death. Nor can the estate argue that it has the right to recover for emotional or reputational injuries given the *Community House* decision. Simply put, there is no basis for substitution as to the conspiracy count.

### C.    There is no basis for substitution as to *Monell* liability.

*Monell* liability is based upon the notion that a municipality, through policy or practice, caused the constitutional violation. As pointed out in prior briefing in support of summary

judgment, if there is no constitutional violation to be pursued, there can be no municipal liability. Given the *Community House, supra,* ruling, if no Payette City practice or policy caused the death of Plaintiff, substitution should not be allowed.  Hence, this court's decision as to the viability of a *Monell* claim will necessarily follow the decisions made as to the underlying personal liability counts.

        **D.**      <u>**In the alternative, the court should stay ruling on the substitution pending discovery and further briefing.**</u>

Given the three year gap between the shooting and the death of Mr. Grant, the issue of causation is very much in play.  Given the ramifications of this court's finding regarding causation, something more than intuition should be required.  From the limited information supplied to the court by the estate, it appears that the substitution motion is based upon the Canyon county coroner's death certificate and nothing more.  The certificate notes that Mr. Grant was cremated, and that no autopsy was performed.  The immediate cause of death is listed as sepsis.  Yet, the coroner apparently assumed that the sepsis was caused by injuries associated with the shooting three years earlier, essentially calling the death a homicide.  Given that the motion for substitution was not accompanied by a certification of the cause of death by a physician, and that there was no referral by the coroner to law enforcement for an investigation (seemingly required under Idaho Code § 19-4301), and given that there was no coroner's inquest, such a finding is seriously suspect.

The question before the court as to causation is not whether Mr. Grant's original injuries were caused by a police officer.  The question is whether the death from sepsis was caused by the police officer.  In other words, was the shooting in this case both the actual cause and the proximate cause of the death by sepsis?  In discussing this question, Idaho law is to be considered. *Cf.   Pate v. Columbia Machine, Co.*, 930 F. Supp. 451 (D. Idaho 1996).

> The breach of duty to be actionable must be the proximate cause of the injury complained of, that is, the cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the result, and without which the result would not have occurred. …It may be stated as a general rule that negligence which merely furnishes the condition or occasion upon which injuries are received, but does not put in motion the agency by which the injuries are inflicted is not the proximate cause thereof.

*Chatterton v. Pocatello Post*, 70 Idaho 480, 484, 223 P.2d 389, 391 (1950).

> A defendant is not liable to a plaintiff for injury suffered by the plaintiff unless there is some reasonable connection between the act of the defendant and the injury. The defendant's act may be both potentially harmful and illegal, but the plaintiff cannot recover unless the injury was the result of the act.
>
> 'This connection is usually dealt with by the courts in terms of what is called 'proximate cause,' or 'legal cause.' There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion.

*Food Machinery and Chemical Corp. v. Meader*, 294 F.2d. 377 (9th Cir. 1961), citing Prosser, Law of Torts (2d ed. 1955) 218.  See also *Van Ort v. Estate of Stanewich*, 92 F.3d 831 (9th Cir. 1996) (Traditional tort law defines intervening causes that break the chain of proximate causation. This analysis applies in section 1983 actions), and *Springer v. Seaman,* 821 F.2d 871, (1st Cir.1987) (although "the question of proximate causation [in a section 1983 action] is sometimes for the court and sometimes for the jury," the court decides whether reasonable disagreement on the issue is tenable).

Without belaboring the point, it is submitted that in the unique circumstances of this case more should be required of the estate than the production of a death certificate from a coroner. All that is known at this point is that the coroner concluded the death occurred from sepsis, presumably from a bladder infection.  A tantalizing clue about how this sepsis may have occurred is found in the deposition of Mr. Grant, wherein he described going into septic shock in 2018 when "they [presumably his caregivers] didn't get my catheter right back into the bladder, and I pretty much went to the hospital so they could put the catheter in the bladder."  See excerpt

from Mr. Grant's deposition (page 38) attached as Exhibit A.  Was a presumptive failure of Mr. Grant's caregivers some three years after the shooting a foreseeable event at the time of the shooting?  The court may so decide, but should do so only after examination of the factual record, which has yet to be developed.  The question of causation has been described as "intensely factual."  *Akey v. Placer County*, 2019 WL 290617 (E.D. Cal. 2019).  The court, as gatekeeper of the litigation, should allow the facts to be determined prior to allowing substitution of parties based upon purported excessive force causing Mr. Grant's death.

IV.

**CONCLUSION**

No Payette City Defendant fired a weapon on the fateful night in question.  As is demonstrated in previous motion practice, the allegation of excessive force was improvidently set forth.  If the Payette City Defendants did not use force at all, let alone excessive force, they cannot be said to have caused the death through a constitutional violation.  Recognizing that the court has yet to rule on the motion for summary judgment, there is no reason for the court to not take notice of the affidavits, and it should require from the estate an explanation regarding why the Payette City Defendants should remain in the lawsuit on a theory that they caused Mr. Grant's death.

Even if an argument can be made as to some theory of excessive force, there is no responsible way for the estate to suggest the purported conspiracy to testify a certain way caused the death.  It is axiomatic that this portion of the complaint cannot be continued by the estate.

If the court concludes that it cannot at this time give the Payette City Defendants repose by denying substitution based upon the current record, then the actual events leading to Mr. Grant's death should be explored prior to ruling on the substitution motion.  Plaintiff's counsel is

in possession of Payette's Discovery Request that has asked for production of all medical files of

Mr. Grant.  At a minimum such files should be produced so that an informed determination can

be made as to the actual cause of death, and the potential parties involved may be identified and

deposed.  Once the facts are before the court, the court will have the ability to engage in

informed decision making on the substitution motion.

DATED this 6th day of December, 2019.

MICHAEL KANE & ASSOCIATES, PLLC

BY:  ____/s/ *Michael J. Kane*_____.
               Attorneys for Payette City Defendants

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the 6th day of December, 2019, I electronically filed the foregoing document with the U.S. District Court.  Notice will automatically be electronically mailed to the following individuals who are registered with the U.S. District Court's CM/ECF System for this action:

- **Jason R. N. Monteleone**
  jason@treasurevalleylawyers.com; lejla@treasurevalleylawyers.com; sam@treasurevalleylawyers.com; cara@treasurevalleylawyers.com; bruce@treasurevalleylawyers.com; kcnovick@treasurevalleylawyers.com

- **Michael J. Elia, Steve R. Kraft**
  mje@melawfirm.net; amber@melawfirm.net; shawna@melawfirm.net; steve@melawfirm.net; krista@melawfirm.net

- **Michael J. Kane**
  mkane@ktlaw.net, tpresler@ktlaw.net

_____/s/ *Michael J. Kane*_____

David Grant                                                    June 27, 2019

**Page 38**

1  was really limited. I can work my hands, and
2  that's fine. I work my arms. But I can't lean
3  over the chair for any kind of strength.
4      Q. I follow that.
5          How many times since you've been living
6  here have you had to go to the hospital to stay?
7      A. Just once.
8      Q. When was that?
9      A. November of 2018.
10     Q. And why did you have to go?
11     A. I went in the septic -- septic shock.
12  It was something --
13         They didn't get my catheter right back
14  into the bladder, and I pretty much went to the
15  hospital so they could put the catheter in the
16  bladder.
17     Q. How long were you there?
18     A. Two days.
19     Q. Aside from here and the hospital, have
20  you stayed the night anywhere else since this
21  incident?
22     A. No.
23     Q. Since you got here?
24     A. Right. Since I have gotten here, I
25  haven't stayed out of this facility once other than

**Page 39**

1  the two nights in the hospital.
2      Q. I'm going to take you from before the
3  incident, talk about some mental health issues that
4  you had.
5          When were you first diagnosed as
6  bipolar?
7      A. 1998.
8      Q. Where were you living at the time?
9      A. I was living in Saint Maries.
10     Q. How did that diagnosis come about?
11     A. I ended up in the Orofino -- I guess
12  under the care of Orofino, the State of Idaho.
13  They -- the doctors diagnosed me with it in
14  Orofino.
15     Q. Was there an incident that was attached
16  to you being hospitalized at North Idaho?
17     A. Yeah, but I don't recall exactly what it
18  was.
19     Q. Since 1998, have you been treated for
20  bipolar disease?
21     A. Yes.
22     Q. I'm probably saying that wrong, but --
23     A. Well --
24     Q. What do you call it?
25     A. I just call it bipolar. I didn't know

**Page 40**

1  it was a disease, but --
2      Q. I'm not sure it is. I think there's a
3  different word for it.
4      MR. MONTELEONE: Disorder.
5      MR. ELIA: Disorder. Thank you.
6          Let's go off the record for a second.
7      (Discussion held off the record.)
8      Q. (BY MR. ELIA) Mr. Grant, when did you
9  first receive a diagnosis for schizophrenia?
10     A. It was 2016.
11     Q. How long before this incident?
12     A. Just months prior. It was --
13         I got out in June of 2016.
14     Q. And are you saying you got out of the
15  State hospital at Orofino?
16     A. The State hospital.
17     Q. Okay. Tell me about that.
18         How long had you been at the State
19  hospital in Orofino?
20     A. I was there from February 23rd until
21  June 21st.
22     Q. All in 2016?
23     A. 2016.
24     Q. And what circumstances led you to be
25  hospitalized there?

**Page 41**

1      A. I did something stupid, I think.
2      Q. Do you remember?
3      A. Not exactly, no. It's just --
4          The cops were called on me and they took
5  me to -- they took me to the North Idaho Behavioral
6  Health, and from there, they took me to Orofino.
7      Q. And I don't know if this will mean
8  anything to you.
9          Were you there on a voluntary hold or an
10  involuntary?
11     A. It was involuntary.
12     Q. You didn't have a choice?
13     A. Right.
14     Q. As you sit here today, do you have a
15  memory of the treatment you received while you were
16  at North Idaho in 2016, just in general?
17     A. In general, yeah.
18     Q. What type of treatment?
19     A. It was -- to get me out was the main
20  goal, was to get my memory functioning and the
21  medicine. They were looking to find a medicine
22  that would work better or longer or --
23         I don't know.
24     Q. Is it during that hospitalization in
25  2016 that you received the diagnosis of

Associated Reporting & V
(208) 343-4004

EXHIBIT
A

38 to 41